# 13-1589-cv(L)

## 13-1779-cv(XAP), 13-1791-cv(XAP)

## United States Court of Appeals

for the

## Second Circuit

➤➤◄◄

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

*Plaintiff-Appellant-Cross-Appellee,*

*-Against –*

NEUBERGER BERMAN, LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, PETER P. TRAPP, AND NEUBERGER BERMAN EQUITY FUNDS D/B/A NEUBERGER BERMAN INTERNATIONAL FUND,

*Defendant-Appellees-Cross-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANT BENJAMIN M. GAMORAN

HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP
Paul J. Hanly, Jr.
112 Madison Avenue
New York, New York 10016-7416
(212) 784-6401

*Attorneys for Plaintiff-Appellant-Cross-Appellee*

## FRAP 26.1 DISCLOSURE STATEMENT

Appellant is a natural person.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ....................................................................................iv

PRELIMINARY STATEMENT ...............................................................................1

JURISDICTION ..........................................................................................................1

ISSUES PRESENTED .................................................................................................1

STANDARD OF REVIEW .........................................................................................2

STATEMENT OF THE CASE ...................................................................................3

SUMMARY OF ARGUMENT ...................................................................................5

STATEMENT OF FACTS ..........................................................................................8

    The Parties ............................................................................................8

    The Illegal Gambling Businesses .........................................................8

    Defendants' Knowing Investments in the Illegal Gambling Businesses .......9

    The Law Enforcement Crackdown ......................................................10

    The Losses Suffered ............................................................................11

    Defendants Violated the Gambling Act ..............................................11

    Defendants Breached Their Common Law Duties...............................12

    Defendants Violated RICO ..................................................................13

    Prior Proceedings ................................................................................15

    Defendants Assured Judge Sand They Would Execute Appropriate Tolling Agreements ............................................................................16

    The Board Abdicated Any Authority to Refuse Appellant's Demand..........17

    The Board Failed to Act in Good Faith ...............................................19

The Board Failed to Exercise Due Care ......................................21

The Board Lacked Independence .............................................22

The Decisions Below ..............................................................23

LEGAL STANDARDS ......................................................................25

ARGUMENT ................................................................................26

I.      DEFENDANTS VIOLATED THE GAMBLING ACT................................26

II.     APPELLANT NEVER WAIVED THE RIGHT TO CHALLENGE THE INDEPENDENCE
        OF THE BOARD'S DECISION ..............................................29

III.    THE DISTRICT COURT ERRED IN REJECTING THE SUFFICIENCY OF THE
        APPELLANT'S ALLEGATIONS THAT THE BOARD LACKED INDEPENDENCE,
        FAILED TO ACT IN GOOD FAITH, AND FAILED TO EXERCISE DUE CARE .........32

        A.      The District Court Erred in Disregarding Appellant's Allegations
                of Lack of Good Faith Concerning the Board's Attempts to Cause
                the Forfeiture of His Claims ..............................................33

        B.      The District Court Erred in Rejecting the Sufficiency of the
                Complaint's Other Allegations that the Board Failed to Act in
                Good Faith, Lacked Independence, and Failed to Exercise Due
                Care....................................................................35

                1.      Because the Board Failed to Give Final Decision-Making
                        Authority to the SLC, the Non-Binding Recommendation of
                        the SLC Is Immaterial ..............................................38

                2.      The Board Was Interested as a Matter of Law .........................40

                3.      The Board Has Conceded Its Lack of Independence as a
                        Matter of Law by Appointing an SLC ......................................42

                4.      The Board and All Members of the SLC Also Have Other
                        Irreconcilable Conflicts of Interest ...........................................42

                5.      The Complaint Alleges Facts That Raise a Reasonable
                        Doubt as to the SLC's Independence........................................44

                6.      The SLC Process Was Not Transparent ....................................47

ii

7.      The SLC Did Not Meet Established Requirements for Conducting an Investigation Reasonably and With Due Care ........................................................................................49

IV.    THE BOARD ABDICATED ANY AUTHORITY TO REFUSE APPELLANT'S DEMAND AND THEREFORE CANNOT TERMINATE THIS LITIGATION ..............................49

CONCLUSION ............................................................................................52

CERTIFICATE OF COMPLIANCE ..................................................................53

# TABLE OF AUTHORITIES

*Page*

## Cases

*Abbey v. Computer & Commc'n Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983) ................................................................................42

*Alford v. Shaw*, 349 S.E.2d 41 (N.C. 1986) .............................................36

*Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338 (2d Cir. 2006)...........46

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) ...........................................36

*Boland v. Boland*, 31 A.3d 529 (Md. 2011) ......................................... 32, 36, 38, 41

*Booth Family Trust v. Jeffries*, 640 F.3d 134 (6th Cir. 2011) ................................36

*Boyle v. United States*, 556 U.S. 938 (2009) ...........................................28

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)................................25

*Cheek v. United States*, 498 U.S. 192 (1990) ...........................................27

*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003)................................................................................27

*Daily Income Fund, Inc. v. Fox,* 464 U.S. 523 (1984) ..................................... 37, 47

*Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006) .......................................26

*Gamoran v. Neuberger Berman Mgmt*., LLC, 10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696 (S.D.N.Y. Nov. 8, 2010), *adhered to on reconsideration*, 2011 U.S. Dist. LEXIS 17939 (S.D.N.Y. Feb. 9, 2011)...........16

*Grimes v. McDonald*, 673 A.2d 1207 (Del. 1996) ......................................... passim

*Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372 (6th Cir. 1984) ...........................44

*Hirsch v. Jones Intercable, Inc.* 984 P.2d 629 (Colo. 1999) ..................................40

*Hollander v. Copacabana Nightclub*, 624 F.3d 30 (2d Cir. 2010)...........................2

*Houle v. Low*, 556 N.E.2d 51 (Mass. 1990)............................................44

iv

*Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310 (2d Cir. 2011) ............................14

*In re Am. Intern. Group, Inc.*, 965 A2d 763 (Del. Ch . 2009), *aff'd*, 11 A.3d 228 (2011)........................................................................................... 50, 52

*In re InfoUSA, Inc. S'holders Litig.*, 2008 WL 762482 (Del. Ch. 2008) ...............16

*In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973) .....................41

*In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003).............. 40, 41

*In re Par Pharm., Inc., Derivative Litig.*, 750 F. Supp. 641 (S.D.N.Y. 1990)................................................................................................... 39, 41

*In re Take-Two Interactive Software, Inc. Derivative Litig.*, 2007 WL 1875660 (S.D.N.Y. 2007)..................................................................................16

*Janssen v. Best & Flanagan*, 662 N.W.2d 876 (Minn. 2003) ................................40

*Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 130 S. Ct. 1418 (2010) .............. 37, 47

*Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726 (Del. 1988)...................52

*La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013)8, 12, 30, 32

*Lambrecht v. O'Neal*, 504 F. App'x 23, 27 (2d Cir. 2012) .....................................32

*Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985).......................................................36

*McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130 S. Ct. 3411 (2010)............................13

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001)...............46

*Peller v. S. Co.*, 707 F. Supp. 525 (N.D. Ga. 1988), *aff'd* 911 F.2d 1532 (11th Cir. 1990) .................................................................................................49

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999)...................................................................................9

*Perrin v. United States*, 444 U.S. 37 (1979)...........................................................27

*Pinkerton v. United States*, 328 U.S. 640 (1946)......................................................12

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................27

*Sanabria v. United States*, 437 U.S. 54 (1978)........................................................28

*Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70 (Del. 1997), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (2000)................................................................................................. 30, 32

*Seidl v. Am. Century Companies, Inc.*, 10-4152-CV-W-SOW, 2012 WL 7986873 (W.D. Mo. Oct. 31, 2012) ....................................................30

*Seidl v. Am. Century Cos., Inc.*, 10-4152-CV-W-SOW, 2012 WL 7986873 (W.D. Mo. Oct. 31, 2012) ..................................................................7

*Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx. 35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011).........................................................14

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990)............................................. 40, 52

*Staehr v. The Hartford Financial Services Group Inc.*, 547 F.3d 406 (2d Cir. 2008).................................................................................................25

*Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155 (1st Cir. 2013) ......................3

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ...........................................27

*United States v. BetOnSports Plc*, 2006 WL 3257797 (E.D. Mo. Nov. 9, 2006)...................................................................................................12

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001)..................................................9

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)..................................................9

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ...........................................27

*Walker v. Schult*, 12-1806-CV, 2013 WL 2249159 (2d Cir. May 23, 2013) ..........26

*Weems v. United States*, 217 U.S. 349 (1910) .........................................................29

*Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981) ..........................................39

