# 13-1589-cv(L),
## 13-1779-cv(XAP), 13-1791-cv(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

---

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

NEUBERGER BERMAN LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, PETER P. TRAPP, NEUBERGER BERMAN EQUITY FUNDS, DBA NEUBERGER BERMAN INTERNATIONAL FUND,

*Defendants-Appellees-Cross-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES-CROSS-APPELLANTS NEUBERGER BERMAN LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL, PETER E. SUNDMAN AND JACK L. RIVKIN

---

MILBANK, TWEED, HADLEY & MCCLOY
*Attorneys for Defendants-Appellees-Cross-Appellants Neuberger Berman LLC, Neuberger Berman Management LLC, Benjamin Segal, Peter E. Sundman and Jack L. Rivkin*
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

## FRAP 26.1 DISCLOSURE STATEMENT

Neuberger Berman Management LLC and Neuberger Berman LLC are indirect subsidiaries of Neuberger Berman Group LLC ("NBG," and together with its consolidated subsidiaries "NB Group").  NBG is not a public company.  NBSH Acquisition, LLC ("NBSH"), which is owned by portfolio managers, members of the NB Group management team and certain of NB Group's key employees, senior professionals, and certain of their permitted transferees, owns, as of June 30, 2013, approximately 74% of NBG's common units, and Lehman Brothers Holdings Inc. and certain of its subsidiaries own the remaining 26% of such common units.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY OF DEFINED TERMS.................................................... xii

COUNTERSTATEMENT OF ISSUES PRESENTED.............................1

COUNTERSTATEMENT OF THE CASE...............................................1

COUNTERSTATEMENT OF THE FACTS ............................................4

COUNTERSTATEMENT OF THE STANDARD OF REVIEW ...........10

SUMMARY OF ARGUMENT ............................................................11

ARGUMENT ....................................................................................13

I.      THE FUND DID NOT VIOLATE SECTION 1955....................13

        A.      Section 1955's Use Of "Owns" Does Not Include Purchasing Or
                Owning Publicly-Traded Stock........................................13

        B.      Congress Did Not Intend To Criminalize The Mere Purchase Or
                Ownership Of Stock ......................................................16

        C.      The Rule Of Lenity Forecloses Plaintiff's Claims..............19

        D.      Section 1955 Has No Extraterritorial Application ..............20

        E.      Extraterritorial Application Of Section 1955 Would Interfere
                With Britain's Regulation Of Its Own Commercial Affairs..............23

        F.      Plaintiff's Citations Do Not Support The Claim That Investing In
                Publicly-Traded Stock Can Be Illegal.................................24

II.     THE FUND DID NOT VIOLATE NEW YORK OR DELAWARE
        LAW ..........................................................................26

        A.      The Fund's Investments Did Not Violate New York Law .................26

        B.      The Fund's Investments Did Not Violate Delaware Law...................28

C.    Plaintiff's Claims Regarding Violations Of State Law Are Barred By The Dormant Commerce Clause ....................................................29

III.  THE DISTRICT COURT'S DECISION DISMISSING PLAINTIFF'S COMMON LAW AND BREACH OF CONTRACT CLAIMS SHOULD BE AFFIRMED BECAUSE THE AMENDED COMPLAINT FAILED TO STATE A CLAIM UPON WHICH RELIEF COULD BE GRANTED....................................................31

A.    The Fund's Ownership Of Neteller And 888 Stock Was Not Illegal ....................................................31

B.    Plaintiff Did Not Plead Negligence Per Se ........................................31

C.    The Amended Complaint Fails To Allege Breach Of Fiduciary Duty Or Negligence....................................................34

1.  Plaintiff Did Not Plead That Defendants Acted In "Bad Faith"....................................................36

2   Plaintiff Did Not Plead Gross Negligence ....................................39

3.  Plaintiff Could Not Plead A Breach Of Fiduciary Duty By The Investment Advisor Defendants Because Their Obligations Arise Under A Contract....................................................42

D.    Plaintiff Failed To Plead A Claim For Waste ....................................43

E.    Plaintiff Failed To Plead A Claim For Breach Of Contract................44

IV.  THE RICO CLAIMS WERE PROPERLY DISMISSED...........................46

A.    Plaintiff Waived Any Argument That The District Court Erred In Dismissing The RICO Claims....................................................46

B.    Plaintiff Did Not Plead Any Predicate Acts.......................................46

C.    Plaintiff Did Not Plead RICO Proximate Cause ...............................47

D.    There Are Additional Reasons The RICO Claims Were Properly Dismissed ....................................................49

V.  THE CLAIMS IN THE AMENDED COMPLAINT ARE TIME-BARRED ....................................................50

VI.   THE AMENDED COMPLAINT SHOULD HAVE BEEN
      DISMISSED WITH PREJUDICE ................................................................50

      A.    The District Court Applied The Wrong Legal Standard.....................51

      B.    Under The Correct Standard, The Amended Complaint Should
            Have Been Dismissed With Prejudice ................................................52

            1.  There Is Nothing Else For Plaintiff To Plead ................................52

            2.  Repleading Would Be Futile ..........................................................53

            3.  The Defendants Are Entitled To Be Done With Plaintiff's
                Accusations ....................................................................................53

CONCLUSION ..........................................................................................................54

STATUTORY ADDENDUM .................................................................................AD-1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Achtman v. Kirby, McInerney & Squire, LLP,*
464 F.3d 328 (2d Cir. 2006) ............................................................. 10

*Alexander v. Sandoval,*
532 U.S. 275 (2001)......................................................................... 33

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) .............................................................. 29

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006).......................................................................... 49

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................ 27, 39, 42

*Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.,*
268 F.3d 103 (2d Cir. 2001) ............................................................ 17

*Barrows v. Forest Labs., Inc.,*
742 F.2d 54 (2d Cir. 1984) .............................................................. 51

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)........................................................................... 44

*Blonstein v. Barr Labs Inc. (In re Tamoxifen Citrate Antitrust Litig.),*
466 F.3d 187 (2d Cir. 2006) ............................................................ 53

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),*
906 A.2d 27 (Del. 2006) .............................................................. 35, 37

*Brehm v. Eisner,*
746 A.2d 244 (Del. 2000) ................................................................. 43

*Broder v. Cablevision Sys. Corp.,*
418 F.3d 187 (2d Cir. 2005) ............................................................ 33

*Bruh v. Bessemer Venture Partners III L.P.,*
464 F.3d 202 (2d Cir. 2006) ............................................................ 11

*Burns Jackson Miller Summit & Spitzer v. Lindner*,
    451 N.E.2d 459 (N.Y. 1983)...............................................................33

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993) ..................................................................34

*Clackamas Gastroenterology Associates, P.C. v. Wells*,
    538 U.S. 440 (2003)...........................................................................24

*Cornwell v. Credit Suisse Grp.*,
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) ..............................................22

*D'Allessio v. S.E.C.*,
    380 F.3d 112 (2d Cir. 2004) .............................................................46

*Del. Elec. Coop. v. Duphily*,
    703 A.2d 1202 (Del. 1997) ...............................................................32

*Elliott Assocs. v. Porsche Automobil Holdings, SE*,
    Nos. 10 Civ. 532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399
    (S.D.N.Y. Dec. 30, 2010) ..................................................................22

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)...........................................................................23

*Frank v. United States*,
    78 F.3d 815 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114
    (1997).................................................................................................46

*Gamoran v. Neuberger Berman Mgmt., LLC*,
    10 Civ. 6234 (LBS), 2010 U.S. Dist. LEXIS 119696 (S.D.N.Y. Nov. 8,
    2010) ...................................................................................................7

*Gamoran v. Neuberger Berman Mgmt., LLC*,
    10 Civ. 6234 (LBS), 2011 U.S. Dist. LEXIS 17939 (S.D.N.Y. Feb. 9,
    2011) ...................................................................................................7

*Gomes v. Am. Century Cos.*,
    No. 10-00083-SOW, 2012 U.S. Dist. LEXIS 187426 (W.D. Mo. Feb. 16,
    2012), *aff'd*, 710 F.3d 811 (8th Cir. 2013) ...........................10, 47, 48

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)...........................................................................14

*Hartsel v. Vanguard Group, Inc.*,
   Civ. A. 5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011), *aff'd*, 38
   A.3d 1254 (Del.), *cert. denied*, 133 S. Ct. 32 (2012) ........................3, 13, 20, 47

*Hartsel v. Vanguard Grp., Inc.*,
   13 Civ. 1128 (LPS) (D. Del. filed June 24, 2013)...............................................9

*Hartsel v. Vanguard Grp., Inc.*,
   C.A. No. 5394 VCP, 2011 Del. Ch. LEXIS 89 (Del. Ch. June 15, 2011),
   *aff'd*, 38 A.3d 1254 (Del.), *cert. denied*, 80 U.S.L.W. 3708 (2012) ...................9

*Hecht v. Commerce Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990) ...............................................................................48

*Horvath v. Banco Comercial Portugues, S.A.*,
   No. 10 Civ. 4697 (GBD), 2011 WL 666410 (S.D.N.Y. Feb. 15, 2011) ...........22

*Ideal Steel Supply Corp. v. Anza*,
   652 F.3d 310 (2d Cir. 2011) ........................................................................48, 49

*In re Bendectin Litig.*,
   857 F.2d 290 (6th Cir. 1988) .............................................................................33

*In re Citigroup Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ....................................................................passim

*In re Direxion Shares ETF Trust*,
   No. 09-cv-8011 (KBF), 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012)................50

*In re Lear Corp. S'holder Litig.*,
   967 A.2d 640 (Del. Ch. 2008) ....................................................................39, 43

*In re Societe Generale Secs. Litig.*,
   No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sep. 29, 2010)..........22

*J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ..............................................................................46

*Johnson v. United States*,
   559 U.S. 133 (2010).............................................................................................14

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ...................................................................................17

vi

*Kiobel v. Royal Dutch Petroleum Co.*,
133 S. Ct. 1659 (2013)...............................................................21

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
305 F.3d 140 (3d Cir. 2002) (*per curiam*), *cert. denied*, 537 U.S. 1113
(2003)...........................................................................................52

*La. Mun. Police Emps. Ret. Sys. v. Blankfein,*
No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May
19, 2009)......................................................................................35

*Mark G. v. Sabol*,
717 N.E.2d 1067 (N.Y. 1999)......................................................32

*McBoyle v. United States*,
283 U.S. 25 (1931).......................................................................15

*McBrearty v. Vanguard Grp., Inc.*,
No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009),
*aff'd*, 353 F. App'x 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct.
3411 (2010)............................................................................passim

*McCarthy v. S.E.C.*,
406 F.3d 179 (2d Cir. 2005) ........................................................46

*Meyer v. Holley*,
537 U.S. 280 (2003).....................................................................17

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007).....................................................................20

*Morrison v. Nat'l Austl. Bank*,
130 S. Ct. 2869 (2010).....................................................20, 21, 23

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) .....................................................42, 43

*NFL v. Governor of the State of Del.*,
435 F. Supp. 1372 (D. Del. 1977)................................................34

*Nicholson v. S. Oaks Hosp.*,
811 N.Y.S.2d 770 (N.Y. App. Div. 2006).....................................32

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
    631 F.3d 29 (2d Cir. 2010) (*per curiam*) ...........................................21

*Oberstein v. SunPower Corp.*,
    07-CV-1155 (JFB) (WDW), 2010 U.S. Dist. LEXIS 41402 (E.D.N.Y.
    Apr. 28, 2010) ................................................................................45

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) ..........................................................10

*People ex rel. Vacco v. World Interactive Gaming Corp.*,
    714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999)...........................25, 28, 37, 38

*People v. Brown*,
    447 N.Y.S.2d 129 (N.Y. Crim. Ct. 1982)......................................28

*People v. Byrne*,
    570 N.E.2d 1066 (N.Y. 1991).........................................................17

*Picard v. Kohn*,
    11 Civ. 1181 (JSR), 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012) ...................47

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010) .........................................19, 22

*Rewis v. United States*,
    401 U.S. 808 (1971)......................................................................18

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988) ...........................................................51

*Sanabria v. United States*,
    437 U.S. 54 (1978)........................................................................25

*Scottrade, Inc. v. BroCo Invs., Inc.*,
    774 F. Supp. 2d 573 (S.D.N.Y. 2011) ...........................................19

*Sealed Plaintiff v. Sealed Defendant*,
    537 F.3d 185 (2d Cir. 2008) ..................................................4, 11, 50

*Segal v. Bitar*,
    No. 11 Civ. 4521 (LBS), 2012 WL 273609 (S.D.N.Y. Jan 30, 2012) .............47

*Seidl v. Am. Century Cos.*,
   713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir.),
   *cert. denied*, 132 S. Ct. 846 (2011)......................................................6, 47, 48, 49

*Sofi Classic S.A. de C.V. v. Hurowitz*,
   444 F. Supp. 2d 231 (S.D.N.Y. 2006) ...............................................................17

*Stackhouse v. Toyota Motor Co.*,
   No. CV 10-0922 (DSF), 2010 WL 3377409 (C.D. Cal. July 16, 2010)............22

*State Farm Ins. Cos. v. Kop-Coat, Inc.*,
   183 Fed. Appx. 36 (2d Cir. 2006)...............................................................11, 51

*State v. Colbert*,
   IN 86-10-0897, 1987 Del. LEXIS 1286 (Del. Nov. 23, 1987)...........................17

*State v. Panaro*,
   28 Del. 230 (Del. 1914) ....................................................................................34

*United States v. Bass*,
   404 U.S. 336 (1971).........................................................................................18

*United States v. Murray*,
   928 F.2d 1242 (1st Cir. 1991)..........................................................................19

*United States v. Santos*,
   553 U.S. 507 (2008).........................................................................................19

*Villareal-Jaramillo v. Gonzalez*,
   232 Fed. Appx. 76 (2d Cir. 2007).....................................................................46

*Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*,
   537 U.S. 371 (2003).........................................................................................15

*Weems v. United States*,
   217 U.S. 349 (1910).........................................................................................25

*White v. Panic*,
   783 A.2d 543 (Del. 2001) .................................................................................43