**Statutes and Rules**

18 U.S.C § 1955(a) ........................................................................ 4, 12

18 U.S.C. § 1955(b) ...........................................................................4

18 U.S.C. § 1961(1)(B) .....................................................................13

18 U.S.C. § 1962(c) ..........................................................................13

18 U.S.C. § 2 .....................................................................................12

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1332 .................................................................................1

Fed. R. Civ. P. 12(b)(6) ................................................................. 2, 25

Fed. R. Civ. P. 15(c)(1)(B) ...............................................................20

Illegal Gambling Business Act of 1970, 18 U.S.C. § 1955 .....................2

Investment Companies Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* ...........37

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961
    *et seq.* ..........................................................................................4

Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361
    *et seq.* ........................................................................................11

**Other Authorities**

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*,
    Congressional Research Service (Updated February 27, 2006) ...........12

K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26,
    2005 ..............................................................................................10

## PRELIMINARY STATEMENT

Plaintiff-Appellant Benjamin M. Gamoran ("Appellant"), a mutual fund investor, appeals from a final judgment of the United States District Court for the Southern District of New York (Griesa, *J.*) entered April 1, 2013, dismissing his derivative complaint seeking to recover losses suffered as a result of Defendants' illegal investments in illegal gambling businesses (the "Judgment"). (SPA- 27) The Judgment is based on an Opinion and Order dated March 29, 2013 ("March 2013 Opinion") (SPA-14) and, to a lesser extent, an Opinion and Order dated June 12, 2012 ("June 2012 Opinion") (SPA-1). Neither opinion is officially reported; both are available on Westlaw. 2013 WL 1286133; 2012 WL 2148217.

Appellees cross-appeal seeking review of the same Judgment.

## JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).

This Court has appellate jurisdiction under 28 U.S.C. § 1291 (final decision).

The Judgment was entered on April 1, 2013. Appellant timely filed his notice of appeal on April 23, 2013. (A-21)

## ISSUES PRESENTED

1.    Whether the district court erred in ruling that owning the stock of "illegal gambling businesses" that generated virtually all of their revenue from criminal activity in the United States does not violate the Illegal Gambling

Business Act of 1970, 18 U.S.C. § 1955 (the "Gambling Act"), which makes it unlawful to "own[] all or part of an illegal gambling business."

2.    Whether the district court erred in refusing to accept as true the well-pleaded allegations in Appellant's complaint that the Board of Trustees (the "Board") of the mutual fund (the "Fund") on whose behalf Appellant sues had failed to act in good faith by, among other things, (a) making misleading representations to two federal courts; (b) attempting to engineer the forfeiture of Appellant's claims on statute of limitations grounds; and (c) failing to enter into effective tolling agreements in violation of assurances they had given to a federal court, all for the purpose of improperly insulating Defendants' wrongful conduct from judicial scrutiny.

3.    Whether the district court erred in disregarding the allegations in the complaint that the Fund's Board lacked independence and failed to act in good faith and with due care because the court believed Appellant was precluded from contesting the Board's independence.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 32 (2d Cir. 2010); *Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan*

*v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 163 (1st Cir. 2013) (derivative complaint).

STATEMENT OF THE CASE

This is a case about investing in criminal enterprises. The essence of any investment is the right to participate in the profits of the enterprise. If the core activity of the enterprise is known by the investor to be illegal, an investment in that enterprise is an attempt to profit from criminal activity. Appellant's case is based on the simple premise that it is wrongful for professional asset managers in the U.S. to purchase stock in foreign companies whose primary business they know violates U.S. criminal law.

Defendants are mutual fund fiduciaries who squandered investors' money by knowingly investing in illegal Internet gambling businesses. Defendants made the investments despite explicit warnings by the Department of Justice ("DOJ") – prominently disclosed in the prospectus of one of the gambling companies – that the primary purpose of the gambling companies was to violate federal and state criminal laws and that law enforcement authorities in the U.S. considered them to be criminal organizations. The successful prosecutions of one of the gambling

companies and its executives have led to the criminal forfeiture of $236 million in criminal proceeds and the sentencing of its executives to significant prison time.[1]

Defendants' conduct was wrongful not only because it violated the fundamental common law principle that one party may not knowingly seek to profit from the wrongdoing of another, but also because that principle is embodied in the Gambling Act, which makes it a felony to "own[] all or part of an illegal gambling business." 18 U.S.C § 1955(a).

The entities in which Defendants invested were "illegal gambling businesses" as defined in the Gambling Act. 18 U.S.C. § 1955(b). By causing the mutual fund they managed to "own" "any part" of those businesses, Defendants violated – and caused the Fund to violate – the Gambling Act. By causing the Fund to violate the Gambling Act *repeatedly*, Defendants conducted the affairs of fund through a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO").

The mutual fund and its innocent investors suffered tens of millions of dollars of losses as a direct result of Defendants' illegal investments. Following a law enforcement crackdown by federal and state law enforcement, the share prices of the gambling companies lost most of their value.

---

[1] *See, e.g., United States v. Lefebvre*, 1:07-cr-00059-ua (Castel) (S.D.N.Y.).

In this derivative action for negligence, breach of fiduciary duty, breach of contract, waste, and racketeering, Plaintiff seeks recovery on behalf of the Fund for the benefit of its shareholders.

## SUMMARY OF ARGUMENT

Defendants caused the Fund to violate the Gambling Act, which makes it a felony to "own[] all or part" of an "illegal gambling business." Defendants knowingly invested over $43 million in businesses they knew were illegal gambling businesses whose principal operations and purpose were to violate U.S. federal and state criminal statutes. Defendants' wrongful *and* criminal conduct will support common law claims for negligence, breach of fiduciary duty, waste, and breach of contract. The district court erred by failing to enforce the plain language of the Gambling Act and holding that investing in illegal gambling businesses is not unlawful.

Appellant demanded that the Board recover the losses suffered by the Fund's investors caused by the unlawful investments in criminal organizations. The Board abdicated its authority to decide Appellant's demand by failing to respond to the demand for over six months in an effort to cause the statute of limitations to expire. The Board was fully informed about the statute of limitations concerns, and its Trustee members had even reassured a federal court that they would take appropriate action to prevent forfeiture. After Appellant filed this action (the day

the statute of limitations would otherwise have expired), the Board belatedly attempted to terminate the action by purporting to refuse Appellant's demand. The Board's refusal was ineffective because the Board had already abdicated any authority to terminate the litigation by attempting to sabotage Appellant's claims. Under Delaware law, the Board's inability or unwillingness to make an effective decision with respect to a demand waives the ability to refuse the demand and terminate litigation.

Even if the Board had not lost its authority to decide Appellant's demand, its refusal of Appellant's demand is not protected by the business judgment rule, because it was made without the independence, good faith, and due care required under Delaware law.

The allegations of the amended complaint, and the reasonable inferences therefrom, indicate that the Board of Trustees failed to act in good faith and failed to act independently and with due care by (i) making misleading representations to two federal courts; (ii) attempting to engineer the forfeiture of Appellant's claims on statute of limitations grounds so that the Defendants' illegal conduct would be insulated from judicial scrutiny; (iii) failing to enter into effective tolling agreements in violation of assurances they had given to the court; and (iv) conducting its purported investigation without the independence, good faith, and due care required under Delaware law.

6

The district court erred in refusing to credit Appellant's well-pled allegations concerning the Board's lack of independence and failure to act in good faith and with due care. The court also refused to draw reasonable inferences from the complaint's factual allegations. Instead, the district court resolved the parties' factual dispute by crediting Defendants' averments and dismissing the complaint. This was error because Appellant's allegations were more than sufficient to survive a motion to dismiss. *See Seidl v. Am. Century Cos., Inc*., 10-4152-CV-W-SOW, 2012 WL 7986873 (W.D. Mo. Oct. 31, 2012) (denying motion to dismiss a derivative complaint in a substantially similar case). On a motion addressed to the sufficiency of the pleadings, the district court should have accepted the truth of Appellant's well-supported allegations.

The district court also ignored the complaint's allegations concerning the Board's lack of independence based on its erroneous view that Appellant was precluded from contesting the Board's independence by making a demand on the Board. Under Delaware law, Appellant is not barred from contesting the Board's independence in *refusing* his litigation demand by reason of his having made the demand. *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 333 & n. 12 (Del. Ch. 2012) (by making a demand, a plaintiff is *only* precluded from contesting whether a demand is *futile*, and not whether a board is independent for demand

7

*refusal* purposes), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013); *Grimes v. Donald*, 673 A.2 1207 (Del. 1996).

The Board was clearly not independent, because, among other reasons, over two thirds of the Board members were proposed defendants. They conceded their lack of independence by appointing a Special Litigation Committee ("SLC") to investigate Appellant's demand.

The SLC did not satisfy the requirements of Delaware law. The SLC was not given final decision-making authority; that authority was expressly reserved to, and exercised by, the non-independent and conflicted Board. Furthermore, the members of the SLC were insiders who failed to meet the test of independence.