*Wodka v. Causeway Capital Mgmt. LLC*,
   9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd,* 433 F. App'x 563 (9th Cir.),
   *cert. denied*, 132 S. Ct. 769 (2011)......................................................10, 47, 48

*Wodka v. Causeway Capital Mgmt. LLC*,
Case No. BC 463623 (Cal. Sup. Ct. May 20, 2013)..........................................10

*Wood v. Baum*,
953 A.2d 136 (Del. 2008) ..............................................................................37

*Wright v. Moffitt*,
437 A.2d 554 (Del. 1981) ...............................................................................32

*Zupnick v. Goizueta*,
698 A.2d 384 (Del. Ch. 1997) ........................................................................43

STATUTES

11 Del. C. § 282 .................................................................................................17

11 Del. C. §§ 1401-11 .......................................................................................28

12 Del. C. § 3302 ...............................................................................16, 26, 28

18 U.S.C. § 1084 ................................................................................................21

18 U.S.C. § 1952 ................................................................................................18

18 U.S.C. § 1955.........................................................................................passim

18 U.S.C. § 1961 ................................................................................................46

18 U.S.C. § 1962 ................................................................................................49

31 U.S.C. § 5361 ................................................................................................21

N.Y. Penal Law § 20.25 ....................................................................................17

N.Y. Penal Law § 225.00 ..................................................................................27

N.Y. Penal Law § 225.05 ...............................................................26, 47, 27

N.Y. Penal Law § 225.10 ..................................................................................26

N.Y. Penal Law § 225.15 ..................................................................................26

N.Y. Penal Law § 225.20 ..................................................................................26

N.Y. Penal Law § 225.30 ..................................................................................26

N.Y. Penal Law § 980 (1909) ...................................................................33

**RULES**

Fed. R. App. P. 28 ...................................................................................46

Fed. R. Civ. P. 12 ....................................................................................10

**OTHER AUTHORITIES**

115 Cong. Rec. 10735 (1969) ................................................................16

116 Cong. Rec. 590 (1970) ....................................................................16

116 Cong. Rec. 603 (1970) ....................................................................16

H.R. Rep. No. 91-1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007 .................16

Paul G. Haskell, *The Prudent Person Rule For Trustee Investment and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) .........................40

## GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| 888 | 888 Holdings plc |
| Amended Complaint | Amended Verified Derivative Complaint, *Gamoran v. Neuberger Berman Management LLC*, No. 11 Civ. 7957 (TPG) (S.D.N.Y., filed July 16, 2012) [ECF No. 50] (A-310) |
| Decision | *Gamoran v. Neuberger Berman, LLC*, 11 Civ. 7957 (TPG), 2013 WL 1286133 (S.D.N.Y. Mar. 29, 2013) (SPA-14) |
| District Court | United States District Court for the Southern District of New York |
| DOJ | United States Department of Justice |
| Fund | Nominal Defendant-Appellee-Cross-Appellant Neuberger Berman Equity Funds d/b/a Neuberger Berman International Fund |
| *Gamoran I* | *Gamoran v. Neuberger Berman Management LLC*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) |
| *Gamoran II* | *Gamoran v. Neuberger Berman Management LLC*, No. 10 Civ. 6234 (LBS) (S.D.N.Y.) |
| *Gamoran III* | *Gamoran v. Neuberger Berman Management LLC*, No. 11 Civ. 7957 (TPG) (S.D.N.Y.) |
| Investment Advisor Defendants | Defendants-Appellees-Cross-Appellants NB, NBM, Benjamin Segal, Peter E. Sundman, and Jack L. Rivkin |
| LSE | London Stock Exchange |

| Management Agreement | Management Agreement, dated November 3, 2003, between the Fund and NBM (A-385) |
| --- | --- |
| NB | Defendant-Appellee-Cross-Appellant Neuberger Berman LLC |
| NBM | Defendant-Appellee-Cross-Appellant Neuberger Berman Management LLC |
| NETeller | NETeller plc |
| OB | Brief of Appellant Benjamin M. Gamoran, dated June 12, 2013 |
| OCCA | Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 941 (1970) |
| Plaintiff | Plaintiff-Appellant-Cross-Appellee Benjamin M. Gamoran |
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* |
| SDNY | United States District Court for the Southern District of New York |
| SDC | The Special Demand Committee of the Fund's Board of Trustees consisting of Trustees Martha Clark Goss, George Morriss, and Michael Knetter |
| SEC | United States Securities and Exchange Commission |
| Trust Agreement | Amended and Restated Trust Agreement, dated December 14, 2005 (A-387) |

| Independent Trustee Defendants | Defendants-Appellees-Cross-Appellants Peter E. Sundman, Jack L. Rivkin, John Cannon, Faith Colish, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and Peter P. Trapp |
| --- | --- |

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.      Does 18 U.S.C. § 1955 or state law make it illegal for a U.S. person to purchase or own stock in publicly-traded companies whose stock is validly listed on non-U.S. stock exchanges?  The District Court correctly held that no law makes such passive investments illegal.

2.      Did the Amended Complaint state claims under RICO or for breach of fiduciary duty, negligence, waste, or breach of the Management Agreement?  Although the Defendants argued that the Amended Complaint did not state claims upon which relief could be granted, the District Court did not reach those arguments.

3.      Should the District Court have dismissed the Amended Complaint with prejudice where, *inter alia*, Plaintiff had already filed four complaints against the defendants, Plaintiff's counsel has had numerous opportunities to pursue substantively identical claims elsewhere, and Plaintiff never explained how he might cure the deficiencies that led to dismissal?  The District Court erred in dismissing "without prejudice."

## COUNTERSTATEMENT OF THE CASE

Plaintiff timely filed a notice of appeal on April 23, 2013 seeking reversal of the Decision, which dismissed the Amended Complaint "without prejudice."  The Investment Advisor Defendants and Independent Trustee

Defendants timely filed notices of cross-appeal on May 3, 2013, seeking reversal of that portion of the Decision which failed to dismiss the Amended Complaint with prejudice.

Among many other investments, the Fund[1] invested in two non-U.S. companies (NETeller and 888) whose stock was listed and traded on the LSE. Plaintiff alleges that 888 and NETeller's share prices fell dramatically after the U.S. government increased law enforcement efforts against gambling companies generally, thus harming the Fund. Plaintiff argues that purchasing 888 and NETeller shares violated federal and state laws, including Section 1955. On this basis, Plaintiff asserted claims against defendants for violation of RICO, breach of fiduciary duty, negligence, waste, and breach of contract.

On March 29, 2013, the District Court issued the Decision, which dismissed the Amended Complaint. The District Court held that the Fund's investments did not violate Section 1955, New York law, or Delaware law, noting that Plaintiff failed to cite any convincing authority in support of his arguments on those points and adopting a portion of a Delaware Chancery Court opinion

---

[1] At the time of the conduct at issue and the majority of the proceedings below, the Fund was known as the Neuberger Berman International Fund. Pursuant to a plan of reorganization and termination approved October 25, 2012, that fund was reorganized and transferred all of its assets to the Neuberger Berman Institutional Fund. This brief uses the term "Fund" to refer to both the former Neuberger Berman International Fund and the successor Neuberger Berman Institutional Fund.

2

dismissing a nearly identical case brought by Plaintiff's counsel against another

mutual fund:

> Despite having been enacted more than forty years ago and the fact that U.S. investors have been able to passively invest as stockholders in offshore gambling enterprises since the mid 2000s, the Complaint contains no allegation that any law enforcement authority or court has interpreted § 1955 to apply to passive public stockholders. Nor have Plaintiffs directed the Court to any instances where government regulatory or law enforcement agencies have brought charges against passive stockholders under § 1955.[2]

Because the Fund's Board had refused Plaintiff's demand to pursue

derivative claims, the District Court also dismissed the breach of fiduciary duty,

negligence, waste, and RICO claims, ruling that "none of [P]laintiff's allegations

[rose] to the level of specificity required to overcome the strong deference owed to

a board under the business judgment rule." (SPA-24)

The District Court dismissed Plaintiff's breach of contract claim

because Plaintiff failed to include it in an earlier demand to the Fund's Board,

holding that, by making such a demand, Plaintiff had conceded that demand was

also required with respect to his breach of contract claim. (SPA-25)

The District Court dismissed the Amended Complaint "without

prejudice." (SPA-26)

---

[2]    SPA-22 (quoting *Hartsel v. Vanguard Group, Inc.*, Civ. A. 5394-VCP, 2011 WL 2421003, at *25 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del.), *cert. denied*, 133 S. Ct. 32 (2012)).

## COUNTERSTATEMENT OF THE FACTS

Plaintiff.  Plaintiff alleged that he purchased shares in the Fund in 2000.  (A-343)  In the Amended Complaint, he purports to sue the defendants derivatively on behalf of the Fund.[3]

The Fund and the Investment Advisor Defendants.  The Fund is an open-ended investment company registered with the SEC, organized under Delaware law, with its principal place of business in New York, and is a series of Neuberger Berman Equity Funds.  (A-343–44)  NBM is the Fund's investment advisor (managing the Fund's investment portfolios and providing administrative services to the Fund) and NB is the Fund's sub-advisor.  (A-344–45)  Although Plaintiff did not discuss the Fund's overall performance during the period at issue, that publicly available fact is highly relevant:  During the two-year period about which Plaintiff complains, the Fund's share price *increased* 23.2% (beating the market during that time).  (A-272–78)

Mr. Segal was the Fund's portfolio manager at all relevant times.[4]  (A-345)  Messrs. Sundman and Rivkin, in addition to holding various positions within

---

[3]    Plaintiff has been all over the map on this issue:  He originally sued directly and derivatively (*Gamoran I*), then just derivatively (*Gamoran II*), then directly and derivatively again (*Gamoran III*), and now just derivatively again.

[4]    Plaintiff dismissed all claims against Milu Komer on October 7, 2011.

NBM and/or NB, served as interested directors of the Fund during the relevant

period.[5]  (A-345)

> <u>The Amended Complaint.</u>  Plaintiff alleged that:
>
> - The defendants caused the Fund "to illegally invest in one or more entities whose primary businesses violated state and federal anti-gambling laws."[6]
> - The nature of 888 and NETeller's businesses was disclosed to the public through public filings by 888 and NETeller, news reports, and government sources.[7]
> - Defendants knew or were reckless in not knowing that 888 and NETeller were taking bets from gamblers in the U.S. or processing payments relating to such bets.[8]
> - 888 and NETeller's share prices fell dramatically after law enforcement efforts against gambling companies increased generally and, as a result, the Fund was injured.[9]

Despite acknowledging that the Fund disclosed the 888 and NETeller investments

in regular SEC filings throughout the relevant period, Plaintiff also alleges that the

---

[5]     Mr. Sundman is no longer a Director.  *See* A-345.

[6]     A-341; *see also* A-351–52.

[7]     A-347–48; A-355–58.

[8]     A-355.

[9]     A-340; A-360.  Plaintiff does not allege any law enforcement activity against 888.  Although he alleges that there was law enforcement activity against NETeller, he concedes that it occurred after the Fund sold its NETeller stock.  *Compare* A-352 *with* A-348.  Similarly, many of Plaintiff's allegations about legislative and law enforcement activity post-date the Fund's sales of its 888 and NETeller stock (A-359–A-360) and are irrelevant to this case.

defendants somehow conspired to conceal the Fund's alleged injuries.[10]

The core of the claims asserted in the Amended Complaint is Plaintiffs' notion that passive investments in publicly-traded stock can be illegal.[11] On that basis, Plaintiff purported to bring civil RICO claims and claims for breach of contract, breach of fiduciary duty, negligence, and waste on behalf of the Fund. (A-371–75)

Background and Related Cases.  Plaintiff's first complaint (*Gamoran I*) was one of a group of cases filed in the SDNY by Plaintiff's counsel alleging that investments by several mutual funds in publicly-traded stock of certain companies were "illegal."[12]  On April 2, 2009, Judge Cote dismissed the RICO claims asserted in one of the cases, holding that the plaintiffs had failed to plead RICO proximate causation.  *See McBrearty*, 2009 WL 875220, at *3.  That

---

[10]    *Compare* A-350 (alleging conspiracy) *with* A-351–53 (acknowledging Fund's disclosures of the 888 and NETeller investments in periodic SEC reports).

[11]    *See* A-340 ("This action arises from wrongful acts committed by the defendants … when they unlawfully invested money entrusted to them in illegal gambling businesses.").

[12]    *See McBrearty v. Vanguard Grp., Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F. App'x 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411 (2010).  Judge Cote dismissed the claims in the other related case on many of the same grounds.  *See Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir.), *cert. denied*, 132 S. Ct. 846 (2011).  Seidl made a post-dismissal demand, filed a separate lawsuit based on that demand, and then argued that the demand-refused complaint mooted the dismissal of the original case; this Court disagreed.  *See* 427 F. App'x 35, 37-38.

decision was affirmed on appeal and became final.  As a result of that decision (which was then on appeal), Plaintiff voluntarily dismissed *Gamoran I* on May 19, 2009.  (A-240–43)

On July 16, 2010, Plaintiff re-filed the derivative claims he had asserted in *Gamoran I* (but not the RICO claims) in the Supreme Court of the State of New York, County of New York.[13]  Defendants removed that case (*Gamoran II*) to the SDNY.  Judge Sand denied Plaintiff's motions to remand and for reconsideration,[14] setting the stage for the defendants to move to dismiss the case on the merits.  But on February 17, 2011, just days before defendants filed their motions to dismiss, Plaintiff demanded that the Fund's Board pursue the claims alleged in his second complaint.[15]  Because that was a concession that demand had not been excused in the first place (despite Plaintiff's allegations to the contrary), Judge Sand dismissed the case without prejudice.[16]

Without waiting for the Fund's Board to respond to his demand, Plaintiff filed his third complaint relating to the Fund (*Gamoran III*) on August 24,

---

[13]    *See* A-363; A-100–128.

[14]    *See Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234 (LBS), 2010 U.S. Dist. LEXIS 119696, at *15 (S.D.N.Y. Nov. 8, 2010); *Gamoran v. Neuberger Berman Mgmt., LLC*, 10 Civ. 6234 (LBS), 2011 U.S. Dist. LEXIS 17939, at *8 (S.D.N.Y. Feb. 9, 2011).