## STATEMENT OF FACTS

### The Parties

Appellant is a shareholder in Neuberger Berman Equity Funds (the "Fund"). The institutional defendants – Neuberger Berman, LLC ("NB") and Neuberger Berman Management LLC ("NBM") – are fiduciaries who manage the Fund. The individual defendants are managers, officers, or trustees of the institutional defendants involved in the wrongdoing. (A-343-45)

### The Illegal Gambling Businesses

NETeller and 888 were illegal Internet gambling businesses that earned up to 90% of their revenues from gamblers in the U.S. in violation of U.S. anti-gambling laws. (A-346-49; *see also* A-320-23) 888 was located in Gibraltar, and

NETeller was located in the Isle of Man. (A-346-47) The illegal gambling businesses sought to evade the reach of U.S. law enforcement by not listing their shares to be traded on any U.S. exchange. (A-348, at ¶ 41) Instead, their shares only traded on a foreign stock exchange. (A-346-47)

**Defendants' Knowing Investments in the Illegal Gambling Businesses**

Beginning in 2005, Defendants caused the Fund to buy approximately $25.4 million in NETeller stock and approximately $18.5 million in 888 stock. (A-351-52) At that time, it was well-established that Internet gambling businesses located outside the U.S. violated numerous federal and state criminal laws when they took wagers from U.S. gamblers. (A-355-60; *see, e.g., United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (affirming a 2003 conviction); *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *People ex rel. Vacco v. World Interactive Gaming Corp*., 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999)). As early as 2003, the DOJ had issued public warnings that Internet gambling companies that take wagers from gamblers in the U.S. were criminal organizations under the Gambling Act – and cautioned the public that supporting them *was itself a crime*. (A-357)

The DOJ's enforcement efforts were not limited to those who conducted the illegal gambling. It also included actions against those who supported illegal Internet gambling or otherwise sought to profit from it. For example, in 2003 the DOJ brought suit against PayPal for processing transactions for an illegal Internet

9

gambling business. PayPal had to pay $10 million in penalties. (A-357) Similarly, in April 2004, the DOJ seized over $6 million from Discovery Communications merely for broadcasting commercials from the illegal gambling companies. (*Id.*) Defendants' attempts to profit from illegal gambling as its "owners" were much more egregious.

NETeller warned investors in its 2004 prospectus that the DOJ considered its principal operations to violate various criminal statutes in the U.S. (A-348) Similarly, 888 warned investors in 2005 that it was "exposed to legal and regulatory risks" due to the revenue it received from gamblers in the U.S. (A-347)

At the time, illegal gambling businesses made no secret of their illegality. In 2005, for example, *The New York Times* reported that, for one of the largest Internet gambling companies, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan." K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26, 2005 (www.nytimes.com/2005/06/26/business/yourmoney/26poker.html    (as    viewed June 8, 2013)).

**The Law Enforcement Crackdown**

A law enforcement crackdown launched by the DOJ in 2006 led to the arrests and prosecution of NETeller's founders. They pleaded guilty to gambling offenses – including the Gambling Act – and agreed to forfeit $100 million in

10

criminal proceeds. In addition, NETeller agreed to forfeit $136 million in criminal proceeds and admitted that its principal business violated federal law, including the Gambling Act. (A-348; A-320-23) Other illegal gambling businesses were also successfully prosecuted under the Gambling Act. (A-358-60) As part of the crackdown, Congress enacted the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.*, which made it more difficult for illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities. (A-359)

**The Losses Suffered**

Defendants' efforts to boost their returns by seeking to profit from criminal wrongdoing proved disastrous for the Fund and its investors. The value of the illegal gambling businesses plummeted after law enforcement began arresting the principals of such entities and taking other actions to choke off their primary source of revenue. (A-340) The stock that Defendants purchased on behalf of the Fund lost all of the value attributable to the companies' illegal revenue. (A-360-61)

**Defendants Violated the Gambling Act**

Appellant's amended complaint ("Complaint") alleges that by knowingly causing the Fund to "own" a "part" of an "illegal gambling business," Defendants

11

caused the Fund to violate § 1955(a) of the Gambling Act.[2] The Complaint further alleges that because Defendants aided and abetted the Fund's violation of § 1955(a) and conspired to do so, they are individually liable as aiders and abettors and co-conspirators. *See* 18 U.S.C. § 2 (aiding and abetting); *Pinkerton v. United States*, 328 U.S. 640 (1946). (conspiracy).

**Defendants Breached Their Common Law Duties**

The Complaint states common law claims for breach of fiduciary duty, negligence, breach of contract, and waste. (A-371-72) These claims are premised in part on the fundamental common law principle that it is wrongful for a party knowingly to seek to profit from the wrongful conduct of another. Moreover, because Defendants' investments also violated the Gambling Act, Defendants are liable on a theory of negligence *per se*, and have committed *per se* breaches of fiduciary duty. This is because it is *per se* misconduct to cause a Delaware entity to seek to profit from unlawful businesses through unlawful acts. *See La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013) ("Delaware law does not charter

---

[2] "Illegality" under the Gambling Act is based on state law. The gambling companies in which Defendants invested violated the laws of virtually all fifty states. *See United States v. BetOnSports Plc*, 2006 WL 3257797, at *2 (E.D. Mo. Nov. 9, 2006); C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Ex. A.

law breakers.... Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'") (Internal citations omitted.)

The illegal investments also support Appellant's breach of contract claim, because the investment advisor defendants failed to manage the Fund's investments "in accordance with applicable law" in violation of their agreements. (A-373)

**Defendants Violated RICO**

By causing the Fund to violate the Gambling Act repeatedly, Defendants conducted the affairs of the Fund through a "pattern of racketeering activity" in violation of RICO. *See* 18 U.S.C. §§ 1961(1)(B), 1962(c). Like the violations of the Gambling Act, the violations of RICO support Appellant's common law claims.

This Court has previously ruled, in two non-precedential summary orders, that mutual fund investors could not bring derivative RICO treble damage actions in the circumstances presented because "direct" injury was lacking, even if such injury was "foreseeable." *McBrearty v. The Vanguard Group, Inc.*, No. 08-CV-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd* 353 Fed. Appx. 640 (2d Cir. 2009) (summary order), *cert. denied*, 130 S. Ct. 3411 (2010); *Seidl v. Am.*

*Century Cos., Inc.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd* 427 Fed. Appx. 35 (2d Cir. 2011) (summary order), *cert. denied*, 2011 WL 4344573 (Dec. 12, 2011). Nothing in those orders called into question the accuracy of the investors' claims that the defendants had committed substantive violations of the Gambling Act and RICO. To the contrary, those orders merely held that the violations did not give rise to civil RICO claims because RICO's "direct" causation requirement is more demanding than the common law proximate cause requirement. The Court treated the reaction of the stock market in response to government action as an intervening cause that broke the chain of causation under RICO, even though it would not have broken the chain of causation under a common law foreseeability standard.

Two months before Appellant filed the present case, this Court issued a formal opinion that appears to undercut the RICO proximate causation reasoning of *McBrearty* and *Seidl*. In *Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310, 326 (2d Cir. 2011), this Court held that intervening market forces do not break the chain of causation for civil RICO claims. Based on the formal opinion in *Ideal Steel*, Appellant alleged RICO claims in this case. The RICO causation issue is not before this Court, however, because the district court did not reach this issue. Instead, the district court held that Defendants' investing in "illegal gambling businesses" did not violate the Gambling Act.

14

**Prior Proceedings**

Appellant has been seeking justice for years.[3] In 2008, he filed *Gamoran v. Neuberger Berman Management LLC, et al.*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) ("*Gamoran I*"). (A-362) Before there was any substantive activity in that case, and because *McBrearty* was on appeal in this Court, the parties stipulated to the voluntary dismissal of the action without prejudice. (A-316, 362-63) The parties' stipulation expressly provided terms for re-filing the suit after *McBrearty*. (*Id.*)

After *McBrearty* was decided, Appellant re-filed his action in New York Supreme Court asserting only state law claims (*Gamoran II*). Defendants removed the action to federal court on the ground that there was federal subject matter jurisdiction because Appellant alleged violations of the Gambling Act and RICO *in support* of his state law tort claims (even though Appellant did not assert any civil RICO claims or any other federal cause of action). *Gamoran II* was assigned to Judge Sand, who ruled that federal jurisdiction was present (even though no federal claims had been asserted) because the federal issues were substantial. (A-363; A-

---

[3] In the district court, Defendants went to great lengths to create the misimpression that the procedural history of this case adversely reflected on its merits. The fact that Appellant has had to navigate a series of procedural roadblocks – thrown up by the very fiduciaries who are charged with representing the best interests of the Fund's investors – should not distract the Court from the merits of Appellant's claims. Mutual fund investors suffered tremendous losses because their fiduciaries knowingly invested in criminal organizations; they are entitled to just compensation.