[15]    A-363.

[16]    *Id.*; *see* A-132.

2011.  In a blatant attempt to avoid the unfavorable rulings in this Court, the
SDNY, and the Delaware Court of Chancery, Plaintiff filed *Gamoran III* in the
District of Delaware.  On November 4, 2011, Chief Judge Sleet granted the
Investment Advisor Defendants' motion to transfer *Gamoran III* to the SDNY,
calling Plaintiff's conduct "the epitome of forum shopping."[17]

On December 8, 2011, defendants moved to dismiss *Gamoran III*.
Shortly thereafter, on March 16, 2012, the Board sent Plaintiff's counsel a letter
responding to Plaintiff's demand.  The letter explained that the Board had formed
the SDC and that the SDC had investigated, reviewed, and analyzed the allegations
and circumstances that were the subject of Plaintiff's demand.[18]  After extensive
consideration, the SDC concluded that the evidence did not support civil RICO
claims or claims for breach of fiduciary duty, negligence, or waste.[19]  On June 12,
2012, the District Court dismissed *Gamoran III*, holding that "[P]laintiff did not
comply with Delaware's demand requirement and Fed. R. Civ. P. 23.1," but
granted Plaintiff leave to replead.[20]  On July 16, 2012, Plaintiff filed the Amended
Complaint, which is the subject of this appeal.

---

[17]     *See* A-431.

[18]     A-433.

[19]     A-435.

[20]     SPA-12.

Beyond the tortured history of this case itself, the larger context of the substantively identical litigations Plaintiff's counsel has pursued around the country against other mutual funds is critical to understanding why the District Court's failure to dismiss with prejudice was erroneous. The Amended Complaint is not just the fourth complaint Plaintiff has filed against the defendants in this case about the same investments, it is one of 14 complaints Plaintiffs' counsel has filed around the country against mutual funds based on the same meritless theory that merely investing in publicly-traded stock can be illegal:

- Plaintiff's counsel refiled the non-RICO claims originally asserted in *McBrearty* in the Delaware Court of Chancery. On June 15, 2011, Vice Chancellor Parsons dismissed that complaint with prejudice for failure to make demand. He expressed skepticism of the theory that investments such as those at issue here were "illegal," and his decision was affirmed by the Delaware Supreme Court and cited favorably in the Decision.[21] After demand was refused in those cases, Plaintiff's counsel re-filed the RICO and non-RICO claims previously asserted in *McBrearty*, but this time in the United States District Court for the District of Delaware, again trying to avoid: (i) the forum in which those claims were originally filed and (ii) the forum that had expressed skepticism of the theory of the cases.[22]

- After Judge Cote dismissed the RICO claims in *McBrearty*,

---

[21] *Hartsel v. Vanguard Grp., Inc.*, C.A. No. 5394 VCP, 2011 Del. Ch. LEXIS 89, at *109 (Del. Ch. June 15, 2011) ("Plaintiffs' arguments essentially hinge on whether purchasing or owning the Challenged Securities is a crime under § 1955. … I am not convinced that this conduct is criminal."), *aff'd*, 38 A.3d 1254 (Del.), *cert. denied*, 80 U.S.L.W. 3708 (2012).

[22] *See Hartsel v. Vanguard Grp., Inc.*, 13 Civ. 1128 (LPS) (D. Del. filed June 24, 2013).

Plaintiff's counsel filed substantially similar complaints, including RICO claims, against mutual funds in the United States District Courts for the Central District of California (*Wodka v. Causeway Capital Management*) and Eastern District of California (*Gomes v. American Century Companies, Inc.*).  Citing *McBrearty*, the *Wodka* court dismissed the RICO claims, the Ninth Circuit affirmed, and the Supreme Court denied *certiorari*.[23]  Not surprisingly, Plaintiff's counsel refiled the *Wodka* derivative claims in state court, where they were recently dismissed yet again.[24]

- After Plaintiff's counsel refiled the *Gomes* action in the Western District of Missouri, that court dismissed the action.  Observing that "numerous courts have already expended time and resources writing on the same legal issues," the *Gomes* court held that "[t]he legal issues [had] been litigated and decided by several courts around the country" and that it could "find no reason why the claims [there] should fare any better," and the Eighth Circuit affirmed.[25]

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

This Court reviews a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) *de novo*,[26] and conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal.[27]  This Court may affirm a

---

[23]   *Wodka v. Causeway Capital Mgmt. LLC*, 9 Civ. 2625 (C.D. Cal. Oct. 8, 2009), *aff'd,* 433 F. App'x 563 (9th Cir.), *cert. denied*, 132 S. Ct. 769 (2011).

[24]   Notice of Entry of Order on Defendants' Demurrers, *Wodka v. Causeway Capital Mgmt. LLC*, Case No. BC 463623 (Cal. Sup. Ct. May 20, 2013).

[25]   *Gomes v. Am. Century Cos.*, No. 10-00083-SOW, 2012 U.S. Dist. LEXIS 187426, at *7 (W.D. Mo. Feb. 16, 2012), *aff'd*, 710 F.3d 811 (8th Cir. 2013).

[26]   *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1197-98 (2d Cir. 1996).

[27]   *See Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.

dismissal for any reason supported by the record, including one rejected or not reached by the District Court.[28]

A decision regarding whether to allow repleading is reviewed for abuse of discretion.[29]  Application of an incorrect legal standard is *per se* abuse of discretion requiring reversal.[30]

## SUMMARY OF ARGUMENT

The key to this case is Plaintiff's notion that it could be illegal for a passive investor to own publicly-traded stock that is validly listed and traded on a non-U.S. exchange.  If the Court agrees that no statute Plaintiff has cited makes it illegal to own publicly-traded stock, that would be sufficient to affirm the dismissal of the entire Amended Complaint and would eliminate the need to address any other issues, including issues relating to whether demand was required or properly refused (allowing the Court to ignore the vast majority of Plaintiff's arguments (OB 29-52)).[31]

---

2006).  Plaintiff's reliance on *Walker v. Schult*, 2013 WL 2249159 (2d Cir. May 23, 2013), is misplaced because Plaintiff is not *pro se*.

[28]  *See  Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 205 (2d Cir. 2006).

[29]  *See State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 Fed. Appx. 36, 37 (2d Cir. 2006)

[30]  *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008).

[31]  For example, one of Plaintiff's bases for attacking the SDC's refusal of his demand is the argument that the SDC's conclusions on this legal issue were

The District Court's conclusion that nothing Plaintiff cited supported his "illegal" investment theory was correct.  Basic principles of statutory construction make clear that the statutes Plaintiff relies on do not criminalize passive ownership of publicly-traded securities — that would represent a significant change to background corporate law which there is no evidence any legislature intended to effect.  And three entirely separate canons — the rule of lenity, the presumption against extraterritoriality, and the requirement to resolve ambiguities to avoid unreasonable interference with the sovereign authority of other nations — also preclude the interpretations Plaintiff advances.

The Amended Complaint also fails for other reasons.  It does not satisfy any of the requirements for pleading a RICO claim, nor does it plead viable claims for breach of fiduciary duty, negligence, waste, or breach of contract.  And Plaintiff has pleaded that all the claims are time-barred.

Finally, the District Court should have dismissed the Amended Complaint with prejudice.  Any way one looks at the Amended Complaint it fails as a matter of law, and Plaintiff and his counsel have had more than enough opportunities to try to plead these claims.  Yet Plaintiff and his counsel continue to press baseless claims that respected fund managers committed felonies by simply investing in publicly-traded securities that a sovereign ally of the United States

---

wrong.  (OB 22)  If the Court agrees with the Defendants, that resolves all issues at once.

allowed to be listed and traded on one of its markets.  Because it is clear that

Plaintiff cannot plead viable claims, the District Court should have ended this

litigation by dismissing the Amended Complaint with prejudice.

## ARGUMENT

### I.    THE FUND DID NOT VIOLATE SECTION 1955

In holding that the Fund's purchases of 888 and NETeller stock did

not violate Section 1955, the District Court adopted the Chancery Court's

reasoning in dismissing a nearly identical case.[32]  That conclusion was correct and

should be affirmed.

### A.    Section 1955's Use Of "Owns" Does Not Include Purchasing Or Owning Publicly-Traded Stock

The plain language of Section 1955 does not support an interpretation

that owning publicly-traded stock violates the statute.  Section 1955 makes it a

crime to "conduct[], finance[], manage[], supervise[], direct[], or own[] all or part

of an illegal gambling business" (with "illegal gambling business" separately

defined in the statute).  The first five verbs clearly contemplate active participation

in the operation of a business, and there is significant overlap in these five words'

meanings — at least four are synonyms for each other.[33]  Every prosecution

---

[32]    *See* SPA-9 (*quoting Hartsel*).

[33]    *See, e.g.,* www.thesaurus.com/browse/direct (listing "manage, oversee" as the definition of "direct" and including "conduct," "supervise," and "control" as synonyms) (last visited July 10, 2013).

Plaintiff cites in the Amended Complaint is consistent with that construction, and none involved prosecuting passive owners of publicly-traded stock.

Although the statute includes the word "own," interpreting that word to include passive ownership of publicly-traded stock makes no sense and is inconsistent with the normal canons of statutory construction. *First*, context determines the meaning of words used in statutes.[34] In particular, the canon *noscitur a sociis* requires that words grouped together in a list be given related meanings, which prevents statutes from being given unintended breadth by not ascribing to one word a meaning so broad that it is inconsistent with the words accompanying it.[35] The terms that precede "own" in Section 1955 — "conduct[], finance[], manage[], supervise[], [and] direct[]" — connote influence over, responsibility for, or participation in the gambling operation itself,[36] and "own" must be read in the same context. The fact that Section 1955 starts with five definitional words that are not compatible with the notion that passive ownership of publicly-traded stock violates the statute requires the conclusion that Congress did not intend to sweep broader conduct in with the catchall word in the definition.

*Second*, the canon *ejusdem generis* requires that where general words

---

[34]     *See Johnson v. United States*, 559 U.S. 133, 139-40 (2010) ("we 'do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense'").

[35]     *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

[36]     Indeed, "control" is a synonym for four of these words.  *See supra* note 33.

14

follow an enumeration of specific items, the general words apply only to items akin to those that were specifically enumerated.[37]  Thus, even if "own" could be viewed as more general than "conduct," "finance," "manage," "supervise," and "direct," this canon would require that its scope be limited to the scope of the more specific words preceding it.  That precludes Plaintiff's interpretation of "own."

*Third*, courts consider the common usage of words and phrases when interpreting criminal statutes.[38]  Under the common usage of "own," a minority stockholder does not "own" the corporation in which he holds stock — no one says that a person who owns 100 shares of Coca-Cola Company "owns" the Coca-Cola Company.  Rather, the common usage of "own" connotes responsible ownership, which requires significant influence over or responsibility for that which is "owned."  That reading of what triggers liability under Section 1955 is consistent with the other five words Congress chose to define the scope of Section 1955 (four of which are synonyms for "control").  And it comports with what a reader using "everyday speech" would take from the text and legislative history of Section 1955 to be the intended targets of the statute — owner-operators and organized crime

---

[37]     *See Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371, 384-85 (2003) (applying both *noscitur a sociis* and *ejusdem generis* to reject interpretation of catchall provision of statute that would have been broader than specific words in statutory enumeration).

[38]     *McBoyle v. United States*, 283 U.S. 25, 27 (1931).

15

figures,[39] not passive investors purchasing publicly-traded stock on major

exchanges.

Together and separately, these rules of construction require the Court

to affirm the dismissal of the Amended Complaint.

### B.    Congress Did Not Intend To Criminalize The Mere Purchase Or Ownership Of Stock

If Congress had intended Section 1955 to criminalize the purchase or

ownership of publicly-traded stock, it would have done a better job of saying that.

Congress stated that Section 1955 was intended to reach "<u>only</u> those persons who

prey systematically upon our citizens and <u>whose</u> syndicated operations are so

continuous and so substantial as to be of national concern" and are "of

considerably greater magnitude than simply meet[ing] the minimum definitions."[40]

The use of the word "only" makes clear that the statute's reach was intended to be

narrow, and the use of the word "whose" makes clear that the reach was restricted

to operators of gambling businesses.  Nor can one can say that buying or selling

stock on a non-U.S. market regulated by a separate sovereign nation counts as

"preying upon" U.S. citizens, especially given that Delaware law expressly

authorizes fiduciaries to invest in foreign securities (12 Del. C. § 3302).  Had

---

[39]    *See* 115 Cong. Rec. 10735 (1969); 116 Cong. Rec. 590 (1970); 116 Cong. Rec. 603 (1970).

[40]    H.R. Rep. No. 91-1549, at 21 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4029 (emphasis added).

16

Congress intended to do what Plaintiff now says it did, it would have spoken more clearly.

Put differently, a broad interpretation of "own" is also inconsistent with well-established legal principles that purposely create a divide between corporate entities and their shareholders. Congress legislates against a backdrop of common law and traditional concepts and intends for its legislation to incorporate those rules and concepts unless it specifically says otherwise.[41] One of the primary purposes of a corporation is to insulate shareholders from legal liability,[42] and state law is clear that owning stock in a company is not the same as owning the company or its assets. Thus, individuals generally are not liable for the criminal conduct of a corporation unless they performed or caused to be performed the criminal conduct in question.[43] In light of these principles, the fact that neither the

---

[41] *See generally Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("when Congress creates a tort action, it legislates against a legal background of ordinary tort-related … liability rules and consequently intends its legislation to incorporate those rules"); *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001) (to abrogate common law principle, statute must "speak directly" to the question addressed by the common law).

[42] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006).