526; *Gamoran v. Neuberger Berman Mgmt.*, LLC, 10 Civ. 6234, 2010 U.S. Dist. LEXIS 119696 (S.D.N.Y. Nov. 8, 2010), *adhered to on reconsideration*, 2011 U.S. Dist. LEXIS 17939 (S.D.N.Y. Feb. 9, 2011))

Although Appellant believed that a demand on the Board would be futile, Judge Cote held in a similar case, *Seidl,* 713 F. Supp. 2d 249, that a demand was required, and Appellant expected that Judge Sand would follow that precedent. To avoid the delay, expense and uncertainty of litigating the demand futility issue, Appellant decided to make a demand on the Board, and he did so on February 18, 2011. (A-363) In making the demand, Appellant expressly

> reserve[d] the right to question the independence of any person identified as a defendant in the Complaint or who has conflicting fiduciary duties to any other mutual fund or entity operated within the Neuberger Berman family of funds who participates in making any decision with respect to this demand.

(A-218; A-526)

**Defendants Assured Judge Sand They Would
Execute Appropriate Tolling Agreements**

Appellant argued that *Gamoran II* should be stayed pending the Board's consideration of his demand because of the possibility that the statute of limitations might expire while the Board considered the demand.[4] Defendants, however, urged

---

[4] Appellant relied on *In re Take-Two Interactive Software, Inc. Derivative Litig.*, 2007 WL 1875660 (S.D.N.Y. 2007), and *In re InfoUSA, Inc. S'holders Litig.*, 2008 WL 762482, *1 (Del. Ch. 2008).

the district court to dismiss in light of the pending demand. In doing so, Defendants assured the Court that they would execute tolling agreements to preserve the Fund's claims. (A-137, 317, 527)

> Defendants specifically represented to the court that
>
> the Trust's board initiated steps to preserve the ability to conduct an appropriate investigation in due course. Defendants ... have been asked to execute an appropriate tolling agreement. Almost all have agreed to do so, but the documentation has not been finalized.

(A-527, *quoting Gamoran v. Neuberger Berman Mgmt. LLC,* No. 1:10-cv-06234-LBS (S.D.N.Y. 2010), Docket No. 39, at page 3 (available on PACER)) Judge Sand dismissed the complaint without prejudice, but before doing so, he stated on the record that he expected that Defendants would in fact execute appropriate tolling agreements. (A-150)

**The Board Abdicated Any Authority to Refuse Appellant's Demand**

In response to Appellant's demand, Defendants requested that Appellant provide proof of his shareholdings. (A-364; 528) On April 22, 2011, Appellant provided the requested information to Defendants' counsel and confirmed that Appellant "would be pleased to assist the board in its investigation." (A-364) Appellant's counsel also requested to be informed "who will be conducting the investigation, so that [Plaintiff and his counsel] might communicate with the appropriate party." (*Id.*)

17

Defendants failed to provide Appellant with any indication that the tolling agreements promised to Judge Sand had actually been signed – or that *anything* had been done during the six months after Appellant made his demand. Appellant commenced the present action on August 24, 2011 – the last day before the statute of limitations expired. (A-364-65; A-527)

Appellant alleged that the failure by the Board to respond to his demand for six months while the statute of limitations ran down – and the Trustees' apparent failure to fulfill their assurance to Judge Sand that they would secure appropriate tolling agreements – constituted an abdication of the Board's responsibility to respond to the demand in good faith. (A-54) Trustees were waiting for the claims to become time-barred before taking any action, knowing that any "decision" by them thereafter would be an empty gesture. Under Delaware law, the Board's inability or unwillingness to make an *effective* decision with respect to a demand waives the ability to refuse the demand and terminate litigation.

The Board also relinquished the right to decide Appellant's demand by stating to the district court, after this action was commenced, that they "take no position at this time regarding the merits" of Appellants claims and that the "pronouncements by the Court on the substance of" the merits of Appellant's

18

claims would "inform the board's response to [Appellant's] demand."[5] Under Delaware law, the Board may not take a neutral position and invite the court to rule on the merits and still retain the right to terminate the litigation if it does not like the court's ruling.

**The Board Failed to Act in Good Faith**

Defendants represented to the court below that the tolling agreements they promised to Judge Sand in *Gamoran II* had in fact been executed, but they inexplicably and obstinately refused to produce any copy of the alleged agreements. (A-365) There is no evidence that effective tolling agreements exist.

In its June 2012 Opinion, the district court rejected the factual allegations in the original complaint and accepted the truth of Defendants unsubstantiated allegations that effective tolling agreements existed. Based on the assumption that effective tolling agreements were in place, the court concluded that the Trustees had not improperly tried to cause the forfeiture of Appellant's claims.

In the amended complaint, Appellant alleged Defendants' ongoing refusal to provide the purported tolling agreements they promised to Judge Sand so that their existence (or the effectiveness of their operative language) could be verified. (A-365) The need for such verification was particularly justified since Defendants had

---

[5] *See* Dkt. # 32, at p.3.

19

*moved to dismiss the complaint on the ground that the statute of limitations had*

expired – at the same time that they were *also* representing to the court that

appropriate tolling agreements had been signed. (A-365; A-528)

Defendants argued in *both* of the motions to dismiss that lead to the June

2012 and March 2013 Opinions that Appellant's claims were barred by the statute

of limitations. (A-365) Because Appellant's amended complaint relates back to the

filing of the original complaint on August 24, 2011 pursuant to Fed. R. Civ. P.

15(c)(1)(B), Defendants' statute of limitations argument can only mean either that

the purported tolling agreements do not exist at all or they were drafted in such a

way that they are ineffective in actually tolling the statute of limitations.

Even if the district court were correct in its factual finding that the Trustees

(i) had in fact executed effective tolling agreements; and (ii) were not intentionally

seeking to extinguish the Fund's claims on statute of limitations grounds,

Defendants' continued withholding of the tolling agreements nevertheless

demonstrated an unreasonable hostility to Appellant's demand that can only be

characterized as a lack of independence and good faith. Either the Trustees gave

misleading assurances to Judge Sand, or they have made an argument to the court

that is inconsistent with the terms of tolling agreements that they, for some

undisclosed reason, continue to conceal from Appellant (and the Courts). Whatever

the explanation, it is clear that Defendants' withholding of the tolling agreements

from the very investors whose best interests they are charged with protecting, at a minimum evinces a lack of independence and good faith, if not outright bias and hostility against Appellant and the recovery of innocent investors' losses.

**The Board Failed to Exercise Due Care**

The Board and SLC failed to conduct its "investigation" in a reasonable manner by failing to assume the minimum responsibility for conducting an acceptable investigation. For example, the Board and the SLC "refused to meet or otherwise speak or communicate with [Appellant] or his attorneys. Indeed, none of the SLC Members participated in any witness interviews and delegated that responsibility to counsel." (A-367)

The SLC's investigation also was not sufficiently "transparent" to meet the requirements of due care under Delaware law. In particular, the "SLC conducted its purported investigation in complete secrecy and barred [Appellant] from participating or otherwise being informed of the investigation. Indeed, despite the request from [Appellant's] counsel, [Appellant] was not even informed that an SLC had been formed until after commencement of this action." (A-367) Defendants also

> refused [Appellant] access to any portion of the SLC's so-called 'investigation.' For example, they refused [Appellant] an opportunity to review annotated summaries of any purported interviews with witnesses. Defendants denied [Appellant] offer to assist in any investigation. Instead, Defendants flatly denied [Appellant] any involvement in the 'investigation,' denied [Appellant] any contact

with the SLC, and barred [Appellant] from any access to any of the
underlying documents gathered, reviewed, or generated in the course
of the SLC's so-called 'investigation.'

(A-367)

Finally, the SLC premised its recommendation not on any legitimate
business judgment, but on "incorrect legal assumptions and erroneous legal
principles contrary to public policy," in particular, the assumption that is was
lawful and perfectly acceptable for Defendants to invest in illegal gambling
businesses. (A-367)

**The Board Lacked Independence**

The Complaint alleges that the Board was not independent because a
majority of the Board face a substantial likelihood of individual liability. (A-366,
369-70) Conceding its inability to make an independent decision whether to sue
themselves, the board created the SLC. This, however, was a mere smokescreen,
because the SLC's "powers and authority were explicitly limited to making a
'recommendation' to the Board of Trustees, who retained final authority to
determine [Appellant's] demand." (A-366) It was the Board – and not the SLC –
that made the decision to reject Appellant's demand. (A-365)

The entire Board, including the SLC, also has irreconcilable conflicts of
interest that render them not independent with respect to Appellant's demand
because of their conflicting fiduciary obligations to the 25 other mutual funds

22

within the Nominal Defendant Trust (which includes many mutual funds in addition to the Fund on whose behalf Appellant sues). (A-366, 369-70)

While the members of the SLC are not proposed defendants, they are far from independent. They are *insiders*, chosen from within the Defendant organization. Their relationships with the proposed defendants are such as to raise substantial doubt about their ability to make a decision solely in the interest of the Fund. (A-366)

**The Decisions Below**

In its June 2012 Opinion, the district court determined that the Board had executed tolling agreements and therefore had not tried to cause the forfeiture of Appellant's claims by unreasonably delaying its response to Appellant's demand. The court granted Appellant leave to amend the complaint to address the board's rejection of Appellant's demand.