[43] Both New York and Delaware recognize this principle. *See* N.Y. Penal Law § 20.25; 11 Del. C. § 282; *People v. Byrne*, 570 N.E.2d 1066, 1069 (N.Y. 1991); *State v. Colbert*, IN 86-10-0897, 1987 Del. LEXIS 1286, at *5 (Del. Nov. 23, 1987).

text nor the legislative history of Section 1955 specifically states that passive

ownership of publicly-traded stock could violate the statute "strongly suggests that

Congress did not intend [for] the statute [to] have [such] broad reach."[44]

       *Rewis v. United States*, 401 U.S. 808 (1971), provides a good example

of these principles.  *Rewis* considered whether 18 U.S.C. § 1952, which prohibits

interstate travel in furtherance of gambling, also prohibited gambling operations

simply because they were patronized by out-of-state bettors.  The Supreme Court

observed that persons in the United States can easily travel between states and that

there are many multi-state metropolitan areas, creating a situation in which

criminal activity is often patronized by out-of-state customers.[45]  The Court thus

held that an expansive interpretation of § 1952 could "alter sensitive federal-state

relationships … overextend limited federal police resources, and … produce

situations in which the geographic origin of customers, a matter of happenstance,

would transform relatively minor state offenses into federal felonies."  *See id.*

Although the Court refused to "weigh the merits of these factors," it held that the

absence of any discussion of these factors in the legislative history showed that

Congress did not intend § 1952 to apply to such gambling operations.  *See id.*

---

[44]     *United States v. Bass*, 404 U.S. 336, 350 (1971).

[45]     *See* 401 U.S. at 812.

The answer must be the same here. Investors can easily purchase stock on exchanges around the world without leaving "home."[46] And they can become owners of stock without even intending to purchase it, such as by receiving it as a gift, bequest, or charitable donation. Plaintiff's interpretation of Section 1955 would (i) criminalize the mere ownership of stock (which is not traditionally prohibited by state or federal law), (ii) create conflicts with foreign sovereigns and regulators (*see infra* Point I(E)), and (iii) make criminals out of investors who do no more than participate in open-market transactions or obtain ownership of stock inadvertently. The text and legislative history of Section 1955 address none of these issues, strongly suggesting that Congress did not intend Section 1955 to do what Plaintiff argues it does.

## C.    The Rule Of Lenity Forecloses Plaintiff's Claims

The rule of lenity requires ambiguities in a criminal statute to be resolved in a defendant's favor, and it applies to civil cases in which criminal statutes are interpreted.[47] Plaintiff alleges that the Fund violated Section 1955's

---

[46]    *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 177-78 (S.D.N.Y. 2010).

[47]    *See generally United States v. Santos*, 553 U.S. 507, 514 (2008) ("Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."); *United States v. Murray*, 928 F.2d 1242, 1246 (1st Cir. 1991) ("The doctrine of lenity 'rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature.'") (citations omitted); *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F.

19

prohibition on "owning part of" an illegal gambling operation. (A-374) The question is whether owning publicly-traded shares in lawfully listed and traded corporations is what Congress intended to prohibit in Section 1955. If Plaintiff's construction of the statute was plausible, the term "own all or part of" would be ambiguous with regard to open market purchases and ownership of publicly-traded stock in lawfully listed corporations.[48] The rule of lenity would thus preclude Plaintiff's interpretation of Section 1955 even if it were plausible.

### D.    Section 1955 Has No Extraterritorial Application

Even if Plaintiff's construction of Section 1955 was remotely plausible, it would conflict with the presumption against extraterritoriality. The Supreme Court has made clear that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," and that presumption applies in all cases.[49] Put differently, "[f]oreign conduct is generally the domain of foreign law."[50]

Although Congress knows how to write a statute to have extraterritorial effect, Section 1955 contains no indication that Congress intended it

---

Supp. 2d 573, 584 (S.D.N.Y. 2011) (applying rule of lenity to interpretation of Computer Fraud and Abuse Act in civil action).

[48]    *See Hartsel*, 2011 WL 2421003, at *25 (calling Plaintiff's counsel's interpretation of Section 1955 "anything but clear and unambiguous").

[49]    *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2873, 2878 (2010).

[50]    *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007).

to apply extraterritorially.[51]  Section 1955's use of "all or part of" does not alter

this analysis — the Supreme Court recently held that "generic terms like 'any' or

'every' do not rebut the presumption against extraterritoriality."[52]  The phrase "all

or part of" is equally generic and does not rebut the presumption against

extraterritoriality.  And this analysis is consistent with the fact that Section 1955

was enacted as part of the legislation that produced the RICO statute, which itself

has no extraterritorial application.[53]  Indeed, Plaintiff implicitly concedes that U.S.

anti-gambling laws have no extraterritorial reach by pleading that 888 and

NETeller chose not to list their stock in the U.S. "to evade the reach of the U.S.

criminal justice system … ." (A-349)

Section 1955 thus applies solely to conduct occurring in the U.S.,

which is not what this case involves.  Following *Morrison*, courts have expressly

rejected the theory that a purchase by a U.S. investor of stock of a non-U.S.

---

[51]  For example, the Wire Act expressly applies to "the transmission in interstate *or foreign commerce* of bets or wagers or information assisting in the placing of bets or wagers," 18 U.S.C. § 1084(a) (emphasis added), and the Unlawful Internet Gambling Enforcement Act was enacted to proscribe gambling that "crosses State or national borders," 31 U.S.C. § 5361(a)(4). In contrast, Section 1955 applies only to a business that is a violation "of the law of a State or political subdivision in which it is conducted," and "State" means "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." 18 U.S.C. § 1955(b).

[52]  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013).

[53]  *See Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (*per curiam*).

21

company on a non-U.S. market "occurs" in the U.S.  Such purchases occur outside

the U.S., and neither (i) the fact that an investor might have decided in the U.S. to

purchase stock outside the U.S. nor (ii) the location of the alleged harm are enough

to overcome the presumption that federal statutes do not apply in those

circumstances.[54]  Here, 888 and NETeller were listed and traded on the LSE and

Plaintiff concedes that the Fund's purchases of those securities were made on the

LSE.[55]  Thus, Section 1955 could not apply to the Fund's purchases or ownership

of 888 and NETeller stock.[56]

        Finally, Plaintiff has argued that Section 1955 must be read broadly to

ensure that foreign countries do not become safe havens for companies to violate

---

[54]    *See Horvath v. Banco Comercial Portugues, S.A.*, No. 10 Civ. 4697 (GBD), 2011 WL 666410, at *2-3 (S.D.N.Y. Feb. 15, 2011);  *Swiss Reins. Co.*, 753 F. Supp. 2d at 177-79; *In re Societe Generale Secs. Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286, at *5 (S.D.N.Y. Sep. 29, 2010); *Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 (DSF), 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 628 (S.D.N.Y. 2010).

[55]    A-346–49.

[56]    *Accord Elliott Assocs. v. Porsche Automobil Holdings, SE*, Nos. 10 Civ. 532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399, at *24 (S.D.N.Y. Dec. 30, 2010) (noting that '34 Act was not intended to regulate foreign securities exchanges and *Morrison*'s "strong pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate").  The same reasoning applies here — U.S. courts should not interfere with foreign corporate or securities regulation without a clear legislative mandate, and there is no such mandate here.

U.S. laws.[57]  That argument directly contradicts the presumption that U.S. statutes

do not have extraterritorial application unless Congress says so specifically.

Indeed, in *Morrison* the Solicitor General argued that extraterritorial application of

the securities laws was necessary to prevent the U.S. from becoming a Barbary

Coast for wrongdoers perpetrating frauds in other markets, and the Supreme Court

rejected that argument because it had no textual basis.[58]  Plaintiff's interpretation

of Section 1955 is no different and should also be rejected.

### E.   Extraterritorial Application Of Section 1955 Would Interfere With Britain's Regulation Of Its Own Commercial Affairs

The presumption against extraterritoriality is reinforced by a separate

canon of construction requiring American courts to resolve statutory ambiguities to

"avoid unreasonable interference with the sovereign authority of other nations."[59]

By doing so, judges "help[] the potentially conflicting laws of different nations to

work together in harmony—a harmony particularly needed in today's highly

interdependent commercial world."[60]

---

[57]   *See* Plaintiff's Brief In Opposition To Defendants' Motions To Dismiss at 20, *Gamoran v. Neuberger Berman LLC*, 11 Civ. 7957(TPG)(KNF) (S.D.N.Y. filed Oct. 9, 2012) [ECF No. 60].

[58]   *See Morrison*, 130 S. Ct. at 2886.

[59]   *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).

[60]   *Id.* at 164-65.

Plaintiff's interpretation of Section 1955 would result in *de facto* regulation of Britain's financial markets by Congress.  Plaintiff does not dispute that 888 and NETeller stock were, under English law, legally listed and traded on the LSE.  But by prohibiting U.S. citizens and entities from purchasing or selling these securities on the LSE, Plaintiff's interpretation of Section 1955 would override Britain's sovereign decision regarding which securities should be allowed to be listed and traded on the LSE and who should be allowed to purchase them. Congress might have the theoretical power to enact such a far-reaching regulation, but American courts are required to resolve any ambiguity *against* such interference in the sovereign authority of other countries.  Here, with no statutory text or legislative history suggesting that Congress intended Section 1955 to do what Plaintiff claims it does, this canon of construction requires the rejection of Plaintiff's interpretation.

### F.    Plaintiff's Citations Do Not Support The Claim That Investing In Publicly-Traded Stock Can Be Illegal

Plaintiff cites just three cases in his argument that owning publicly-traded stock can be illegal.  But none have anything to do with that issue:

- Plaintiff cites *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003), to argue that a shareholder "owns" a company. (OB 26-27)  But *Clackamas* did not decide that issue.  It decided whether four physicians who owned their medical practice through a closely-held professional corporation were employees for purposes of the Americans with Disabilities Act, which has nothing to do with whether owning publicly-traded stock can be illegal.

24

- Plaintiff cites *Weems v. United States*, 217 U.S. 349 (1910), to argue for a broad interpretation of Section 1955.  (OB 28-29)  But *Weems* was not about Section 1955 and was not even about determining the scope of any federal criminal statute — it was about whether a Philippine statute violated the constitutional prohibition on cruel and unusual punishment.

- Plaintiff cites *Sanabria v. United States*, 437 U.S. 54 (1978), for the proposition that Section 1955 has been "construed broadly."  (OB 28)  But *Sanabria* does not address (or even mention) whether ownership of publicly-traded stock violates Section 1955.

Plaintiff attempts to get around the fact that no authorities say that owning publicly-traded stock can be illegal by arguing that this is a case of first impression and that it was impossible to invest in off-shore Internet gambling businesses before mid-2000.  (OB 28)  But *World Interactive Gaming Corp.* (which Plaintiff repeatedly cites) demonstrates that it has been possible to invest in such companies since at least 1998.[61]  Critically, when those operations were shut down, U.S. stockholders were not prosecuted.

And although Plaintiff goes to great lengths to discuss prosecutions of Internet-based off-shore gambling operations themselves (including NETeller) (A-355–60), he cannot cite a single instance where charges have been brought against passive stockholders.  The simple explanation for this (which the District Court correctly adopted) is that passive ownership of publicly-traded stock is not illegal.

---

[61]  *See People ex rel. Vacco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 848 (N.Y. Sup. Ct. 1999).

25

## II.    THE FUND DID NOT VIOLATE NEW YORK OR DELAWARE LAW

For the same reasons it held that the Funds' purchases of stock in 888 and NETeller did not violate Section 1955 — Plaintiff failed to cite any precedent or convincing authority in favor of that theory — the District Court also held that the Fund did not violate Article 225 of the New York Penal Law and 12 Del. C. § 3302.  (SA-8–9)  That decision should be affirmed.

### A.    The Fund's Investments Did Not Violate New York Law

The only provision of the New York Penal Law that is even potentially applicable here is § 225.05, which criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity."[62]  Those terms are defined in the statute:

- "[A]dvanc[ing] gambling activity" means "conduct that materially aids any form of gambling activity."

- "[P]rofit[ing] from gambling activity" means "when, other than as a player, [defendant] accepts or receives money or other property pursuant to an agreement or understanding with any person whereby

---

[62]    Other provisions of Article 225 cannot be at issue because Plaintiff does not allege that defendants directly participated in operating any gambling enterprise.  *See* N.Y. Penal Law § 225.10 (prohibiting "bookmaking," lotteries, and "numbers games"); N.Y. Penal Law § 225.15 (possession of gambling records); N.Y. Penal Law § 225.20 (same); N.Y. Penal Law § 225.30 (possession of a gambling device).  Plaintiff does not allege that someone does any of the things prohibited by these statutes by buying or owning publicly-traded stock (which would be inconsistent with the general principle that shareholders do not own a corporation's assets).

26

[defendant] participates or is to participate in the proceeds of gambling activity."

Plaintiff does not allege that the Fund did either, instead alleging that the Fund bought and owned publicly-traded stock and engaged in normal passive shareholder behavior.  (A-352–53)  Such ordinary incidents to owning publicly-traded stock cannot qualify as "considerably" or to a "great extent" aiding gambling activity and thus do not qualify as "materially aiding" a gambling company.[63]  Plaintiff also does not allege conduct that fits the statutory definition of "profit[ing] from gambling activity."[64]  In any event, just as with Section 1955, the rule of lenity would preclude Plaintiff's arguments even if they were textually plausible (which they are not).

That Article 225 cannot apply here can also be seen by looking at the specific behaviors prohibited under § 225.05, including possessing gambling equipment, soliciting persons to gamble, conducting gambling games, and allowing a building to be used for gambling.[65]  That list shows that the intended scope of the statute is defendants who operate gambling businesses, which is how

---

[63]    *See Shing*, 371 N.Y.S.2d 322, 326 (N.Y. Crim. Ct. 1975).  Because all Plaintiff has done is plead ordinary investor activity as opposed to actions that could plausibly be viewed as improper, the Amended Complaint did not satisfy the requirements of Fed. R. Civ. P. 8.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009).

[64]    Nor does Plaintiff allege "profit" in any other sense — he alleges that the Fund *lost* money on the 888 and NETeller investments.  *See* A-376.

[65]    N.Y. Penal Law § 225.00.