In its March 2013 Opinion, the district court held that:

- Defendants' conduct did not violate the Gambling Act. (SPA-21-22)

- Appellant could not challenge the independence and disinterestedness of the board in rejecting the demand because – notwithstanding his express reservation of the right to do so – Appellant had supposedly waived the ability to contest the independence of the Board by making the demand. (SPA-22-24)

- Appellant's allegations that the Board had failed to act in good faith and had failed to exercise due care in purporting to "investigate" Appellant's demand were insufficient under Delaware law. (SPA-24)

In both of its opinions, the district court rejected the well-pled allegations of the complaints, refused to draw reasonable inferences in favor of Appellant, and resolved factual disputes in favor of Defendants. For example, in the June 2012 Opinion, the district court accepted Defendants' assertions that effective tolling agreements had been executed and that the Trustees had therefore not sought to improperly cause the forfeiture of Appellant's claims by delaying their response to Appellant's demand until after the statute of limitations expired. (SPA-12) The court said that "[a]lthough plaintiff has not seen these agreements and has questions as to their scope, he does not dispute their existence." (SPA-12) That was not a fair characterization of Appellant's position. Appellant did not concede the existence of tolling agreements. Rather, he argued that:

> Defendants have refused to provide a copy of any purported tolling agreements so that Plaintiff can evaluate their language, scope, enforceability, and date of execution. … Nor is there any basis in the record to assume that the alleged "tolling" agreements will be effective in saving investors' claims from forfeiture.

(Plaintiff's Brief in Opposition to Defendants' Motions to Dismiss at 21 [Dkt. No. 42, Filed 01/27/12, Page 27 of 32])

Similarly, in responding to Defendants' second motion to dismiss, Appellant argued that "even though Plaintiff does not have any evidence to dispute the existence of a document that Defendants refer to as a 'tolling agreement' – there is no evidence that what Defendants call a 'tolling agreement' actually functions as one." (Plaintiff's Brief in Opposition to Defendants' Motions to Dismiss at 47 [Dkt. No. 60, Filed 10/09/12, Page 56 of 59]) In the March 2013 Opinion, the district court simply ignored Appellant's argument that Defendants' (a) efforts to engineer a forfeiture of Appellant's claims; (b) misleading statements to the court; and (c) obstinate refusal to provide the purported tolling agreement reflected a lack of good faith and improper bias and hostility against Appellant. (SPA-22-25)

## LEGAL STANDARDS

On a motion to dismiss, the court should construe the complaint liberally, accepting as true the allegations of the complaint and drawing all reasonable inferences in Appellant's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

When determining the sufficiency of a complaint under Rule 12(b)(6), consideration is limited to the factual allegations in the complaint, but the court may also rely on matters of which judicial notice may properly be taken. *Staehr v. The Hartford Financial Services Group Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). The Court may not, however, take judicial notice of documents that are in dispute.

"[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In exercising this review, the court's task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Walker v. Schult*, 12-1806-CV, 2013 WL 2249159, at *3 (2d Cir. May 23, 2013).

## ARGUMENT

### I.    DEFENDANTS VIOLATED THE GAMBLING ACT

The Gambling Act is clear and unambiguous: "[w]hoever conducts, finances, manages, supervises, directs, or *owns all or part of an illegal gambling business* shall be fined under this title or imprisoned not more than five years, or both." 28 U.S.C. § 1955(a) (emphasis added).

The "illegal gambling businesses" in which Defendants invested are corporations. According to the ordinary meaning of the word "own", a corporation is "owned" by its shareholders. *See, e.g., Clackamas Gastroenterology Assocs.,*

26

*P.C. v. Wells*, 538 U.S. 440, 442 (2003) (shareholders described as "own[ing]" a corporation).[6] Thus, owning shares of stock in illegal gambling businesses is prohibited by the statute.

A violation of § 1955 is a crime of general criminal intent. *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999), *citing Hawes*, 529 F.2d at 481. There is no requirement that the defendant be shown to have known that his conduct actually violated the law, because everyone is presumed to know the law. *Compare Cheek v. United States*, 498 U.S. 192, 199 (1990) (tax statute required "willful" violation, which requires knowledge of illegality). Liability under § 1955 only requires knowledge of the facts – that the gambling businesses in which Defendants caused the Fund to invest were taking bets from gamblers in the United States or processing payments relating to such bets. The Complaint alleges that Defendants had the requisite knowledge. (A-347-53 & 355-58)

In construing criminal statutes, courts "must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997). Where, as here, the statutory language is clear, courts may not resort to a narrowing construction. *Boyle v. United States*, 556 U.S. 938, 950-51

---

[6] Unless otherwise defined, words in a statute must be interpreted according to "their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).

27

(2009). In fact, § 1955 has been construed broadly. *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978).

The district court gave two reasons for rejecting Appellant's argument that the investments at issue were illegal. First, the court said that *McBrearty* and *Seidl* had rejected the same argument. (SPA-21) The court was mistaken. *McBrearty* and *Seidl* did not address this issue. They merely held that the plaintiffs in those cases had not alleged sufficiently "direct" injury to support recovery under civil RICO. Certainly, neither case even remotely suggested that it was lawful for U.S. mutual funds to knowingly invest in illegal gambling businesses.

Second, the district court said that Appellant had failed to cite any "convincing authority" in support of his argument. (SPA-21) That a case presents an issue of first impression, however, is hardly a reason to refuse to apply the plain language of an unambiguous statute to conduct to which the statute clearly applies. When the Gambling Act was enacted in 1970, the Internet did not exist. That did not stop this Court and others from applying the Gambling Act to Internet gambling once that industry developed in the 1990s. Similarly, prior to mid-2000, it was not possible for public investors to buy stock in illegal off-shore Internet gambling businesses. But that should not stop the courts from applying the plain language of the Gambling Act to conduct to which it expressly applies. As the Supreme Court has explained:

> Legislation … is enacted, it is true, from an experience of evils but its
> general language should not, therefore, be necessarily confined to the
> form that evil had theretofore taken. Time works changes, brings into
> existence new conditions and purposes. Therefore a principle, to be
> vital, must be capable of wider application than the mischief which
> gave it birth.

*Weems v. United States*, 217 U.S. 349, 373 (1910).

By giving mutual funds the green light to invest in foreign entities that exist primarily for the purpose of committing crimes in the U.S., the decision below sets an extremely dangerous precedent. The Judgment should be reversed.

## II. APPELLANT NEVER WAIVED THE RIGHT TO CHALLENGE THE INDEPENDENCE OF THE BOARD'S DECISION

A motion to dismiss based on demand refusal must be denied if the plaintiff alleges facts "creating a reasonable doubt" that "the board acted independently or with due care in responding to [a] demand." *Grimes*, 673 A.2 1207, 1219.

The Complaint alleges that, for a variety of reasons, the decision of the board to reject his demand was not made with the independence required by Delaware law. The district court, however, refused to consider any of those allegations on the ground that by making a demand on the Board, Appellant had supposedly not only waived the right to challenge the Board's independence for demand *futility* purposes, but also the right to question the Board's independence in actually *refusing* Appellant's demand. That was error.

29

The Delaware Supreme Court long ago rejected the notion that if a board is deemed "independent" for purposes of demand futility, it must also be deemed "independent" when determining wrongful demand refusal. *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Grimes*, 673 A.2 at 1219.

The most recent decision by the Delaware Court of Chancery dismissed as "incorrect" the notion that a shareholder who makes a demand on the board is somehow barred from contesting a board's independence for wrongful refusal purposes after making a demand. *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 333 & n. 12 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013).

On facts not materially distinguishable from those presented here, the court in *Seidl v. Am. Century Companies, Inc*., 10-4152-CV-W-SOW, 2012 WL 7986873 (W.D. Mo. Oct. 31, 2012), rejected defendants' arguments that the plaintiff should be precluded from challenging the independence of a decision to reject a demand.