27

New York courts have applied it.[66]  But no court has applied it to passive owners of publicly-traded stock.  Indeed, in the only instance Plaintiff cites in which Article 225 was even applied to an online casino company, the New York Attorney General did not prosecute passive stockholders.[67]

### B.   The Fund's Investments Did Not Violate Delaware Law

Because Delaware law specifically allows fiduciaries to purchase foreign stocks (12 Del. C. § 3302), the only way Plaintiff could assert claims for violations of Delaware law would be if some other Delaware law prohibited buying and owning foreign securities that § 3302 allowed the Fund to buy.  There is no such law.  Certain Delaware statutes deal with lotteries or numbers games (11 Del. C. §§ 1401-02), sports betting (11 Del. C. § 1403), providing premises for gambling or possessing gambling devices (11 Del. C. §§ 1404-06), engaging in a crap game (11 Del. C. § 1407), and disseminating gambling information (11 Del. C. § 1411).  But none prohibit passive ownership of publicly-traded stock.  In each case, the statutes make clear that they only apply to those who actually participate in the gambling activity.  And once again any ambiguity would, under the rule of lenity, mean that Plaintiff's claims fail.

---

[66]   *See Shing*, 371 N.Y.S.2d at 326-27; *People v. Brown*, 447 N.Y.S.2d 129, 131 (N.Y. Crim. Ct. 1982).

[67]   *See World Interactive Gaming*, 714 N.Y.S.2d at 848.

## C.    Plaintiff's Claims Regarding Violations Of State Law Are Barred By The Dormant Commerce Clause

Even if Plaintiff's arguments about state criminal laws made textual sense and could survive the rule of lenity, the application of such laws to transactions occurring outside the U.S. would violate the dormant Commerce Clause.  A state statute violates the dormant Commerce Clause if it has the practical effect of exerting control over commerce occurring entirely outside the boundaries of the state in question.[68]  The conduct complained of here is the Fund's investments in 888 and NETeller, which were not domestic transactions and did not occur within the boundaries of any U.S. state.

Application of any state's law to prohibit the transactions would thus violate the dormant Commerce Clause.  This can be seen by noting the absurd results that would follow from Plaintiff's theory:

- Assume that State X's law made it a crime to buy or own publicly-traded stock.

- Assume that at precisely the same moment in time, an investor in State X and an investor in Paris each directed their brokers to purchase one share of NETeller or 888 stock on the LSE.  Because both transactions took place on the LSE, both investors would have done the same thing, at the same time, in the same place.  So which investor violated state law — both investors, only the Parisian investor, or only the State X investor?

---

[68]    *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (Vermont law regulating internet communications containing sexually explicit materials violated dormant Commerce Clause).

29

- Because both transactions took place on the LSE and outside both State X and Paris, there is no analytically consistent basis to avoid finding that the Paris investor violated State X's law if the State X investor did so.  Indeed, assume there was such a basis, but that the Parisian investor and the State X investor switched domiciles while they still owned the single NETeller or 888 share each purchased on the LSE.  Would the Parisian investor then be in violation of State X's law and the State X investor not be?  Answering yes is absurd,[69] but answering no means there was no basis to distinguish between the investors in the first instance.

Because every analytically consistent interpretation of state law that would cover the Fund's investments in 888 and NETeller necessarily implies state regulation of purely foreign conduct, the dormant Commerce Clause precludes those interpretations and thus precludes the application of state law to the Fund's investments in 888 and NETeller.

---

[69] Such an interpretation of state law would frustrate world markets and international travel and raise significant foreign policy power issues: Anyone owning stock, even stock purchased on a non-U.S. exchange, would have to study the laws of all fifty states before setting foot in the U.S. to avoid interpretations like the one Plaintiff advances.  And any U.S. citizen would need to investigate whether stock they owned would violate the laws of any state they traveled to, even if such a purchase was legal in their home state and the jurisdiction that was home to the exchange the purchase was made on.  And anyone receiving shares of stock as a gift or charitable donation would have to consider whether simply receiving such stock was a criminal act.  This is what limitations on state power like the dormant Commerce Clause are designed to avoid.

### III.    THE DISTRICT COURT'S DECISION DISMISSING PLAINTIFF'S COMMON LAW AND BREACH OF CONTRACT CLAIMS SHOULD BE AFFIRMED BECAUSE THE AMENDED COMPLAINT FAILED TO STATE A CLAIM UPON WHICH RELIEF COULD BE GRANTED

The Investment Advisor Defendants adopt the arguments set out in the Independent Trustee Defendants' Principal And Response Brief, which require the affirmance of the Decision because Plaintiff did not plead sufficient facts to overcome the SDC's refusal of his demand. In addition, the dismissal of the common law and breach of contract claims should be affirmed for the reasons set forth below.

### A.    The Fund's Ownership Of Neteller And 888 Stock Was Not Illegal

All of Plaintiff's claims are premised on the notion that the Fund's purchase and ownership of NETeller and 888 stock was illegal. (*E.g.*, A-250, A-340, A-353) As the District Court held and for the additional reasons set forth above, that is wrong. As a result, each of Plaintiff's common law claims and breach of contract claim fail and were properly dismissed.

### B.    Plaintiff Did Not Plead Negligence Per Se

Plaintiff argued that the Fund's investments in 888 and NETeller were negligence *per se*. (OB 12-13) Negligence *per se* requires that a plaintiff asserting the negligence claim be a part of the class of persons that the statute he or she

31

claims was violated was intended to protect.[70]  And because negligence *per se*

effectively creates a private right of action for violating a statute, the creation of

such a right must be consistent with the legislative scheme in which the statute was

enacted.[71]  Because neither is true here, Plaintiff cannot rely on negligence *per se*.

> <u>Section 1955</u>.  Congress enacted Section 1955 as part of the OCCA,

which also enacted RICO.[72]  Congress intended the OCCA to halt the influence of

organized crime, which threatened to "infiltrate and corrupt legitimate business and

labor unions."[73]  But Plaintiff did not allege conduct remotely like what Congress

targeted through the OCCA — he alleged passive ownership of stock the LSE

deemed appropriate for listing and trading on that market, something Congress has

no say in.  Nor would allowing Plaintiff to proceed on a negligence *per se* theory

based on Section 1955 be consistent with the legislative scheme Congress enacted:

- Congress enacted Section 1955 against the backdrop of general corporate law, in which shareholders are not held liable for acts of a corporation except in unusual situations not present (or even alleged) here.  If Congress had meant to change the ordinary rule that shareholders are not liable for the activities of the companies in which they invest, it would have said so specifically.

---

[70]  *Del. Elec. Coop. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997); *Nicholson v. S. Oaks Hosp.*, 811 N.Y.S.2d 770, 771 (N.Y. App. Div. 2006).

[71]  *See Wright v. Moffitt*, 437 A.2d 554, 559 (Del. 1981); *Mark G. v. Sabol*, 717 N.E.2d 1067, 1070 (N.Y. 1999).

[72]  *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (codified in various sections of the U.S. code).

[73]  *See id.*, 84 Stat. at 923; *see also supra* note 39.

- Only Congress can create a private right of action to enforce federal law,[74] but it did not do so for Section 1955 other than by means of a RICO claim (which fails here for the reasons discussed below). Allowing Plaintiff to try to create a private right of action through the back door of state law would be inconsistent with Congress's intent in enacting Section 1955 and is thus impermissible.[75]

New York Law.  Prior to 1967 (when the New York Legislature reformed New York's anti-gambling statutes), several New York statutes provided for civil remedies relating to gambling enterprises.  For example, under the previous statutory regime, persuading a person to visit a gambling establishment gave rise to a civil claim for that person's gambling losses.[76]  The 1967 enactment eliminated those remedies.  The New York Legislature clearly understood how to create civil claims for violations of criminal anti-gambling statutes, but chose to eliminate such claims when it created Article 225.  Where, as here, the New York legislature has repealed an explicit private right of action, no private right of action remains.[77]  Allowing Plaintiff to rely on negligence *per se* here would thus conflict with New York law.

---

[74]    *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

[75]    *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005); *In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988).  Plaintiff seeks to use common law causes of action to pursue claims under federal and state statutes that on their face provide no private rights of action, precisely what *Broder* and *Bendectin* warned against.

[76]    N.Y. Penal Law § 980 (1909) (A-280).

[77]    *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 465-66 (N.Y. 1983).

Delaware Law.  Delaware's anti-gambling statutes and constitutional provision were enacted to protect Delaware citizens from the influence of gambling.[78]  The Delaware legislature did not intend for these provisions to protect businesses or investors, especially not investors several times removed.[79]  Because neither the Fund nor its investors are part of the class of persons intended to be protected by the Delaware anti-gambling statutes and constitutional provision, Plaintiff cannot rely on negligence *per se* here.

### C.    The Amended Complaint Fails To Allege Breach Of Fiduciary Duty Or Negligence

Under Delaware law, the business judgment rule applies to decisions by corporate officers and directors.[80]  Decisions will not be disturbed by courts unless the directors or officers were interested or lacked independence relative to the decision, did not act in good faith, acted in a manner that cannot be attributed to a rational business purpose, or reached their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available;

---

[78]  *See State v. Panaro*, 28 Del. 230, 233 (Del. 1914); *NFL v. Governor of the State of Del.*, 435 F. Supp. 1372, 1383 (D. Del. 1977).

[79]  In *NFL*, the court rejected arguments that federal anti-gambling statutes were enacted to benefit "sports entrepreneurs," holding that such statutes were meant to protect citizens "from the demoralizing or corrupting influence of solicitations to gamble."  435 F. Supp. at 1388.  A Delaware court would likely reject arguments that Delaware's anti-gambling statutes and constitutional provision were enacted to protect mutual fund investors for similar reasons.

[80]  *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

34

a plaintiff who fails to rebut the presumptions of the business judgment rule is not entitled to any remedy unless the transaction constituted waste.[81]

Plaintiff does not allege that any defendants had interests in the Fund's 888 or NETeller investments or that any defendants lacked independence relative to those investments. Instead, Plaintiff attempts to evade the business judgment rule by arguing that (1) 888 and NETeller operated illegal gambling operations and there was a known risk that federal authorities could crack down on these operations; (2) defendants knew these risks but recklessly proceeded to invest in these corporations; and (3) if defendants were ignorant of these risks, it was because they breached their duties to conduct due diligence and monitor the investment process. Plaintiff thus argued that the defendants did not act in good faith or could not reasonably have chosen to invest in 888 or NETeller. Those arguments fail.

Where, as here, defendants engaged in legal conduct, Delaware courts have rejected exactly this type of argument.[82]  In *Citigroup*, the plaintiffs alleged that the directors of Citigroup failed to monitor and manage the risks Citigroup

---

[81]    *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 52 n.62 & 73-74 (Del. 2006).

[82]    *See In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 128 (Del. Ch. 2009); *La. Mun. Police Emps. Ret. Sys. v. Blankfein,* No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852, at *10-17 (S.D.N.Y. May 19, 2009).

faced from problems in the subprime lending market.[83]  Instead of specifically

alleging how the directors had failed to monitor those risks, the plaintiffs argued

that certain "red flags" should have given the defendants notice of the impending

problems in the subprime mortgage market and that the defendants consciously

ignored these risks in the reckless pursuit of profits or were ignorant of them

because they failed to properly implement a system to identify risk.[84]  The Court of

Chancery rejected that argument, holding that the plaintiffs' conclusory allegations

failed to explain adequately what the directors did or did not do to violate their

duties and reiterating that the mere fact that a company takes business risk and

suffers losses (even catastrophic ones) does not evidence misconduct and, without

more, is not a basis for personal director liability.[85]  *Citigroup* required the

dismissal of these claims.

### 1.     Plaintiff Did Not Plead That Defendants Acted In "Bad Faith"

A fiduciary acts in bad faith when (1) he or she intentionally acts with

a purpose other than that of advancing the best interests of the corporation, (2) he

or she acts with the intent to violate applicable positive law, or (3) he or she

intentionally fails to act in the face of a known duty to act, demonstrating a

---

[83]     *See Citigroup*, 964 A.2d at 111.

[84]     *See id.* at 126-27.

[85]     *See id.* at 126-27 & 129-30.

36

conscious disregard for his or her duties.[86]  Plaintiff did not assert the first type of bad faith, because he did not allege that the defendants purchased stock in 888 or NETeller for any reason other than as part of the Fund's general investment strategy.

Plaintiff also failed to plead adequately that defendants knew that investing in 888 or NETeller violated any law.  To plead bad faith in this way, a plaintiff must plead "facts that demonstrate that [defendants] … had 'actual or constructive knowledge' that *their conduct* was legally improper."[87]  Although Plaintiff cited various documents about whether certain conduct engaged in by 888, NETeller, and other companies violated federal and state law, he cited nothing suggesting any defendants knew or should have known that investments in publicly-traded securities could or did violate any laws.  As demonstrated above, such investments are not illegal, and Plaintiff has not identified any court or prosecutorial decision to the contrary, meaning that Plaintiff did not allege any "red flags."  Indeed, in *World Interactive Gaming* (cited extensively in the

---

[86]    *See In re Walt Disney*, 906 A.2d at 64, 66-67.  Plaintiff does not allege "subjective bad faith," which would require a showing that defendants intended to harm the Fund.  *See id.* at 64.

[87]    *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis added).

Amended Complaint), the New York Attorney General did <u>not</u> pursue claims against outside investors.[88]

The Amended Complaint also failed to allege intentional failure to act in the face of a known duty to act. Plaintiff alleged that defendants knew of the risk that 888 and NETeller's businesses might be harmed by a federal crackdown on illegal gambling operations, but nonetheless invested. (A-355, A-361) But allegations that there was a known potential risk when an investment decision was made are insufficient to plead that defendants disregarded a duty to protect the Fund from investment losses.[89] Indeed, the fact that the Fund had significantly positive returns during the period it was invested in 888 and NETeller means Plaintiff could not allege that the defendants disregarded a duty to protect the Fund from investment losses, because there is no duty to protect a mutual fund from all possible losses on every investment.[90]

Plaintiff also made conclusory allegations that if the defendants were unaware of the risks posed to 888 and NETeller by a crackdown by federal authorities, then defendants failed in their duties to conduct due diligence or

---

[88]   *See* 714 N.Y.S.2d at 848.

[89]   *See Citigroup*, 964 A.2d at 130.