In *Seidl*, the plaintiff brought a derivative action against a different mutual fund that had invested in illegal gambling businesses. The *Seidl* plaintiff filed suit without making a pre-suit demand and argued that a demand would be futile. The court held the board was sufficiently independent that the plaintiff was required to

make a demand. After the plaintiff made a demand, the demand was refused, and the plaintiff then brought a new action alleging that the board's refusal of her demand was wrongful. The court held that, despite the prior judicial determination that the board was sufficiently independent that a demand was required, the plaintiff could still contest the board's independence with respect to refusing the demand.[7]

The court explained the rationale for this common-sense rule: Because "courts have encouraged derivative plaintiffs to file a [pre-suit] demand, including in cases where the Board may find it advisable to appoint a [Special Litigation Committee], it is clear that the derivative plaintiff may continue to contest the independence of the board members *after filing such a demand, and should not be*

---

[7] Here, there has been no judicial determination that the board was independent. Thus, this case presents a much more compelling case than the facts in *Seidl*, particularly since Appellant made a specific reservation of rights to contest the independence of any SLC member who is appointed from among Defendants' "insiders" or otherwise faces a conflict of interest.

*prejudiced by that choice.*'" 2012 WL 7986873, at \*8, *quoting Boland v. Boland*,

31 A.3d 529, 550 n. 25 (Md. 2011)) (emphasis added by the *Seidl* court).[8]

The district court's holding that a plaintiff's demand conclusively establishes

the board's independence for demand refusal purposes was erroneous and should

be reversed.

### III.   THE DISTRICT COURT ERRED IN REJECTING THE SUFFICIENCY OF THE APPELLANT'S ALLEGATIONS THAT THE BOARD LACKED INDEPENDENCE, FAILED TO ACT IN GOOD FAITH, AND FAILED TO EXERCISE DUE CARE

Under Delaware law, a board fails to act independently if it does not respond

to a demand "in good faith" after "reasonable investigation." *Scattered Corp. v.*

*Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997), *overruled on other*

*grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). A motion to dismiss based

on demand refusal must be denied if the plaintiff alleges facts "creating a

reasonable doubt" that "the board acted independently or with due care in

responding to [a] demand." *Grimes*, 673 A.2 1207, 1219.

---

[8] *Seidl* was governed by Maryland law, and *Boland* is a Maryland decision, but *Boland* followed Delaware case law on this issue. Although it is not a controlling authority, Appellant brings to the Court's attention the summary order in *Lambrecht v. O'Neal*, 504 F. App'x 23, 27 (2d Cir. 2012), which states, in *dicta*, that a demand operates as a concession of the board's independence. That statement is *dicta* because in that case the ultimate decision was made not by the board but by an independent SLC. It is also "incorrect." *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d at 333 & n. 12.

The court in *Seidl*, 2012 WL 7986873, at *7, denied the defendants' motion to dismiss based on the board's refusal of the plaintiff's demand. The court held that because "the Court would need to rely heavily on the SLC report in determining whether to grant the motion to dismiss [based on wrongful refusal of the plaintiff's demand], the Court finds that it would be improper to make such findings on a motion to dismiss ... ." *Id.*

### A. The District Court Erred in Disregarding Appellant's Allegations of Lack of Good Faith Concerning the Board's Attempts to Cause the Forfeiture of His Claims

In both of its opinions, the district court rejected the well-pled allegations of the complaints and credited Defendants' assertions that effective tolling agreements had been executed and that the Trustees had not sought to improperly cause the forfeiture of Appellant's claims.[9] (SPA-12; SPA-22-25) The Complaint's allegations, however, provide much more than a "reasonable doubt" concerning Board's independence and good faith. *Grimes*, 673 A.2 at 1219. Therefore, the

---

[9] Assuming, *arguendo*, that the district court was correct in affording broad preclusive effect to Plaintiff's demand, that would not apply to Appellant's allegations that the Board failed to act in good faith and with due care, including his allegations relating to the Board's seeking to cause the forfeiture of Appellant's claims. This misconduct occurred *after* Appellant made his demand and could not possibly have been waived by that demand. Nor, of course, would Appellant be barred from challenging the independence of the insiders appointed to the SLC.

33

district court's rejection of the well-pled allegations in the Complaint, and its refusal to draw reasonable inferences in favor of Appellant, was error.[10]

Even if it had been proper for the district court to accept Defendants' factual averments that the Board did not intentionally seek to extinguish the Fund's claims on statute of limitations grounds, the *continued withholding* of the tolling agreements demonstrates an unreasonable hostility to Appellant's demand that can only be characterized as a lack of good faith and a lack of independence. Either Defendants made misleading statements to the court about the existence or content of any purported tolling agreements, or Defendants have submitted an argument to the court (*i.e.,* that Appellant's claims are barred by the statute of limitations) that is inconsistent with the terms of documents that they, for some unexplained reason, continue to conceal from Plaintiff (and the Courts).

Whatever the explanation, it is clear that Defendants' withholding of the purported tolling agreements from the very investors whose interests they *claim* to represent, at a minimum evinces a lack of good faith, if not outright bias and

---

[10] There is no proper basis for the court's assumption that any tolling agreements have actually been executed, much less that they were actually effective to toll Appellant's claims. The alleged agreements were not before the court on the motions to dismiss because Defendants refused to produce them. "[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Appellant did not concede the existence of any effective tolling agreements.

hostility against Appellant. When "considered as a whole" with the other allegations of lack of good faith and lack of due care, *see Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985), a reasonable and objective observer would be justified in harboring a "reasonable doubt" that Trustees are independent and unbiased towards Appellant, or that they conducted an independent investigation in good faith. To the contrary, an objective observer would have strong grounds to believe that the Board's refusal of Appellant's demand was a predetermined decision to shield themselves and their colleagues from liability at the expense of innocent investors.

### B. *The District Court Erred in Rejecting the Sufficiency of the Complaint's Other Allegations that the Board Failed to Act in Good Faith, Lacked Independence, and Failed to Exercise Due Care*

In *Boland*, the court extensively analyzed the kinds of circumstances that give rise to "reasonable doubt" that the board acted independently, in good faith, and with due care. In that case, the plaintiff made a demand on the board, and the board delegated final decision-making authority to the SLC, which rejected the demand. Reviewing the SLC's determination under a business judgment inquiry "indistinguishable" from that applicable under Delaware law, 423 Md. at 346 & n.37, Maryland's highest court held that the lower courts had failed to make "an adequate inquiry in the SLC's independence and the reasonableness of its procedures." *Id.* at 538.

Relying on the Delaware Supreme Court's decision in *Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004), and the Delaware Court of Chancery's decision in *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985), the *Boland* court emphasized that an SLC should not be allowed to terminate meritorious litigation before trial unless *defendants* satisfy the court that the SLC's independence is "beyond reproach" sufficient to meet a "Caesar's wife" standard. *Boland,* 31 A.3d at 556; *see also Booth Family Trust v. Jeffries*, 640 F.3d 134, 146 (6th Cir. 2011).

Significantly, the court placed the burden on the defendants to establish that this high standard has been met. In doing so, it adopted the reasoning of the Supreme Court of Delaware:

> The only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit. A defendant who desires to avail itself of this unique power to self destruct a suit brought against it ought to *make certain that the [SLC] is truly independent*.

*Boland,* 31 A.3d at 556 (emphasis added), *citing Lewis*, 502 A.2d at 967.

*Boland* said that courts should be vigilant to ensure that the structural bias inherent in the SLC process does not "eviscerate[] plaintiff's opportunities as minority shareholders to vindicate their rights." 31 A.3d at 560, *quoting Alford v. Shaw*, 358 S.E.2d 323, 328 (N.C. 1987).

This level of scrutiny is particularly appropriate in a case such as this one, which involves a mutual fund rather than a conventional corporation. In *Jones v.*

*Harris Assocs. L.P.,* 559 U.S. 335, 130 S. Ct. 1418 (2010), the Supreme Court counseled courts to exercise heightened vigilance to protect mutual fund shareholders from the inherent conflicts faced by mutual fund boards. This is because mutual fund boards cannot be relied upon to adequately protect mutual fund investors such as Appellant from the investment advisors who manage the funds. 130 S. Ct. at 1422. *Accord, Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 & 541 (1984) (noting that the Investment Companies Act of 1940, 15 U.S.C. §§ 80a-1 *et seq*., which governs mutual funds, reflected Congressional skepticism that it would be prudent to "rely solely on the fund's directors" to protect the interests of mutual fund investors given the inherent conflicts those directors face).

A high level of scrutiny applied to mutual fund boards who seek to terminate derivative litigation brought by investors against the funds' investment advisors is also appropriate in light of the trend by courts in recent years to require derivative plaintiffs to make demands in most cases. That trend is based on the theory that (i) plaintiffs should be encouraged to make pre-suit demands because that allows boards the opportunity to reconsider a challenged transaction and (ii) any conflicts faced by board members can be addressed by delegating decision-making authority to truly independent special litigation committees. *Boland*, 31 A.3d at 551 & n.25.