[90]   Put differently, all investment funds are expected to suffer some losses on some of their investments some of the time — that is an inevitable consequence of portfolio diversification.

oversee the investment process.[91]  But Plaintiff pleaded no *facts* demonstrating how the defendants' "oversight mechanisms" or due diligence processes were "inadequate," or how the defendants "knew of these inadequacies and consciously ignored them," the requirements for pleading this sort of claim.  Indeed, Plaintiff actually pleaded that the defendants developed and implemented an investment strategy for the Fund (A-350), which is inconsistent with a claim that the defendants ignored their obligations.  This means that Plaintiff's allegations could not be deemed plausible, and so they were properly dismissed.[92]

### 2.    Plaintiff Did Not Plead Gross Negligence

Gross negligence is "a reckless indifference to or a deliberate disregard of the whole body of stockholders[] or actions which are without the bounds of reason," an "extremely stringent" standard.[93]  The Amended Complaint did not meet that standard.

Plaintiff alleged that defendants invested in 888 and NETeller despite knowing that the companies were involved in illegal gambling operations and could be hurt by what Plaintiff calls — in pure hindsight — an impending crackdown by federal authorities.[94]  But such allegations regarding two

---

[91]    *See* A-355.

[92]    *See Iqbal*, 556 U.S. at 678-80.

[93]    *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 & n.45 (Del. Ch. 2008).

[94]    *See* A-355; A-361–62.

investments in the Fund's portfolio were, without further allegations regarding the entire portfolio, insufficient to support a gross negligence claim.  A portfolio containing some higher-risk investments may be overall less risky than individual investments in the same instruments.[95]  In such a portfolio, some investments will be expected to lose money, sometimes as a result of known risks, but the portfolio may still be very profitable (as was the case here).[96]  A trustee or investment manager overseeing a portfolio of investments thus cannot be found grossly negligent based on the performance of one or two investments in the portfolio; their investment behavior can only be evaluated according to the composition and performance of the entire portfolio.[97]  Delaware has in fact codified this principle, requiring that courts considering "the propriety of an investment decision" examine "the inherent nature and expected performance" of the entire investment portfolio.  12 Del. C. § 3302(c).

Not surprisingly, Plaintiff failed to make a single allegation regarding the Fund's portfolio as a whole, probably because the Fund's share price increased 23.25% while it owned stock in 888 and NETeller, compared to the Dow Jones

---

[95]  *See* Paul G. Haskell, *The Prudent Person Rule For Trustee Investment and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) (A-303–07).

[96]  *See id.*; *see also Citigroup*, 964 A.2d at 126 ("Businesses — and particularly financial institutions — make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return.").

[97]  *See Citigroup*, 964 A.2d at 126.

40

Industrial Average and the S&P 500, which increased 16.85% and 14.66%, respectively, over the same period.[98]  All Plaintiff alleged was that two particular Fund investments lost money.  Because Plaintiff failed to allege any facts regarding the composition or performance of the Fund's entire portfolio — which outperformed the market despite the investments Plaintiff challenges — the Amended Complaint did not plead gross negligence.

Plaintiff also made conclusory allegations that if the defendants were unaware of 888 and/or NETeller's alleged involvement in illegal gambling or the supposedly impending crackdown by federal authorities, then they did not adequately conduct due diligence or oversee the investment process.  But such claims were pure hindsight and were not supported by any _factual_ allegations regarding defendants' due diligence or oversight efforts, such as allegations about the due diligence that the Investment Advisor Defendants conducted, what a reasonable person could have concluded about the overall risks of the Fund's portfolio or particular investments, or how the Independent Trustee Defendants supposedly failed to properly oversee the Fund's investment process.  As in _Citigroup_, Plaintiff simply relied on the flawed logic that, because the 888 and

---

[98]    _Compare_ A-351–52 (alleging that Fund owned stock in 888 and NETeller between September 1, 2005 and November 30, 2006) _with_ A-272–78 (Fund, DJIA, and S&P 500 prices during same period).

NETeller investments later lost value, the defendants must have breached duties.[99] Not only is that not enough to plead gross negligence, but the only particularized allegations in the Amended Complaint were actually inconsistent with wrongdoing — Plaintiff affirmatively pleaded that the Fund's trustees hired a professional advisor for the Fund, that the Fund's advisor developed and implemented investment strategies for the Fund, that the Fund voted at annual meetings of the companies in which the Fund invested, and that the Fund's trustees received regular reports regarding the Fund.[100]  Those allegations are more consistent with the defendants upholding the Fund's interests than with gross negligence, which required dismissal under *Iqbal*.

> 3.    Plaintiff Could Not Plead A Breach Of Fiduciary Duty By The Investment Advisor Defendants Because Their Obligations <u>Arise Under a Contract</u>

When a dispute relates to obligations that arise under a contract, that dispute should be treated as a breach of contract claim and any breach of fiduciary duty claim should be dismissed.  *See Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).  Here, the relationship between the Fund and the Investment Advisor Defendants is and was governed by the Management Agreement.  Because Plaintiff's claim that the Investment Advisor Defendants breached their fiduciary

---

[99]    *See* A-355; *Citigroup*, 964 A.2d at 128.

[100]    *See* A-343, A-349–53.

duties is governed by the Management Agreement, dismissal was required under *Nemec*.

### D.    Plaintiff Failed To Plead A Claim For Waste

Waste is an exchange so one-sided that no businessperson of ordinary, sound judgment could think the corporation received adequate consideration.[101]  To plead waste, a plaintiff must plead that defendants irrationally squandered corporate assets (for example, where the challenged transaction served no corporate purpose or the corporation received no consideration at all).[102]  Waste claims trigger "an extreme test, very rarely satisfied by a shareholder plaintiff."[103]  Put differently, "[i]f given the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'"[104]  Thus, a waste claim requires a plaintiff to plead that no rational person would have done the transaction being attacked.  Plaintiff did not come close to meeting this test:

- The Amended Complaint did not allege that the Fund "received no consideration" for its 888 and NETeller investments or even paid too much for the investments.[105]  Plaintiff concedes that the Fund

---

[101]    *White v. Panic*, 783 A.2d 543, 554 (Del. 2001); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).

[102]    *Panic*, 783 A.2d at 554; *Brehm*, 746 A.2d at 263.

[103]    *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997).

[104]    *In re Lear Corp.*, 967 A.2d at 656.

[105]    Nor could Plaintiff allege anything like this, because according to Plaintiff the public (and thus the markets) knew that 888 and NETeller might be impacted by a hypothetical federal crackdown on internet gambling at all relevant times.  *See* A-346–47, A-354.  The efficient market hypothesis thus

43

purchased and sold shares in LSE-listed companies in open-market, arm's-length transactions, received and owned those shares, and took normal shareholder actions (such as voting the shares). In each transaction, including the Fund's sales of the shares, there was someone (who the Court must presume was rational) willing to take the other side of the transaction in an impersonal market. That means Plaintiff could not show that no rational person would have engaged in the transactions, which is fatal to the waste claim.

- The sole basis Plaintiff pleads for the waste claim is that the 888 and NETeller investments were "illegal."[106] As demonstrated above, that argument has no merit. Other than that, the Amended Complaint alleges only that the Fund lost money on the 888 and NETeller investments. But Delaware does not permit waste claims based on alleged underperformance of a subset of publicly-traded investments out of a portfolio that otherwise met a fund's overall investment objectives (which Plaintiff has never disputed).[107]

If the Amended Complaint sufficed to assert a waste claim then every

underperforming investment could be challenged as "waste," which would be

inconsistent with the fact that waste claims are the exception rather than the rule.

The waste claim was thus properly dismissed.

###    E.    Plaintiff Failed To Plead A Claim For Breach Of Contract

In addition to the reasons set forth in the Decision and the

Independent Trustee Defendants' Principal and Response Brief, the breach of

---

dictates that the market prices for 888 and NETeller — the prices the Fund paid and received — accurately reflected the value of the securities (including everything discussed in the Amended Complaint) at all relevant times. *See Basic Inc. v. Levinson*, 485 U.S. 224, 245-47 (1988).

[106]    A-372; *see also* A-346 (alleging that Fund's investments were "unlawful").

[107]    *See* 12 Del. C. § 3302(c).

44

contract claim failed for two other reasons.  *First*, the Fund contractually waived any possible claims against the Investment Advisor Defendants for "any error of judgment or mistake of law or for any loss suffered by [the Fund] in connection with any matter to which" the Management Agreement related except for claims against the Advisor for "willful misfeasance, bad faith, or gross negligence."[108]  To any extent the Investment Advisor Defendants might have been mistaken about the legality of investing in the stock of a public company listed on a foreign exchange, the Management Agreement thus exculpates them from liability.  And as demonstrated above (*supra* Point III(C)), Plaintiff did not plead any facts that fit within the carveout to the exculpation clause.

*Second*, because NB and Messrs. Segal, Sundman, and Rivkin were not parties to the Management Agreement, they cannot be sued for allegedly breaching it.[109]  These are independent reasons to affirm the dismissal of the contract claim.

---

[108]    A-250.

[109]    *See Oberstein v. SunPower Corp.*, 07-CV-1155 (JFB) (WDW), 2010 U.S. Dist. LEXIS 41402, at *11-12 (E.D.N.Y. Apr. 28, 2010).

## IV.   THE RICO CLAIMS WERE PROPERLY DISMISSED

### A.   Plaintiff Waived Any Argument That The District Court Erred In Dismissing The RICO Claims

Arguments not properly raised in an appellant's opening brief are waived.[110]  And just mentioning an issue somewhere in an opening brief is not enough — issues not sufficiently argued are deemed waived.[111]

Plaintiff's opening brief does not argue that the District Court erred in dismissing the RICO claims.  Although Plaintiff asserts in his statement of facts that any violation of Section 1955 would support common law and breach of contract claims (OB 26-29), his brief contains no separate argument that the Amended Complaint stated viable RICO claims.  For this reason alone, this Court should deem waived any arguments that the District Court erred in dismissing the RICO claims asserted in the Amended Complaint.

### B.   Plaintiff Did Not Plead Any Predicate Acts

A RICO plaintiff must allege predicate acts as defined in the statute. *See* 18 U.S.C. § 1961.  The only predicate acts alleged by Plaintiff were owning shares of 888 and NETeller purportedly in violation of Section 1955 and state

---

[110]   *See* Fed. R. App. P. 28(a)(9); *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005); *D'Allessio v. S.E.C.*, 380 F.3d 112, 123 (2d Cir. 2004); *J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

[111]   *See Villareal-Jaramillo v. Gonzalez*, 232 Fed. Appx. 76, 77 (2d Cir. 2007); *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997).

46

law.[112]  As the District Court held and for the additional reasons set forth above, such investments were not illegal.  Because Plaintiff did not allege any predicate acts, the RICO claims were properly dismissed.

### C.    Plaintiff Did Not Plead RICO Proximate Cause

The RICO claims in this case are substantively identical to those at issue in *McBrearty*, *Seidl*, *Wodka*, and *Gomes*.  Indeed, *McBrearty*, *Wodka*, and *Gomes* involved investments in NETeller.[113]  All of the RICO claims in those cases were dismissed with prejudice for lack of RICO proximate cause, and all four dismissals have been affirmed and are final. Furthermore, Judges Sand and Rakoff relied on *McBrearty* in dismissing RICO claims in *Picard v. Kohn,* 11 Civ. 1181 (JSR), 2012 WL 566298 (S.D.N.Y. Feb. 22, 2012) and *Segal v. Bitar*, No. 11 Civ. 4521 (LBS), 2012 WL 273609 (S.D.N.Y. Jan 30, 2012), confirming the viability, applicability, and persuasiveness of *McBrearty*.

This Court has repeatedly emphasized that the reasonably foreseeable victims of an alleged RICO violation are the targets, competitors, and intended

---

[112]    *See* A-341.  And Plaintiff did not even properly allege state law predicate acts.  Only acts chargeable under state law "and punishable by imprisonment for more than one year" count as predicate acts under § 1961(1), but Plaintiff did not allege that any state law satisfies that requirement, nor is it clear he could have done so.  For example, even if it could apply here, a violation of N.Y. Penal Law § 225.05 is a class A misdemeanor.

[113]    *See Hartsel*, 2011 WL 2421003, at *4; *Wodka*, 433 F. App'x at 564; A-420.

victims of the racketeering enterprise.[114]  As Judge Cote explained in *McBrearty*, "cases from this Circuit and elsewhere, when discussing victims of gambling enterprises, refer to those who gambled and lost, and not to investors in the enterprise."[115]  Because there was no allegation here that would permit a different result from those reached in *McBrearty*, *Seidl*, *Wodka*, and *Gomes*, the RICO claims were properly dismissed.[116]

Plaintiff asserts in his Statement Of Facts — not even in argument — that the Court should ignore *McBrearty*, *Seidl*, *Wodka*, and *Gomes* because *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011) supposedly "undercuts" their "reasoning."  (OB 14)  Plaintiff's arguments for disregarding the decisions his counsel generated in four substantively identical cases fail.  Like this case, *McBrearty*, *Seidl*, *Wodka*, and *Gomes* involved claims brought under § 1962(c) and (d), whereas *Ideal Steel* involved claims brought under § 1962(a).  The district court dismissed Ideal Steel's § 1962(a) claim for lack of proximate causation.  This Court reversed, concluding that the proximate causation standards under § 1962(a)

---

[114]    *See Lerner v. Fleet Bank*, N.A., 318 F.3d 113, 124 (2d Cir. 2003).

[115]    *McBrearty*, 2009 WL 875220, at *3.

[116]    Although the Amended Complaint alleged that "[a]ny other cause that may have contributed to the loss, including law enforcement efforts or the market reaction to those efforts, was not a superseding cause of the losses because it was reasonably foreseeable and part of the risk that defendants' wrongful acts created" (A-361), that conclusory allegation was insufficient.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

48

and § 1962(c) are different and that the act constituting the alleged violation in *Ideal Steel* — the use or investment of the proceeds of racketeering activity to open a competing store — was what caused Ideal Steel's alleged injury. *See* 652 F.3d at 323. That is different from § 1962(c), which requires the racketeering injury to flow directly from the alleged predicate acts themselves. This Court confirmed that distinction in *Ideal Steel* itself (*see id.* at 326-27) and the Supreme Court had previously noted it in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). Because the proximate cause standards of (i) § 1962(a) and (ii) § 1962(c) and (d) are different, *Ideal Steel* is not inconsistent with *McBrearty* and *Seidl*, and those cases thus require the conclusion that the RICO claims were properly dismissed.