Consistent with the teaching in *Grimes,* 673 A.2 at 1219, that a plaintiff need only plead facts that raise a "reasonable doubt" concerning the board's

independence, good faith, or due care, *Boland* held that determining a board's wrongful refusal of a demand should ordinarily be made not at the pleading stage but after full discovery and after an "engaged and thorough" judicial review. 31 A.3d at 561.

The Complaint here alleged numerous facts that support Appellant's allegations that the "investigation" and rejection of his demand fail to satisfy the requirements of independence, good faith, and due care. Certainly, the Complaint's allegations establish much more than a "reasonable doubt" that the Board and the SLC failed to meet anything remotely approaching a "Caesar's wife" standard.

> 1. *Because the Board Failed to Give Final Decision-Making Authority to the SLC, the Non-Binding Recommendation of the SLC Is Immaterial*

Because of its erroneous decision that Appellant waived his ability to contest the independence of the Board, the district court was able to avoid considering the adequacy of Appellant's allegations that the Board and SLC lacked independence. Those allegations were more than sufficient to survive a motion to dismiss.

Over two-thirds of the members of the Board are interested persons antagonistic to the pursuit of the claims in this litigation because they are Defendants and are exposed to civil and criminal liability. (A-366, 368) Recognizing that they could not possibly make a disinterested decision with respect to Appellant's demand, the Board appointed the SLC.

38

In a significant departure from what is recommended by the courts in this situation, however, the SLC was denied authority to actually determine Appellant's demand. Instead, the SLC's authority was explicitly limited to making a non-binding "recommendation" to the Board, which retained final authority to decide how to respond to Appellant's demand. (A-366; A-453) Where, as here, a board appoints a committee to investigate claims against board members but fails to give the committee final decision-making authority, the business judgment rule affords no protection to the board's decision.

For example, in *In re Par Pharm., Inc., Derivative Litig.*, 750 F. Supp. 641, 646 (S.D.N.Y. 1990), an SLC recommended termination of a derivative suit, but the board (a majority of whose voting members were defendants) made the final decision. The court held that "the business judgment rule, while appropriate in evaluating decisions entrusted to an independent special litigation committee … is too lenient a standard by which to judge the decision of a Board of Directors, a majority of whose voting members are defendants in the federal and state claims they voted to dismiss." *Id.* at 645-46 (citations omitted). Citing, among other authorities, the decision of the Delaware Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981), the court said, "[t]he leading cases under state law formulate standards for judicial review based on the premise that the decision to terminate is made by a special litigation committee rather than by the

board itself." 750 F. Supp. at 646. A "mere advisory role" played by an SLC "fails to bestow sufficient legitimacy on the Board's decision to warrant deference to the Board by [the] Court." *Id.* at 647. *Accord Janssen v. Best & Flanagan*, 662 N.W.2d 876, 884 (Minn. 2003).

Other Delaware decisions are consistent with Judge Patterson's decision. In *Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990), the Delaware Supreme Court gave deference to decision of an SLC that had been given "complete authority" to determine and act upon the derivative plaintiff's demand. 571 A.2d at 770. Similarly, in *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003)*,* then Vice Chancellor Strine (now Chancellor) carefully noted that the SLC had been "granted *full authority* to decide … without the need for approval by the other members of the … board." 824 A.2d at 923 (emphasis added). *See also Boland,* 31 A.3d at 561 (the purpose of the SLC procedure is to "substitute" the SLC's independent judgment for the judgment of the directors accused of wrongdoing).

The SLC's non-binding recommendation is entitled to no deference from the court, and the business judgment rule does not apply to the Board's decision.

2.    *The Board Was Interested as a Matter of Law*

The Board cannot be deemed independent if its members were "*for any substantial reason,* incapable of making a decision with only the best interests of

40

the corporation in mind." *Boland,* 31 A.3d at 557 (emphasis in original), *citing In re Oracle*, 824 A.2d 917. Board members are not independent if they stand on both sides of a transaction. *Id.* at 549. Here, the members of the board were not independent because, among other reasons, they are Defendants who face a substantial likelihood of civil liability for their involvement in unlawful investments in criminal organizations.

It is now well-established that, for demand futility purposes, just because the members of a board are named as prospective defendants does not necessarily mean they are so lacking in independence that a demand on them would be futile. Such a board could, for example, delegate final decision-making authority to a genuinely independent committee.

Just because board member-defendants are sufficiently independent that a demand on them would not necessarily be futile does not mean that they are also sufficiently independent to decide whether to sue themselves once a demand is made. *See, e.g., In re Par Pharm., Inc.* The present case calls to mind what Judge Coffin said in his concurring opinion in *In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973):

> I also note that the management fee contracts are not attacked as simply ultra vires or as the product of mere negligence or even of "unsound" or "erroneous business judgment". They are alleged to be illegal under federal antitrust laws. If I were to calibrate a scale to measure the impact of varying improprieties, I would rate such an allegation fairly high. I find it hard to imagine that a director, however

41

unaffiliated, who had participated, or under these circumstances knowingly acquiesced, in a major transaction, albeit for a corporate purpose, would authorize a suit, effectively against himself, claiming that the transaction violated the federal antitrust laws. Even independent watchdogs cannot be thought ready to sign a confession of that magnitude.

479 F.2d at 269.

3. *The Board Has Conceded Its Lack of Independence as a Matter of Law by Appointing an SLC*

In *Abbey v. Computer & Commc'n Tech. Corp.*, 457 A.2d 368, 373 (Del. Ch. 1983), the Delaware Supreme Court held that by appointing an SLC, the board *conceded* its lack of independence for the purpose of responding to a shareholder demand. Subsequently, the Delaware Supreme Court decided *Spiegel*, which held that if a board first makes a motion to dismiss and delegates to the SLC "complete authority to act on a demand," then the *Abbey* waiver is avoided. 571 A.2d at 777.

Because they failed to delegate complete authority to the SLC as required by *Spiegel*, Trustees here are deemed to have conceded their lack of independence as a matter of law under *Abbey*.

4. *The Board and All Members of the SLC Also Have Other Irreconcilable Conflicts of Interest*

All the members of the Board and the SLC face an irreconcilable conflict of interest with respect to allowing the Fund to recover damages from Defendants because of the conflicting interests between among and between separate entities to whom they own separate fiduciary duties. The Fund is one of 26 "series" of shares

42

offered by Nominal Defendant. None of these 26 "series funds" is a separate legal entity, although they are treated as such under the securities laws. The Board of the Nominal Defendant and the SLC have separate fiduciary obligations, including a duty of undivided loyalty, to each group of shareholders in all 26 of the funds offered by Nominal Defendant, including the Fund.

The irreconcilable conflict arises because defendants NBM and NB serve as investment advisors or sub-advisors to all 26 of the series funds offered by Nominal Defendant. NB and NBM are responsible for providing or arranging for all services necessary for the operation of all the separate funds that compose Nominal Defendant. NB and NBM obtain the funds to pay for all such operational expenses and overhead in large part from the fees allocated to the Fund. (A-366, 369-70) Were the Plaintiff to prevail in this litigation, NB and NBM would be liable to forfeit all of the fees they have received on account of their management of the Fund's portfolio from the time that Defendants first caused Nominal Defendant to purchase shares in illegal gambling businesses. NB and NBM would also be liable for the money Defendants squandered on illegal gambling businesses.

As a result, it is contrary to the interests of investors in the other 25 funds for Appellant to succeed in this action. All of the trustees and the SLC therefore have

43

an irreconcilable conflict of interest with respect to any decision to vindicate the rights of the Fund against NB, NBM, or any other Defendant. (A-369-370)

5.    *The Complaint Alleges Facts That Raise a Reasonable Doubt as to the SLC's Independence*

Even if the SLC had been given full decision-making authority, its decision (if it had actually made one) would be subject to challenge if the SLC is, "*for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind." *Boland,* 31 A.3d at 557 (emphasis in original), *citing In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003). That inquiry requires the Court to consider whether the members of the SLC are in fact independent of their fellow members of the Board whose conduct and potential liability they are called upon to judge. And that, in turn requires the court to examine the relationships between the members of the SLC and the members of the Board. Disqualifying relationships include, for example, "previous business relationships" – and even when a member of an SLC is junior to the Trustee defendants and "depended on them for advancement in her career." *Boland,* 31 A.3d at 558, *citing Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372, 379 (6th Cir. 1984); and *Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990).

In addition to considering whether there are any "significant business relationship or affiliations" between the SLC and Defendants, a court should also "take notice of informal business influences and incentives potentially affecting the

44

SLC." *Boland,* 31 A.3d at 564. Such disqualifying influences could be outside interests that create "a strong incentive to stay on good terms with the defendants." *Id.* Relevant influences include "significant personal or social relationships." 31 A.3d at 564. For example, participation in a "parallel network of influence and relationships in the fundraising world" could be enough to raise an issue of material fact to defeat a motion to dismiss. *Id.*

> In particular, *Boland* cautioned that courts should not
>
> ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operations. Some things are "just not done," or only at a cost, which … may involve a loss of standing in the institution.