### D.    There Are Additional Reasons The RICO Claims Were Properly Dismissed

Although the failure to plead predicate acts and lack of proximate cause alone required dismissal of the RICO claims here, there are additional reasons those claims were properly dismissed:

- RICO does not apply extraterritorially. *See supra* note 53.

- Plaintiff failed to plead continuity. Plaintiff did not try to plead closed-ended continuity, and the allegations of open-ended continuity were insufficient. Plaintiff's continuity allegation was a single conclusory paragraph that appears to confuse open-ended continuity for RICO purposes with a fund being an "open-ended investment company" (A-353), which are entirely different concepts.

These are independent bases to affirm the dismissal of the RICO claims.

## V.    THE CLAIMS IN THE AMENDED COMPLAINT ARE TIME-BARRED

Plaintiff outright pleaded that he filed *Gamoran III* when he did (August 24, 2011) because the claims would have become time-barred on August 25, 2011.[117]  But then *Gamoran III* was dismissed, and any limitation periods that even arguably had not already expired did so between the time *Gamoran III* was dismissed and the time the Amended Complaint was filed.[118]  All the claims asserted in the Amended Complaint are thus time-barred.

## VI.    THE AMENDED COMPLAINT SHOULD HAVE BEEN DISMISSED WITH PREJUDICE

A decision reviewed for abuse of discretion must be overturned if it is "rests on an error of law (such as application of the wrong legal principle) … a clearly erroneous factfinding , or [its decision] cannot be located within the range of permissible decisions."[119]  The District Court applied the wrong standard in

---

[117]    *See* A-54.

[118]    Because *Gamoran III* was dismissed without prejudice and without an order providing for repleading within a specified period of time, no statutes of limitation were tolled following dismissal, *see In re Direxion Shares ETF Trust*, No. 09-cv-8011 (KBF), 2012 WL 717967, at *6 (S.D.N.Y. Mar. 6, 2012), and the single day Plaintiff alleged remained on the statute of limitations ran before the Amended Complaint was filed.  This is the answer to Plaintiff's assertion that the Amended Complaint relates back (OB 20): Relation back does not help Plaintiff here.

[119]    *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008).

deciding to dismiss "without prejudice" and that decision was not within the range of permissible decisions.

### A.    The District Court Applied The Wrong Legal Standard

Futility, undue delay, bad faith, and prejudice to the opposing party are the "touchstones" of a district court's decision regarding whether to dismiss with prejudice.[120]  Instead of applying that standard, the District Court held that it only had "the power to dismiss without leave to amend … in 'extraordinary circumstances, such as where ... the substance of the claim pleaded is frivolous on its face … .'"[121]  But the authority the District Court relied on addressed a very specific scenario — whether a district court had the power to dismiss a *pro se* complaint with prejudice *sua sponte* on the sole ground that it did not constitute a short and plain statement pursuant to Fed. R. Civ. P. 8(a).

That is not this case.  Plaintiff is not *pro se* and the District Court was considering, in the context of fully briefed motions to dismiss, whether to dismiss Plaintiff's *fourth* complaint in this matter — the 14th substantively identical complaint filed by Plaintiff's counsel — with prejudice.  *Salahuddin* was the

---

[120]    *See Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 58 (2d Cir. 1984); *see also State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 Fed. Appx. 36, 37 (2d Cir. 2006).

[121]    SPA-25 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).

wrong standard to apply, and that requires reversal of the failure to dismiss with prejudice.

### B. Under The Correct Standard, The Amended Complaint Should Have Been Dismissed With Prejudice

When considered in the context of the correct standard, the District Court's allowance of repleading was not within the range of permissible decisions.

### 1. There Is Nothing Else For Plaintiff To Plead

Plaintiff has already filed four complaints against the defendants and has not indicated what he might plead that is different from what he already has pleaded, and his counsel has had at least 14 opportunities to fine-tune the arguments in this case in courts around the country. This is critical: Not only has Plaintiff's counsel had 14 opportunities to plead claims like those in the Amended Complaint, Plaintiff has never given the slightest indication of what more he would plead here if given the chance. Particularly given that the substance of Plaintiff's case has not actually changed since day one (in this case or the others Plaintiff's counsel has pursued), the only reasonable conclusion is that there is no more Plaintiff could plead than he already has.[122]

---

[122] *Accord Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144-45 (3d Cir. 2002) (affirming dismissal of second amended complaint with prejudice) (*per curiam*), *cert. denied*, 537 U.S. 1113 (2003).

2.    Repleading Would Be Futile

Amendment is futile where it "appears beyond doubt that plaintiff can prove no set of facts in support of [their] claim which would entitle them to relief."[123]  The District Court held that the Fund's investments in 888 and NETeller did not violate Section 1955, New York law, or Delaware law.[124]  If this Court agrees — and Plaintiff has given no basis to come to any other conclusion — then there is nothing more Plaintiff could allege to support his claims that the 888 and NETeller investments were "illegal" and those claims would fail as a matter of law.  Repleading would thus change nothing and would be futile.

3.    The Defendants Are Entitled To Be Done With Plaintiff's Accusations

The complaint that was dismissed here was not the first, second, or third complaint Plaintiff filed — it was his fourth, and it said nothing substantively different from (i) the first three complaints Plaintiff filed against the Defendants and (ii) the other 10 complaints Plaintiff's counsel filed against other mutual fund defendants.  Plaintiff and his counsel have already been given more than enough opportunities to explain why claims like those asserted here are viable or what Plaintiff or his counsel might add to try to make them so.  At no time has Plaintiff even hinted that there are additional facts that could be pleaded to justify the

---

[123]    *See Blonstein v. Barr Labs Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 221 (2d Cir. 2006).

[124]    *See* SPA 21–22.

53

claims in this case. *If Plaintiff could have pled additional facts to support his claims, he would have done so by now*.

The District Court should thus have given weight to the Defendants' interests in being free of Plaintiff's accusations after 5 years, four complaints, and three different fora. The Defendants are experienced businesspeople managing a large and well-respected series of mutual funds, and Plaintiff has spent the last five years publicly accusing them of being felons for doing their jobs. The Defendants have had to move to dismiss Plaintiff's complaints three times and fought pitched battles regarding venue and jurisdiction, both as a result of Plaintiff's blatant attempts at forum-shopping. The defendants are entitled to know, once and for all, that they are free of Plaintiff's baseless accusations. That required dismissal with prejudice.

## CONCLUSION

For all the foregoing reasons, the Court should affirm the Decision below except with respect to the District Court's decision to dismiss this action without prejudice, which should be reversed. Instead, this Court should direct that the dismissal of the Amended Complaint be with prejudice.

54

Dated:  July 17, 2013

MILBANK, TWEED, HADLEY &
   McCLOY LLP

By:    /s Douglas W. Henkin      
   James N. Benedict
   jbenedict@milbank.com
   Alan J. Stone
   astone@milbank.com
   Douglas W. Henkin
   dhenkin@milbank.com
   Matthew J. Latterner
   mlatterner@milbank.com
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Attorneys for Defendants Neuberger
Berman Management LLC, Neuberger
Berman LLC, Benjamin Segal, Peter E.
Sundman, and Jack L. Rivkin*

55

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 28.1(e)(2)(B), I hereby certify that the foregoing brief complies with the type-volume limitations of Rule 28.1(e), in that the brief was produced using Times New Roman typeface in 14-point font, and contains 13,201 words according to the word processor utilized by my firm.

/ s Matthew J. Latterner

Matthew J. Latterner

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM

## 18 U.S.C. § 1955.  Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $ 2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $ 2,000 in any single day shall be deemed to have been established.

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the

collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954 [1986], as amended [26 USCS § 501(c)(3)], if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

## 18 U.S.C. § 1961.  Definitions

As used in this chapter--

**(1)** "racketeering activity" means

(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting),section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant),section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas,  permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments),

section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251 , 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials),

(C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds),

(D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States,

(E) any act which is indictable under the Currency and Foreign Transactions Reporting Act,

(F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act

indictable under such section of such Act was committed for the purpose of financial gain, or

(G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

## 18 U.S.C. § 1962.  Prohibited activities

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**N.Y. Penal Law § 20.25.  Criminal liability of an individual for corporate conduct**

A person is criminally liable for conduct constituting an offense which he performs or causes to be performed in the name of or in behalf of a corporation to the same extent as if such conduct were performed in his own name or behalf.

**N.Y. Penal Law § 225.00.  Gambling offenses; definitions of terms**

The following definitions are applicable to this article:

**1.** "Contest of chance" means any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein.

**2.** "Gambling." A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

**3.** "Player" means a person who engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity. A person who gambles at a social game of chance on equal terms with the other participants therein does not otherwise render material assistance to the establishment, conduct or operation thereof by performing, without fee or remuneration, acts directed toward the arrangement or facilitation of the game, such as inviting persons to play, permitting the use of premises therefor and supplying cards or other equipment used therein. A person who engages in "bookmaking", as defined in this section is not a "player."

**4.** "Advance gambling activity." A person "advances gambling activity" when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. One advances gambling activity when, having substantial proprietary or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits such to occur or continue or makes no effort to prevent its occurrence or continuation.

**5.** "Profit from gambling activity." A person "profits from gambling activity" when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity.

**6.** "Something of value" means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

**7.** "Gambling device" means any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine. Notwithstanding the foregoing, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices.

**7-a.** A "coin operated gambling device" means a gambling device which operates as a result of the insertion of something of value. A device designed, constructed or readily adaptable or convertible for such use is a coin operated gambling device notwithstanding the fact that it may require adjustment, manipulation or repair in order to operate as such. A machine which awards free or extended play is not a gambling device merely because such free or extended play may constitute something of value provided that the outcome depends upon the skill of the player and not in a material degree upon an element of chance.

**8.** "Slot machine" means a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value. A device so constructed, or readily adaptable or convertible to such use, is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because, apart from its use or adaptability as such, it may also sell or deliver something of value on a basis other than chance. A machine which sells items of merchandise which are of equivalent value, is not a slot machine merely because such items differ from each other in composition, size, shape or color.

AD-10

**9.** "Bookmaking" means advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events.

**10.** "Lottery" means an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value provided, however, that in no event shall the provisions of this subdivision be construed to include a raffle as such term is defined in subdivision three-b of section one hundred eighty-six of the general municipal law.

**11.** "Policy" or "the numbers game" means a form of lottery in which the winning chances or plays are not determined upon the basis of a drawing or other act on the part of persons conducting or connected with the scheme, but upon the basis of the outcome or outcomes of a future contingent event or events otherwise unrelated to the particular scheme.

**12.** "Unlawful" means not specifically authorized by law.

**N.Y. Penal Law § 225.05.  Promoting gambling in the second degree**

A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity.

Promoting gambling in the second degree is a class A misdemeanor.

**N.Y. Penal Law § 225.10.  Promoting gambling in the first degree**

A person is guilty of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by:

**1.** Engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars; or

**2.** Receiving, in connection with a lottery or policy scheme or enterprise, (a) money or written records from a person other than a player whose chances or plays are represented by such money or records, or (b) more than five hundred dollars in any one day of money played in such scheme or enterprise.

Promoting gambling in the first degree is a class E felony.

**N.Y. Penal Law § 225.15.  Possession of gambling records in the second degree**

A person is guilty of possession of gambling records in the second degree when, with knowledge of the contents or nature thereof, he possesses any writing, paper, instrument or article:

**1.** Of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise; or

**2.** Of a kind commonly used in the operation, promotion or playing of a lottery or policy scheme or enterprise; except that in any prosecution under this subdivision, it is a defense that the writing, paper, instrument or article possessed by the defendant constituted, reflected or represented plays, bets or chances of the defendant himself in a number not exceeding ten.

**3.** Of any paper or paper product in sheet form chemically converted to nitrocellulose having explosive characteristics.

**4.** Of any water soluble paper or paper derivative in sheet form.

Possession of gambling records in the second degree is a class A misdemeanor.

**N.Y. Penal Law § 225.20.  Possession of gambling records in the first degree**

A person is guilty of possession of gambling records in the first degree when, with knowledge of the contents thereof, he possesses any writing, paper, instrument or article:

**1.** Of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise, and constituting, reflecting or representing more than five bets totaling more than five thousand dollars; or

**2.** Of a kind commonly used in the operation, promotion or playing of a lottery or policy scheme or enterprise, and constituting, reflecting or representing more than five hundred plays or chances therein.

Possession of gambling records in the first degree is a class E felony.

**N.Y. Penal Law § 225.30.  Possession of a gambling device**

**a.** A person is guilty of possession of a gambling device when, with knowledge of the character thereof, he or she manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:

**1.** A slot machine, unless such possession is permitted pursuant to article nine-A of the general municipal law; or

**2.** Any other gambling device, believing that the same is to be used in the advancement of unlawful gambling activity; or

**3.** A coin operated gambling device with intent to use such device in the advancement of unlawful gambling activity.

**b.** Possession of a slot machine shall not be unlawful where such possession and use is pursuant to a gaming compact, duly executed by the governor and an Indian tribe or Nation, under the Indian Gaming Regulatory Act, as codified at 25 U.S.C. §§§§ 2701-2721and 18 U.S.C §§§§ 1166-1168, where the use of such slot machine or machines is consistent with such gaming compact and where the state receives a negotiated percentage of the net drop (defined as gross money wagered after payout, but before expenses) from any such slot machine or machines.

**c.** Transportation and possession of a slot machine shall not be unlawful where such transportation and possession is necessary to facilitate the training of persons in the repair and reconditioning of such machines as are used or are to be used for operations in those casinos authorized pursuant to a tribal-state compact as provided for pursuant to section eleven hundred seventy-two of title fifteen of the United States Code in the state of New York.

**d.** Transportation and possession of a slot machine shall not be unlawful where such slot machine was transported into this state in a sealed container and possessed for the purpose of product development, research, or additional manufacture or assembly, and such slot machine will be or has been transported in a sealed container to a jurisdiction outside of this state for purposes which are lawful in such outside jurisdiction.