*Boland,* 31 A.3d at 558, n. 36, *quoting Oracle*, 824 A.2d at 938.

The allegations of the Complaint are more than sufficient to give rise to a strong inference that the members of the SLC are not genuinely independent.

Where, as here, the conduct of *insiders* is to be judged by the SLC, the members of the SLC should be "appointed from outside the corporation." *See Boland*, 31 A.3d at 551. This Board, however, appointed only *other insiders* – fellow board members within the Neuberger Berman family of funds. From this, it may reasonably be inferred that the SLC members were appointed not because of their independence but because of their lack of it.

Each of the members of the SLC also serves on the boards of 45 other funds within the Neuberger Berman mutual fund complex, including, but not limited to, the other 25 funds within Nominal Defendant. The SLC members serve on these boards along with the board member-Defendants. NBM and NB receive substantial revenue (in the hundreds of millions of dollars) from these 45 other funds. Each of the SLC Members was appointed to his or her positions with those 45 funds by NBM and NB or persons controlled by NMB and NB, and they receive substantial income (exceeding $150,000 per year each) from those appointments. (A-366)

Under *Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338, 345 (2d Cir. 2006), and *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329-31 (4th Cir. 2001), service on multiple boards and receipt of compensation does not *by itself* cause a director to be "interested" for demand *futility* purposes. That is a completely different question from whether the members of the SLC are independent for demand *refusal* purposes. The *Amron* and *Migdal* decisions *permit* mutual fund trustees to sit on multiple boards despite the serious concerns over potential conflicts of interest that might arise. *See Jones,* 130 S. Ct. at 1422. Those cases do not, however, require the courts to assume that such Trustees have actually acted with independence, in good faith, and with due care *when an actual conflict of interest arises*.

46

Once again, it is important to note that this case involves a mutual fund, not a conventional corporation. "Because the [investment] adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, *the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest*." *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536 (1984) (emphasis added); *see also Jones,* 130 S. Ct. at 1422.

Appellant's allegations are more than sufficient to shift the burden to Defendants to establish the independence of the Board and the SLC. As the court correctly concluded in *Seidl*, 2012 WL 7986873, at *7, these are issues that cannot be resolved on a motion to dismiss but must await the development of a factual record through discovery.

6.    <em>The SLC Process Was Not Transparent</em>

The SLC's process "requires near-complete transparency." *Boland,* 31 A.3d at 562. The decision of an SLC investigation lacks "good faith" if the SLC has "insulated its investigation from scrutiny by plaintiff." *Id.* at 559, *quoting Peller*. Courts should also consider whether the SLC "pursued its investigation with zeal or whether it played softball with critical players." 31 A.3d at 559. It is therefore important that the SLC must have allowed Appellant, for example, "an opportunity to review the annotated summaries of interviews" of witnesses. *Id.*

47

Defendants have failed to satisfy any of these requirements. The SLC process was a Star Chamber proceeding conducted in complete secrecy. Defendants rejected Appellant's offer of assistance; they denied Appellant any involvement in the investigation; they denied Appellant any contact with the SLC, and they barred Appellant from any access to any of the underlying documents gathered, reviewed, or generated in the course of the SLC's process. They certainly did not allow Appellant "an opportunity to review the annotated summaries of interviews" of any witnesses. (A-367)

The district court held that a board is not required to "continuously inform a plaintiff of developments in the investigation." (SPA-24; SPA-11) Appellant, however, did not merely complain that he had not been "continuously informed." Rather, he complained of a *complete* failure to provide Appellant with *any* access, at *any* time, to *any* part of the process or to *any* part of the record on which the SLC's recommendation and the Board's decision was based. (A-367) As *Boland* demonstrates, such a lack of transparency is sufficient to survive a motion to dismiss. Indeed, Chancellor Strine's decision in *Oracle*, the Delaware Supreme Court's decision in *Beam*, and the well-reasoned decision *Boland* all require a degree of scrutiny of an SLC's refusal substantially greater than that exercised by the district court.

48

      7.     *The SLC Did Not Meet Established Requirements for Conducting an Investigation Reasonably and With Due Care*

An SLC demonstrates a lack of due care when the SLC relies almost exclusively on independent counsel "to conduct the substantive aspects of the investigation." *Boland* at 559, *quoting Peller v. S. Co.*, 707 F. Supp. 525, 529 (N.D. Ga. 1988), *aff'd,* 911 F.2d 1532 (11th Cir. 1990). None of the SLC Members participated in any witness interviews and *completely* delegated that responsibility to counsel. (A-367)

The district court characterized Appellant's allegations as improperly seeking to "control" the Board or SLC's "investigation." (SPA-24) That is not true. Appellant has never sought to "control" the investigation; he merely seeks the degree of due process that the law requires.

## IV.   THE BOARD ABDICATED ANY AUTHORITY TO REFUSE APPELLANT'S DEMAND AND THEREFORE CANNOT TERMINATE THIS LITIGATION

When this action was filed the day before the applicable statute of limitations expired, Defendants had made absolutely no substantive response to Appellant's litigation demand made over six months earlier. Defendants refused to even tell Appellant that an SLC had been formed or the identity of an appropriate contact person as Appellant had requested. There was – and still is – no evidence that the tolling agreements the Board promised to Judge Sand had been executed, much less that they were effective. The "reasonableness" of a Board's delay in

responding to a demand is case-specific. The Board knew of the statute of limitations deadline and was fully informed of the need to preserve the rights of the Funds' investors in this case if they intended to investigate Appellant's demand in good faith. The Board even told the *Gamoran II* court that they would take appropriate action to avoid such a forfeiture.

Therefore, the Board's (i) refusal to make any substantive response for over six months to Appellant's demand prior to expiration of the statute of limitations about which they were previously warned and (b) apparent failure to fulfill their assurance to Judge Sand that they would secure appropriate tolling agreements was unreasonable given the circumstances. *See In re Am. Intern. Group, Inc.*, 965 A2d 763, 810 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011) (holding that the board's inability to decide whether to bring suit for a year and a half permitted the derivative plaintiff to proceed with the litigation).

In *Am. Int'l Group*, the court held that the board's expressed reluctance to take a position on proposed litigation – *even though there was no concern in that case that the statute of limitations would expire* – permitted the derivative plaintiff to proceed with his claims. 965 A.2d at 809, n.165. This holding demonstrates that where a board indicates an inability or unwillingness to make an effective and authoritative decision concerning a demand, it loses the ability to terminate

litigation and permits the derivative plaintiff to have his claims adjudicated by the court on the merits.

This case presents more compelling circumstances than *Am. Int'l Group* because the Board of Trustees in this case tried to cause the forfeiture of Appellant's claims through the expiration of the statute of limitations, effectively stripping the themselves of any effective authority to make a meaningful decision whether Appellant's claims should be pursued and the Fund's losses recovered. The Board was not merely "neutral" – they were openly hostile to the point of handcuffing themselves so that Appellant's claims *could not* be pursued by them or by Appellant. The Trustees in this case – more so than the members of the AIG board – had been given a "full and fair opportunity" to decide whether to prosecute the claims brought by Appellant but instead abdicated their right to make that decision. 965 A.2d at 809.

Moreover, after this case was filed, defendant Trustees told the district court that they took "no position" with respect to the merits of Appellant's claims and that their response to Appellant's demand would be informed by the court's ruling on the merits. *See* Dkt. No. 32 at 3. The Trustees' stated neutrality on the merits – and their statement that the court's ruling on the merits would "inform" their response, "must be viewed as tacit approval for the continuation of the litigation" contingent only upon a determination by the court that Appellant's claims are

viable. *Cf. In re Am. Inter'l Group*, 965 A2d at 810; *Spiegel,* 571 A.2d at 775 ("[W]hen a board of directors is confronted with a derivative action asserted on its behalf, it cannot stand neutral"); *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 731 (Del. 1988) ("if the demand rule requires deference to the prerogative of management, its invocation must advance management's position, *vis-a-vis,* the claims in question, otherwise, the rule serves no function.")

Based on the foregoing, the Board's attempt to refuse Appellant's demand cannot support dismissal because the Board had effectively abdicated and waived any authority or power to refuse Appellant's demand by inviting the court to rule on the merits.

### CONCLUSION

The Judgment should be reversed.

Dated:  June 12, 2013

_____
Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). As counted by Microsoft Word, this brief contains 11,892 words exclusive of the Table of Contents and Table of Authorities.

Dated:      June 12, 2013

_____
Thomas I. Sheridan, III