**e.** Transportation and possession of a gambling device shall not be unlawful where (i) the manufacturer or distributor of the gambling device has filed a statement with the state gaming commission required by subdivision twenty-one of section one hundred four of the racing, pari-mutuel wagering and breeding law, (ii) such gambling device was transported into this state in a sealed container and possessed for the purpose of exhibition or marketing in accordance with such statement, and

AD-16

(iii) such device is thereafter transported in a sealed container to a jurisdiction outside of this state for purposes that are lawful in such outside jurisdiction.

Possession of a gambling device is a class A misdemeanor.

**Delaware Constitution, Article 2, § 17.  Lotteries and other gambling**

All forms of gambling are prohibited in this State except the following:

(a) Lotteries under State control for the purpose of raising funds,

(b) Lotteries (other than slot machines, roulette, craps and baccarat games) provided that each is sponsored and conducted under the limitations of Section 17B by companies, organizations or societies which have been in existence for at least 2 years; provided, however, that no person who shall not have attained the age of 18 years shall participate in any lottery (where money is the prize) otherwise authorized by the article,

(c) Wagering or betting by the use of pari-mutuel machines or totalizators on horse races conducted at racetracks within or without the State, provided that such wagering or betting may be conducted only either:

(1) within the enclosure of any racetrack licensed under the laws of the State to conduct a race meeting, or

(2) within the enclosure of any racetrack licensed under the laws of the State to receive and accept wagers or bets on electronically televised simulcasts of horse races.

(d) Bingo games as conducted under the limitations of Section 17A.

The General Assembly shall enforce this Section by appropriate legislation.

**11 Del.C. § 282.  Criminal liability of an individual for organizational conduct**

A person is criminally liable for conduct constituting an offense which the person performs or causes to be performed in the name of or in behalf of an organization to the same extent as if the conduct were performed in the person's own name or behalf.

## 11 Del.C. § 1401.  Advancing gambling in the second degree; class A misdemeanor

A person is guilty of advancing gambling in the second degree when:

**(1)** The person sells or disposes of, or has in the person's possession with intent to sell or dispose of, a lottery policy, certificate or any other thing by which the person or another person or persons promises or promise, guarantees or guarantee that any particular number, series of numbers, character, ticket or certificate shall, in the event or on the happening of any contingency in the nature of a lottery, entitle the purchaser or holder to receive money, property or evidence of debt; or

**(2)** The person uses or employs any other device by which such person, or any other person, promises or guarantees as provided in paragraph (1) of this section; or

**(3)** The person is concerned in interest in lottery policy writing, or in selling or disposing of any lottery policy, certificate, number or numbers or any other thing by which the person or another person or persons promises or promise, guarantees or guarantee that any particular number or numbers, character, ticket or certificate shall, in the event or on the happening of any contingency in the nature of a lottery, entitle the purchaser or holder to receive money, property or evidence of debt; or

**(4)** The person uses or employs any other device by which such person or any other person promises or guarantees as provided in paragraph (3) of this section.

Advancing gambling in the second degree is a class A misdemeanor.

**11 Del.C. § 1402.  Foreign lotteries; prima facie evidence; class A misdemeanor**

**(a)** A person is guilty of engaging in a foreign lottery when the person brings, sends or procures to be brought or sent into this State any scheme of any lottery or any drawing of any such scheme or any ticket or part of a ticket or certificate of or a substitute for any ticket or part of a ticket, and sells or offers for sale any such ticket or part of ticket or any certificate or substitute for a certificate, and circulates in any manner any scheme or any drawing.

**(b)** On the trial of any person under subsection (a) of this section any lottery scheme drawing, ticket, certificate of or a substitute for a ticket or parts of tickets, which shall be proved to have been by the accused brought or procured to be brought, or sent or procured to be sent into this State or printed or procured to be printed within this State, for the purpose of circulating the same by mail or otherwise, shall be prima facie evidence within the description of this section.

**(c)** Engaging in foreign lotteries is a class A misdemeanor.

## 11 Del.C. § 1403.  Advancing gambling in the first degree; class A misdemeanor

A person is guilty of advancing gambling in the first degree when:

**(1)** The person keeps, exhibits or uses, or is concerned in interest in keeping, exhibiting or using any book, device, apparatus or paraphernalia for the purpose of receiving, recording or registering bets or wagers upon the result of any trial or contest, wherever conducted, of skill, speed or power of endurance of human or beast; or

**(2)** Being the owner, lessee or occupant of a room, house, building, enclosure or place of any kind, the person keeps, exhibits, uses or employs therein or permits or allows to be kept, exhibited, used or employed therein, or is concerned in interest in keeping, exhibiting, using or employing therein any book, device, apparatus or paraphernalia for the purpose of receiving, recording or registering bets or wagers as provided in paragraph (1) of this section, or of forwarding in any manner money, thing or consideration of value for the purpose of being bet or wagered as provided in paragraph (1) of this section; or

**(3)** The person records or registers bets or wagers, or receives, contracts or agrees to receive money or anything of value for the purpose or with the intent to bet or wager personally or for another person as provided in paragraph (1) of this section; or

**(4)** The person directly or indirectly bets or wagers, or promises to bet or wager, money or anything of value as provided in paragraph (1) of this section.

This section does not apply to a bet or wager made on a horse race within the enclosure of any race meeting licensed and conducted under the laws of this State, and made by or through the means of a pari-mutuel or totalizator pool, the conduct of which is licensed by the Delaware Racing Commission or other state licensing agency. Such exception need not be negatived in any indictment or information.

Advancing gambling in the first degree is a class A misdemeanor.

**11 Del.C. § 1404.  Providing premises for gambling; class A misdemeanor; unclassified misdemeanor**

A person is guilty of providing premises for gambling when:

**(1)** The person lets, demises or transfers to another person any building, structure, room or rooms knowing that the same will be used for the purpose of committing any gambling offense; or

**(2)** The person knowingly permits any house, structure, building, room or rooms of which the person has possession or control to be used for the purpose of committing any gambling offense; or

**(3)** The person contributes to the support and maintenance of any house or place where gambling is carried on or conducted; or

**(4)** The person keeps or maintains any house or place where gambling is carried on.

Providing premises for gambling or contributing thereto is an unclassified misdemeanor, unless the accused has been convicted, within the previous 5 years, of the same offense or of an offense under § 663 or § 665 of this title as the same existed prior to July 1, 1973, in which case it is a class A misdemeanor.

**11 Del.C. § 1405.  Possessing a gambling device; class A misdemeanor**

**(a)** A person is guilty of possessing a gambling device when the person knowingly manufactures, sells, transports, keeps, exhibits, manages, places, possesses or conducts or negotiates any transaction affecting or designed to effect ownership, custody or use of a slot machine or any other gambling device.

**(b)** Possessing a gambling device is a class A misdemeanor.

**(c)** A person is not guilty of a violation of this section if the device or machine is either:

    **(1)** An antique slot machine which is not used for gambling purposes; or

    **(2)** Any slot machine or gambling device which is manufactured (including, without limitation, the retrofitting or alteration of a finished machine or device), assembled, transported, kept, exhibited, managed, placed or possessed by a person within this State or which is the subject of any negotiation which involves a transaction affecting or designed to affect the ownership, custody or use of such machine or device by such person in this State where:

        **a.** Such person is duly licensed to conduct a manufacturing or other business in this State; and

        **b.** Such person is registered in accordance with the federal Gambling Devices Act of 1962 as amended (15 U.S.C.A. § 1171 et seq.) and is in the business of designing, assembling, manufacturing, selling, supplying, repairing or retrofitting slot machines, gambling devices or component parts thereof exclusively for lawful possession and use.

**(d)** For purposes of this section, a slot machine is an antique machine if such machine is at least 25 years old.

**(e)** For purposes of this section, a "video lottery machine," as defined in § 4803 of Title 29, which is owned or leased by the State for use in the Delaware video lottery shall not constitute either a slot machine or a gaming device.

AD-24

**11 Del.C. § 1406.  Being concerned in interest in keeping any gambling device; class A misdemeanor**

**(a)** A person is guilty of being concerned in interest in keeping any gambling device when:

**(1)** The person keeps or exhibits a gaming table, faro bank, sweat cloth, roulette table or other device under any denomination at which cards, dice or any other game of chance is played for money, or other thing of value or other gambling device of any kind whatsoever; or

**(2)** The person, with the intent that it shall be kept or exhibited for use by the public, buys, sells or distributes a gaming table, faro bank, sweat cloth or other gambling device; or

**(3)** The person is a partner or concerned in interest in the keeping or exhibiting of a gaming table, faro bank, sweat cloth or other gambling device.

**(b)** Being concerned in interest in keeping any gambling device is a class A misdemeanor.

**(c)** An antique slot machine, as defined in § 1405 of this title, is not a gambling device for purposes of this section.

**11 Del.C. § 1407.  Engaging in a crap game; violation**

A person is guilty of engaging in a crap game when the person takes part in or is knowingly present at the form of gambling commonly known as crap, in which money or other valuable things are played for by means of dice.

Engaging in a crap game is a violation.

**11 Del.C. § 1411. Unlawfully disseminating gambling information; class A misdemeanor**

A person is guilty of unlawfully disseminating gambling information when:

**(1)** Being a public utility it knowingly furnishes to another person a private wire for use in disseminating information in furtherance of gambling or for gambling purposes; or

**(2)** The person knowingly uses a private wire in disseminating or receiving information in furtherance of gambling or for gambling purposes; or

**(3)** The person engages in the business of or receives compensation in any form for disseminating or receiving information in furtherance of gambling or for gambling purposes by means of a private wire or a call service.

Unlawfully disseminating gambling information is a class A misdemeanor.

**12 Del.C. § 3302. Degree of care; authorized investments**

**(a)** When investing, reinvesting, purchasing, acquiring, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account. In making investment decisions, a fiduciary may consider the general economic conditions, the anticipated tax consequences of the investment and the anticipated duration of the account and the needs of its beneficiaries.

**(b)** Within the limitations of the foregoing standard and considering individual investments as part of an overall investment strategy, a fiduciary is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, wherever located, whether within or without the United States, including, but not by way of limitation, bonds, debentures and other corporate obligations, stocks, preferred or common, shares or interests in common funds or common trust funds, securities of any open-end or closed-end management type investment company or investment trust registered under the Federal Investment Company Act of 1940 (15 U.S.C. § 80a-1 et seq.), options, futures, warrants, limited partnership interests and life insurance. No investment made by a fiduciary shall be deemed imprudent solely because the investment is not specifically mentioned in this subsection.

**(c)** The propriety of an investment decision is to be determined by what the fiduciary knew or should have known at the time of the decision about:

>   **(1)** The inherent nature and expected performance of the investment portfolio;

>   **(2)** The limitations of the standard set forth in subsection (a) of this section; and

>   **(3)** The nature and extent of other investments and resources, whether held in trust or otherwise, available to the beneficiaries as they existed at the time of the decision; provided however, that the fiduciary shall have no duty to inquire as to the nature and extent of any such other investments and resources not held by the fiduciary.

Any determination of liability for investment performance shall consider the performance of the entire portfolio and such other factors as the fiduciary considered when the investment decision was made.

**(d)** Notwithstanding the foregoing provisions of this section, a trustee who discloses the application of this subsection and the limitation of the trustee's duties thereunder either in the governing instrument or in a separate writing delivered to

each insured at the inception of a contract of life insurance or thereafter if prior to an event giving rise to a claim thereunder, may acquire or retain a contract of life insurance upon the life of the trustor or the trustor's spouse, or both, without liability for a loss arising from the trustee's failure to:

(1) Determine whether the contract is or remains a proper investment;

(2) Investigate the financial strength or changes in the financial strength of the life insurance company;

(3) Make a determination of whether to exercise any policy option available under the contract;

(4) Make a determination of whether to diversify such contracts relative to 1 another or to other assets, if any, administered by the trustee; or

(5) Inquire about changes in the health or financial condition of the insured or insureds relative to any such contract.

(e) Any fiduciary acting under a governing instrument shall not be liable to anyone whose interests arise from that instrument for breach of fiduciary duty for the fiduciary's good faith reliance on the express provisions of such instrument. The standards set forth in this section may be expanded, restricted or eliminated by express provisions in a governing instrument.

(f) Where a bank or trust company acting in a fiduciary capacity invests trust funds in, or otherwise acquires an interest in, a common trust fund which it or 1 of its affiliates manages, as defined in § 23A of the Federal Reserve Act (12 U.S.C. § 371c), the plan for such common trust fund shall be filed and recorded in the office of the Register in Chancery of the county in which is located the main office in Delaware of the bank or trust company which is the fiduciary for such trust funds.

(g) Fees may be charged for making an investment through a computerized or automated process, such as sweeping otherwise uninvested cash into a cash management vehicle, provided that the amount of such fees is disclosed on a continuing basis as a separate item on the regular periodic statements furnished to the beneficiaries of the account.

(h) A fiduciary is authorized, in the absence of an express provision to the contrary, whenever a law, regulation, governing instrument or order directs, requires, authorizes or permits investment in United States government obligations, to invest in those obligations, either directly or in the form of securities of, or other interests in, any open-end or closed-end management investment company or investment trust registered under the Investment Company Act of 1940 (54 Stat. 847, 15 U.S.C. § 80a-1 et seq.), if the portfolio of that investment company or

investment trust is limited to United States government obligations and to repurchase agreements fully collateralized by United States government obligations, which collateral shall be delivered to or held by the investment company or investment trust, either directly or through an authorized custodian.

**(i)** Except in the case of United States government obligations, which are treated in subsection (h) of this section above, the authority to invest in specified types of investments includes authorization to invest in any open-end or closed-end management investment company or investment trust registered under the Investment Company Act of 1940 (54 Stat. 847, 15 U.S.C. § 80a-1 et seq.), or in any common or collective trust fund established and maintained by a corporate fiduciary, if the portfolio of the investment company or investment trust, or of the common or collective trust fund, consists substantially of the specified types of investments and is otherwise in conformity with the laws of the State.