# 13-1589-cv(L)

## 13-1779-cv(XAP), 13-1791-cv(XAP)

## United States Court of Appeals

for the

## Second Circuit

►►◄◄

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with
respect to its series mutual fund, the Neuberger Berman International Fund,

*Plaintiff-Appellant-Cross-Appellee,*

-*Against* –

NEUBERGER BERMAN, LLC, NEUBERGER BERMAN MANAGEMENT LLC, BENJAMIN SEGAL,
PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, C. ANNE HARVEY,
ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON,
CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, PETER P. TRAPP, AND NEUBERGER
BERMAN EQUITY FUNDS D/B/A NEUBERGER BERMAN INTERNATIONAL FUND,

*Defendants-Appellees-Cross-Appellants.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## RESPONSE AND REPLY BRIEF FOR
## PLAINTIFF-APPELLANT-CROSS-APPELLEE
## BENJAMIN M. GAMORAN

HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP
Paul J. Hanly, Jr.
112 Madison Avenue
New York, New York 10016-7416
(212) 784-6401
*Attorneys for Plaintiff-Appellant-Cross-Appellee*

July 31, 2013

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................... iii

PRELIMINARY STATEMENT ............................................................1

STANDARD OF REVIEW ................................................................3

JUDICIAL NOTICE ......................................................................3

PRIOR AND SIMILAR PROCEEDINGS ...............................................4

ARGUMENT ..............................................................................5

I.    DEFENDANTS VIOLATED THE GAMBLING ACT .................................5

    A.    The Reasons Given by the District Court Are Meritless ......................5

    B.    No Other Court Has Rejected Appellant's Theory ...............................6

    C.    A Corporation Is Owned by Its Shareholders ......................................6

    D.    The Rule of Lenity Does Not Apply ....................................................7

    E.    Section 1955 Is Consistent With Corporate Law .................................7

    F.    Section 1955 Contains No Exception for "Passive" Owners ...............8

    G.    The Legislative History Does Not Support Defendants' Interpretation .......................................................................................9

    H.    Section 1955 Contains No Exception for Criminal Enterprises Traded on Foreign Stock Exchanges...................................................10

    I.    This Case Involves No Extraterritorial Application of U.S. Law .......10

    J.    Appellant Need Not Prove That Defendants Violated State Criminal Laws ...............................................................................11

    K.    Section 1955 Creates No Liability for Inadvertent Conduct...............12

II.    DEFENDANTS VIOLATED THEIR COMMON LAW DUTIES ..................12

A.    Defendants Committed Negligence .....................................................12

B.    Defendants Were Negligent Per Se...................................................13

C.    Defendants Violated RICO ..................................................14

D.    Defendants Breached Their Fiduciary Duties .....................................15

E.    Defendants Committed Waste..................................................17

F.    The Fund's Overall Performance Cannot Insulate Defendants from Liability ..................................................17

G.    The Claim of Breach of the Management Agreement Was Within the Scope of Appellant's Demand.......................................17

III.    APPELLANT'S ALLEGATIONS RAISE A "REASONABLE DOUBT" THAT THE BOARD FAILED TO ACT INDEPENDENTLY, IN GOOD FAITH AND WITH DUE CARE ...................................................18

A.    The Complaint's Allegations Concerning Defendants' Attempt to Improperly Cause the Forfeiture of Appellant's Claims and Withholding of the Disputed Tolling Agreements Are Sufficient to Raise a "Reasonable Doubt" Concerning the Board's Independence and Good Faith..........................................19

B.    Appellant's Other Allegations Are Sufficient to Raise a "Reasonable Doubt" Concerning the Board's Lack of Independence, Good Faith and Due Care ..........................................25

IV.    APPELLANT AND HIS COUNSEL ARE ADEQUATE REPRESENTATIVES .............31

CONCLUSION ...................................................32

CERTIFICATE OF COMPLIANCE ...................................................33

# TABLE OF AUTHORITIES

*Page*

## Cases

*Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338 (2d Cir. 2006)..........31

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) ........................................................26

*Boland v. Boland*, 31 A.3d 529 (Md. 2011) .................................................... 27, 28

*Boyle v. United States*, 556 U.S. 938 (2009) ..........................................................7

*Brehm v. Eisner,* 746 A.2d 244 (2000) ............................................................ 4, 18

*Daily Income Fund, Inc. v. Fox,* 464 U.S. 523 (1984) ...........................................30

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986)............................................................9

*Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d
    Cir. 2006)......................................................................................................4

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308
    (2005)...........................................................................................................13

*Hartsel v. Vanguard Group, Inc.*, No. 5394-VCP, 2011 WL 2421003
    (Jun. 15, 2011) (unpublished), *aff'd*, 38 A.3d 1254 (Del.) (unpublished),
    *cert. denied*, 133 S. Ct. 32 (June 25, 2012) ..........................................6

*Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310 (2d Cir. 2011) ............................15

*In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch.
    2009)............................................................................................................13

*In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003)............... 25, 26

*Jackson v. Smith*, 254 U.S. 586 (1921)...................................................................8

*Kautz v. Sugarman*, 456 Fed.Appx. 16 (2d Cir. 2011) ............................................3

*La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch.
    2012) , *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013) ..... 12, 29

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................17

*Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010) ......................................10

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010)........................................................15

*PT China LLC v. PT Korea LLC*, CIV.A. 4456-VCN, 2010 WL 761145
    (Del. Ch. Feb. 26, 2010)......................................................................................15

*Pyott v. La. Mun. Police Employees' Ret. Sys.*, 2013 WL 1364695 (Del.
    Apr. 4, 2013).........................................................................................................29

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................7

*Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972) ..................................................13

*Sanabria v. United States*, 437 U.S. 54 (1978).........................................................9

*Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004)..............................3

*Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70 (Del.
    1997)................................................................................................................ 4, 18

*Seidl v. Am. Century Cos., Inc.,* 10-4152 –CV-W-SOW, 2012 WL
    7986873 (W.D. Mo. Oct. 31, 2012) ................................................................ 5, 29

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990)................................................ 25, 27

*Sugule v. Frazier*, 639 F.3d 406 (8th Cir. 2011).......................................................6

*Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 (Del. Ch.
    1986)......................................................................................................................17

*Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v.
    UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155 (1st Cir. 2013), *cert.
    granted*, 133 S. Ct. 2857 (June 24, 2013). ...........................................................3

*United States v. Busacca*, 936 F.2d 232 (6th Cir.1991) .........................................14

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000).............................................8

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) .............................................8

*United States v. Merrell,* 701 F.2d 53 (6th Cir 1983)..............................................10

*Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371 (2003) ............8

*Wodka v. Causeway Capital Mgmt. LLC,* No. BC463623 (Cal. Super. Ct., May 20, 2013) (unpublished) ...................................................................6

*Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del. 1981) .........................................26

**Statutes and Rules**

18 U.S.C. § 1955 ............................................................................... passim

18 U.S.C. § 1955(b)(1) ....................................................................... 9, 11

28 U.S.C. § 1367(d) ...............................................................................23

Fed. R. Civ. P. 15(c) ..............................................................................23

Investment Companies Act, 15 U.S.C. § 80a-35(b) ................................30

N.Y. Penal Law § 100.00 .......................................................................12

N.Y. Penal Law § 110.00 .......................................................................12

N.Y. Penal Law § 225.00(5) ...................................................................11

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 .............14

## PRELIMINARY STATEMENT

Defendants attempt to avoid the plain language of the Illegal Gambling Business Act of 1970, 18 U.S.C. § 1955(a) – which makes it a crime to "own[] all or part of an illegal gambling business" – by invoking narrowing canons of construction. Such canons of construction have no application where, as here, the language of the statute is unambiguous.

Defendants also invite the Court to invent judicial exceptions to the statutory prohibition that would eviscerate the statute. There is no good reason to exempt Defendants' conduct from the operation of the statute. With the specific intent to profit from criminal activity, these fiduciaries knowingly caused a mutual fund to become a part owner of two large criminal enterprises and thereby inflicted massive losses on innocent investors. What they did was patently illegal, and they deserve no "lenity" from the Court.

As the U.S. Attorney for the Southern District of New York said concerning the successful criminal prosecution of one of the illegal gambling businesses in which Defendants invested: "NETeller stated in its prospectus … that its conduct violated the law in the United States. … Supporting illegal gambling is not a business risk, it is a crime." (A-342)

Nor is Trustees' refusal to hold themselves and their co-conspirators accountable to investors exempt from judicial review. Trustees do not dispute that

this Court should reverse the decisions below if Appellant raises a "reasonable doubt" concerning Trustees' independence, good faith and due care. Accepting the allegations of the Complaint are true, and drawing all reasonable inferences in Appellant's favor, Defendants either (i) attempted to engineer the forfeiture of Appellant's claims after representing to a federal judge that they would protect the claims against the expiration of the statute of limitations; (ii) misrepresented the existence of effective tolling agreements they promised to the courts; or (iii) unreasonably withheld tolling agreements they said would be executed, while at the same time making inconsistent and potentially frivolous arguments that Appellant's claims were time-barred.

Defendants cannot deny that any of the foregoing conduct would constitute a lack of independence and good faith. It was error for the district court to reject the complaint's allegations and to resolve the parties' factual dispute in favor of Defendants.

Trustees' refusal of Appellant's litigation demand was a whitewash. They appointed a special committee, but that was window-dressing because the committee was given no decision-making authority, and its members faced inherent conflicts of interest. The committee conducted its affairs in absolute secrecy and failed to conduct a fair investigation of Appellant's demand. The

2

appointment of such a committee does not insulate Trustees' decision from judicial review.

## STANDARD OF REVIEW

After Appellant filed his opening brief, the Supreme Court granted *certiorari* to decide the proper standard of review of a judgment dismissing a complaint pursuant to Rule 23.1. *Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 163 (1st Cir. 2013), *cert. granted*, 133 S. Ct. 2857 (June 24, 2013). Relying in part on views expressed in two decisions of this Court,[1] the First Circuit held that review is *de novo*. *Union* was correct to follow the views expressed by this Court.

## JUDICIAL NOTICE

Defendants rely on numerous disputed facts that are outside the complaint. While the court may take judicial notice of certain facts that are not subject to genuine dispute, Defendants' factual assertions range far beyond the permissible scope of judicially noticeable facts.

There is no rule of judicial notice that authorizes the Court to take judicial notice of disputed, self-serving facts asserted in Defendants' letter notifying Appellant that his demand was rejected. The Court may take judicial notice that the

---

[1] *Kautz v. Sugarman*, 456 Fed.Appx. 16, 18 (2d Cir. 2011); *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 137 n. 6 (2d Cir. 2004).

letter says what it says, but it cannot properly take judicial notice of the truth of the matter asserted. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Although the issue is one of federal procedure, Defendants' only authority for their assertion that the Court must presume the truth of the self-serving assertions in their letter is a "*see also*" citation to *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 75 n.24 (Del. 1997). *Scattered* said in that footnote that the court would presume facts stated in a demand refusal letter to be true in the absence of particularized allegations rebutting them. *Scattered* was decided at a time when Delaware reviewed decisions regarding derivative complaints for abuse of discretion. *Scattered* was overruled in *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), however, and Delaware now follows the majority *de novo* standard of review. In any event, Appellant's complaint specifically rebuts the material allegations in the letter.

## PRIOR AND SIMILAR PROCEEDINGS

Defendants go to great lengths to create the misimpression that the procedural history of this case reflects adversely on its merits. The fact that Appellant has had to navigate a series of procedural roadblocks – thrown up by the very fiduciaries who are charged with representing the best interests of the Fund's investors – should not distract the Court from the merits of Appellant's claims.

Appellant will not waste words to correct the numerous inaccuracies and distortions in Defendants' briefs relating to the procedural history. He respectfully refers the Court to pages 15-18 of his opening brief for an accurate description.

As for other similar litigation in which Appellant's counsel has sought just compensation for mutual fund investors, there have only been four other cases filed against mutual funds that invested in illegal gambling, and all are currently being litigated. The *only* other case that has ruled on the issues relevant to this appeal is *Seidl v. Am. Century Cos., Inc.,* 2012 WL 7986873, (W.D. Mo. Oct. 31, 2012), and in that case the court *denied* the defendants' motions to dismiss, exactly what the court below should have done. In doing so, the court expressly or impliedly rejected the same arguments for dismissal raised by Defendants in this appeal.

## ARGUMENT

### I.  DEFENDANTS VIOLATED THE GAMBLING ACT

#### A.  The Reasons Given by the District Court Are Meritless

Defendants make no attempt to defend the two reasons given by the district court in support of its holding that § 1955 does not prohibit ownership of stock in illegal gambling businesses. By their silence, Defendants implicitly concede that those reasons are meritless.

The district court said that this Court had previously rejected Appellant's argument. In fact, this Court has never addressed this issue.

The district court said that Appellant had failed to cite any "convincing authority" in support of his argument. (SPA-21) Just because a case presents an issue of first impression is not a valid reason to refuse to apply a statute to conduct to which it applies. There is no better "authority" for Appellant's position than the words of the statute.

### B.    No Other Court Has Rejected Appellant's Theory

No court other than the court below has rejected Appellant's theory of liability. In *Hartsel v. Vanguard Group, Inc.*, 2011 WL 2421003 (Del. Ch., Jun. 15, 2011) (unpublished), *aff'd,* 38 A.3d 1254 (Del. Jan. 19, 2012) (unpublished), *cert. denied*, 133 S. Ct. 32 (June 25, 2012), the Vice Chancellor expressly declined to decide the issue. In deciding whether a demand on the board of directors was excused, the court noted that no court had ever decided the issue. Thus, the court did not hold that stock ownership in illegal gambling businesses was lawful; it merely held that because the issue was one of first impression, the complaint failed to allege that defendants knew such ownership was illegal. *See also*, *Wodka v. Causeway Capital Mgmt. LLC,* No. BC463623 (Cal. Super. Ct., May 20, 2013) (unpublished).

### C.    A Corporation Is Owned by Its Shareholders

"[A] corporation is owned by its shareholders." *Sugule v. Frazier*, 639 F.3d 406, 412 (8th Cir. 2011). If Defendants' argument were accepted, *nobody* could

6

"own" "all or part" of a corporation. Such an interpretation would eviscerate § 1955 by making it possible to "own" illegal gambling businesses by the simple expedient of setting up a corporation through with to conduct the business.

Defendants argue that a shareholder of Coca-Cola is not ordinarily said to "own" Coca-Cola. They cannot deny, however, that according to the common usage of the term, Coca-Cola is "owned" by its shareholders and a shareholder of Coca-Cola "owns" "part" of Coca-Cola.

### D.    The Rule of Lenity Does Not Apply

In construing criminal statutes, courts "must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997). Where, as here, the statutory language is clear, courts may not resort to narrowing constructions. *Boyle v. United States*, 556 U.S. 938, 950-51 (2009).

### E.    Section 1955 Is Consistent With Corporate Law

Defendants argue that holding them liable would violate corporate law principles that shield shareholders from liability. Section 1955 does not make shareholders of an illegal gambling business *vicariously* liable for the crimes of the illegal gambling business they own; rather it makes them *primarily* liable for their own *distinct crime* of owning part of the illegal business itself. The statute is entirely consistent with principles of corporate law.

## F.    Section 1955 Contains No Exception for "Passive" Owners

Nothing in the language of § 1955 supports the existence of an exception for "passive" owners. The prohibition against ownership of illegal businesses is a codification of the bedrock common law principle that it is wrongful for one person knowingly to profit from the wrongdoing of another. *See Jackson v. Smith*, 254 U.S. 586, 589 (1921). It was perfectly rational for Congress to prohibit passive profiteering.

Defendants argue that because some forms of conduct proscribed by § 1955 ("conducts", "manages", "supervises", and "directs") involve active participation in gambling, "owns" should be judicially limited to ownership that involves active participation. Defendants' premise is flawed. Section 1955 prohibits "finance[ing]" illegal gambling businesses. Financing is passive. Thus, two of the six forms of conduct proscribed by the statute are passive. The statute unambiguously prohibits both passive and active conduct. *See United States v. Hawes*, 529 F.2d 472, 478 (5th Cir. 1976) ("we find no requirement that defendants must themselves engage in the act of illegal gambling").

*Ejusdem generis* and *noscitur a sociis* are inapplicable. "Owns" is not a *general* word that *follows* a specific enumeration. It is a *specific* word that is *part of* the enumeration. *See United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000). In *Wash. State Dep't of Soc. & Health Svcs. v. Keffeler*, 537 U.S. 371, 384-85 (2003),

the Court rejected an overly broad interpretation of a "catch-all" provision. "Owns" is not a catch-all.

Finally, the Court should avoid a construction that would render the words "owns" and "finances" redundant. *Exxon Corp. v. Hunt*, 475 U.S. 355, 369-70 (1986). "Conducts", "manages", "supervises", and "directs" constitute all possible forms of active involvement in gambling other than as a bettor. If "finances" and "owns" were construed to require active participation, then both words would be rendered redundant.

### G.    The Legislative History Does Not Support Defendants' Interpretation

Defendants misleadingly quote a statement in the legislative history that § 1955 was intended to reach "only those persons who prey systematically on our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern." That statement relates to the definition of "illegal gambling business," which defines the nature and size of the gambling organizations targeted by Congress. 18 U.S.C. § 1955(b)(1). The businesses in which Defendants invested easily meet that definition. The statement in the legislative history does not mean that only large, syndicated entities can be guilty of violating § 1955. Section 1955 "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria v. United States*, 437 U.S. 54, 70 at n.26 (1978). Even waiters and janitors are subject

9

to criminal liability under the Act. *United States v. Merrell*, 701 F.2d 53 (6th Cir 1983). Defendants are more culpable than waiters and janitors.

### H.   Section 1955 Contains No Exception for Criminal Enterprises Traded on Foreign Stock Exchanges

Section 1955 contains no exception for ownership of illegal businesses whose shares are traded on a foreign stock exchange. Defendants' proposed judicially-created loophole for illegal businesses listed on foreign exchanges would effectively legitimize off-shore havens for illegal conduct, and it would effectively permit foreign stock exchanges to undermine U.S. law by giving criminal enterprises access U.S. investment capital.[2]

Defendants ask rhetorically what would happen if a Parisian purchased shares abroad and later moved to New York. The answer is simple. The Parisian would have to divest himself of ownership in the criminal organization (and he would also have to leave behind any illegal narcotics or other contraband that he might have acquired abroad).

### I.   This Case Involves No Extraterritorial Application of U.S. Law

*Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010), held that the U.S. securities laws do not apply to *purchases or sales* of securities that take place

---

[2] The illegal gambling businesses traded *only* on foreign stock exchanges and *not* in the U.S. because the U.S. government considered them to be criminal organizations. (A-348-49)

outside the U.S. However, §1955 it is not concerned with the integrity of transactions involving the purchase or sale of securities. Instead, it proscribes *ownership* of businesses that are violating U.S. laws. The Fund is a Delaware entity located in New York. Its ownership of the illegal gambling businesses occurred here. The illegal gambling also occurred here. Thus, Appellant does not rely on any extraterritorial application of U.S. law; rather, he seeks to apply U.S. law to conduct that occurred in the U.S.

Section 1955's prohibition against persons in the U.S. owning stock in companies whose primary business is to violate U.S. criminal law – even if the stock lawfully trades on a foreign country's stock exchange – is no more a violation of the foreign country's sovereignty than it would be a violation of a foreign country's sovereignty to prohibit individuals from bringing into this country contraband lawfully purchased abroad.

### J.    Appellant Need Not Prove That Defendants Violated State Criminal Laws

To establish that Defendants violated § 1955 and RICO, Plaintiff need not prove that *Defendants* violated state criminal law. Violations of state criminal law are only relevant under § 1955 and RICO with respect to the operations of the illegal gambling businesses in which Defendants invested. 18 U.S.C. § 1955(b)(1).

In any event, Defendants violated state criminal law. Under N.Y. Penal Law § 225.00(5), "[a] person 'profits from gambling activity' when, other than as a

11

player, he … participates … in the proceeds of gambling activity." The only reason the Fund did not violate § 225.05, is that it *lost* money instead of profiting. The *attempt* to profit from illegal gambling, however, was a violation of Penal Law § 110.00 (attempt). By causing the Fund to attempt to violate § 225.05, Defendants violated Penal Law § 100.00 (criminal solicitation). By conspiring to seek to profit from illegal gambling Defendants violated Penal Law § 100.00 (conspiracy).

### K.    Section 1955 Creates No Liability for Inadvertent Conduct

There is no danger that those who obtain stock "inadvertently" might be rendered felons. Someone who "inadvertently" receives such stock would lack the necessary *mens rea* to be held criminally liable.

## II.    DEFENDANTS VIOLATED THEIR COMMON LAW DUTIES

### A.    Defendants Committed Negligence

Defendants argue that they were not negligent because they were entitled to make risky investments. Appellant does not merely complain that the risk versus reward metrics of investing in these criminal enterprises was too high; rather, he contends that such investments were *inherently* improper. As a matter of public policy, it is wrongful for fiduciaries to take the risks associated with investing in criminal activity. *See La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 352 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013)

Defendants rely on *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009), for the proposition that the "mere fact that a company takes a business risk and suffers loss ... does not evidence misconduct ...." In *Citigroup,* however, defendants were sued for investing in sub-prime mortgages. Investing in sub-prime mortgages is not a crime, and it does not violate the principle that prohibits one party from profiting from the wrongdoing of another. Owning part of illegal gambling businesses is a crime and it is a form of profiting from wrongdoing.

Contrary to Defendants' argument, Appellant's claims are based not on hindsight but on what Defendants knew before they made the illegal investments.

### B.      Defendants Were Negligent Per Se

"'The violation of federal statutes and regulations is commonly given negligence *per se* effect in state tort proceedings.'" *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318 (2005). There are countless cases involving negligence *per se* based on statutes that create no private cause of action. For example, there is no private cause of action against a driver who passes a stopped school bus, but a driver who passes a stopped school bus and injures a schoolchild may be held liable for negligence *per se. See, e.g., Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972). The cases upon which Defendants rely merely held that there was no private cause of action under the particular statutes at

issue. None of them involved a claim of negligence *per se*. Defendants' argument, if accepted, would abolish the law of negligence *per se*.

To support negligence *per se*, recovery need only be "consistent" with the legislative scheme. *See Sammons*. Appellant's claim of negligence *per se* is entirely consistent with the legislative scheme of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (the "OCCA"), under which § 1955 and RICO were both enacted. The OCCA sought to address "harm to innocent investors" and the corruption of "legitimate businesses" in connection with "syndicated gambling." 84 Stat. 922-923. That is what we have here. Appellant's claim is also consistent with the New York Penal law, which expressly prohibits profiting from illegal gambling activity.

### C.    Defendants Violated RICO

Contrary to Defendants' argument, the complaint alleges open-ended continuity because Defendants' conduct posed a threat of continuing criminal activity that was halted only because of law enforcement activity. *See, e.g., United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) ("lack of a threat of continuity …cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict"). The complaint also alleges closed-ended continuity based on the number of times and length of time during which Defendants invested in illegal gambling businesses.

14

The Court need not reach the RICO causation issue on this appeal because the district court did not decide it. If the Court accepts Defendants' invitation to do so, however, we submit that the issue is governed by the Court's opinion in *Ideal Steel Supply Corp. v. Anza*, 652 F. 3d 310, 326 (2d Cir. 2011), and not its summary orders in *McBrearty* and *Seidl*.

### D.    Defendants Breached Their Fiduciary Duties

Delaware law allows the simultaneous assertion of breach of fiduciary and breach of contract claims. *See, e.g., PT China LLC v. PT Korea LLC*, 2010 WL 761145 (Del. Ch. Feb. 26, 2010). Relying on *Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010), Defendants argue that the breach of fiduciary claim must be dismissed. In *Nemec*, however, the contract "superseded and negated any distinct fiduciary duties" arising from the same conduct. *Id.* The duties at issue in *Nemec* arose purely from the contract and thus were "intended to be defined solely by reference to that contract." *Id*. That is not the case here.

Contrary to Defendants' denials, the complaint alleges sufficient facts to support the inference that they knew that what they were doing was wrong. These include warnings from the DOJ that supporting illegal gambling was *itself* a crime; newspaper articles warning of the illegality; prospectuses disclosing that the DOJ considered these businesses to be illegal; and prosecutions not just of illegal

15

gambling businesses, but also companies that provided any degree of support to them (such as running advertisements and processing payments).

Defendants' self-serving professions of ignorance of the law must be disregarded. Everyone is presumed to know the law – including mutual fund fiduciaries.

Trustees argue that the complaint fails to adequately allege *their* knowledge of the illegal investments. To the contrary, the complaint alleges that they had such knowledge. (A-39-40) Indeed, Trustees admit that they knew about what was being invested based on their Performance Review Committee and that at least one report identified NETeller and 888 as among the top ten worst performers in the entire portfolio. (AII-456) The complaint plausibly alleges that these "watchdogs" were at least reckless. (A-40)

Advisors claim that Section 9 of their Management Agreement excuses them for any "error of judgment or mistake of law." (A-250) The agreement does not excuse a purported "mistake" or "error of judgment" that constitutes "willful misfeasance, bad faith or gross negligence," (*id*.) which is what the complaint alleges. (A-51 ("Defendants' conduct was willful, wanton or reckless")) Moreover, Section 1.1 of the agreement specifically charges them to carry out their duties with respect to the Fund's investments "in accordance with applicable law." (A-

246) This specific provision takes precedence over the more general ones purporting to exculpate them from liability.

### E.   Defendants Committed Waste

Defendants argue that the complaint fails to state a claim for waste because there is no allegation that they over-paid. Under Delaware law, the question is whether the "investments" are properly characterized as the use of corporate assets for an "improper" or "unnecessary" purpose. *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). Here, the complaint alleges that the investments were improper and unnecessary. (A-61)

### F.   The Fund's Overall Performance Cannot Insulate Defendants from Liability

"Even where the defendant's actions cause both a detriment and a benefit to the plaintiff, the value of the benefit offsets the detriment only when the benefits accruing to the plaintiff are sufficiently proximate to the wrong alleged and occur during the period of damage." *Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 *413 (Del. Ch. 1986). The gains on Defendants' profitable investments were completely unrelated to the losses suffered on their illegal investments.

### G.   The Claim of Breach of the Management Agreement Was Within the Scope of Appellant's Demand

A demand encompasses "all legal theories arising out of the set of facts described in the demand letter." *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del.

1996), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Appellant's contract claim arises from the same facts as his other claims.

### III. APPELLANT'S ALLEGATIONS RAISE A "REASONABLE DOUBT" THAT THE BOARD FAILED TO ACT INDEPENDENTLY, IN GOOD FAITH AND WITH DUE CARE

A motion to dismiss based on demand refusal may not be granted in the face of allegations "creating a reasonable doubt" that "the board acted independently or with due care in responding to [a] demand." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The "reasonable doubt" standard is intended to be liberal and "sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.* at 1217.

Defendants therefore bear the heavy burden of demonstrating that Appellant's allegations do not create a "reasonable doubt" that the Board responded to Appellant's demand "in good faith" after "reasonable investigation" and with "due care." *See Grimes*, 673 A.2 at 1219; *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997) ("independence" requires "good faith" and "reasonable investigation").

### A. The Complaint's Allegations Concerning Defendants' Attempt to Improperly Cause the Forfeiture of Appellant's Claims and Withholding of the Disputed Tolling Agreements Are Sufficient to Raise a "Reasonable Doubt" Concerning the Board's Independence and Good Faith

The most telling evidence of the Board's lack of good faith in responding to Appellant's demand is its attempt to engineer a forfeiture of Appellant's claims through the running of the statute of limitations while refusing to disclose the alleged tolling agreements that they represented to a federal judge would be executed to preserve Appellant's claims.

Defendants do not contest that each of the following facts, if true, would be independently sufficient to create a "reasonable doubt" concerning the Board's independence and good faith: (1) intentionally trying to cause the forfeiture of claims by allowing the expiration of the statute of limitations; (2) making misrepresentations to the court concerning the existence of tolling agreements that did not, in fact, toll the statute of limitations; and (3) interposing a statute of limitations defense while intentionally withholding a tolling agreement that would defeat that defense. The allegations in paragraphs 120 through 126 of the Complaint (A-54-55), the record of Defendants' actions in the district court, and the reasonable inferences therefrom, are sufficient to support all three of those factual conclusions.

Defendants seek to avoid the implications of their actions and statements about the tolling agreements by claiming they *did* procure tolling agreements, even if they have never shown them to anybody. But that is a mere unproven allegation, which may not be considered on a motion to dismiss. Furthermore, Defendants' unproven allegation is implausible. If effective tolling agreements *did* exist, it is difficult to understand why Defendants insist on concealing them from the Court. In support of their Rule 12(b)(6) motions, Defendants submitted six declarations, forty-three (mostly irrelevant) exhibits, and six post-briefing supplemental letters to the court. Their failure to submit the alleged tolling agreements – a central point of contention between the parties – is compelling proof that no effective agreements exist.

Either effective tolling agreements do not exist, and Defendants have made materially misleading statements to Judges Sand and Griesa, or the disclosure of the documents would have exposed Defendants' affirmative defense based on the statute of limitations as meritless. In either case, there is certainly more than a reasonable doubt that Board was unreasonably hostile to Appellant's claims and acted in bad faith to scuttle those claims to evade judicial review.

Defendants assert that they did not actually "promise" Judge Sand that they would execute effective tolling agreements. That is an evasion. Defendants convinced Judge Sand to rule in their favor – dismissing Appellant's case without

prejudice rather than staying it – by leading him to believe that tolling agreements were being "finalized." (Tr. Br. at 45, *quoting* 1:10-cv-06234-LBS at Doc. #39; *see* A-130-51)

In any event, Trustees' hair-splitting does not help them, because whether they "promised" or merely "represented" that tolling agreements would be executed, their failure to do so, coupled with their refusal to provide documents to substantiate their representations, are sufficient to create a reasonable doubt concerning their independence and good faith.

Appellant's claim that the board intentionally delayed its investigation to extinguish Appellants claims is supported by particularized allegations:

- Defendants were notified that Appellant's claims faced statute of limitations concerns and there was therefore a need to preserve them from forfeiture.

- Defendants represented to a federal court that they would obtain tolling agreements, and therefore a stay was unnecessary to preserve such claims while the Board considered Appellant's demand.

- Despite their representations, Defendants refused to respond for over *six months* to Appellant's inquiry or otherwise confirm that tolling agreements had been secured before this action was filed.

- Some of Plaintiff's claims could have been barred by the statute of limitations on August 25, 2011 had Plaintiff not filed this action by August 24, 2011.

- Defendants refused to provide the tolling agreements while at the same time making inconsistent arguments that Appellant's claims are time barred.

(A-53-55) From these and the other facts alleged, and from the record of the prior proceedings of this litigation, it may reasonably be inferred that the Board was deliberately allowing the statute of limitations to expire before acting on Appellant's demand.

Defendants argue that Appellant himself created the statute of limitations issue by deliberately refusing to make demand for years. That is not a fair accusation. Appellant had a well-founded belief that a demand would be futile, and he proved to be right. In any event, his delay would not relieve Trustees of their duty to act with independence and good faith in responding to the demand. They were well aware of the limitations issue, and they had years to deal with it. After Defendants told Judge Sand that they would execute tolling agreements, they refused to communicate with Appellant for *six months* until after the limitations period would have expired.

Recognizing the inherent inconsistency of interposing the affirmative defense of the statute of limitations while at the same time asserting that effective tolling agreements were in place, Defendants attempt to fine tune their statute of limitations argument by stating that they were merely arguing that the Amended Complaint filed on July 16, 2012, would not be protected under the relation back

doctrine, Fed. R. Civ. P. 15(c) even though the court below provided in its June 12, 2012 order that Appellant could re-plead. (A-18-19, at Doc. # 49; SPA-12) Re-pleading was made necessary to account for *Defendants' belated decision* to refuse the demand one month *after* Defendants' motions to dismiss the original complaint had been fully briefed. (*Compare* A-18 at Docs. # 44 & 45 *with* A-452)

Defendants' statute of limitations argument lacks merit. The Amended Complaint was timely under the relation back provisions of Fed. R. Civ. P. 15(c) *and* under the savings provision of 28 U.S.C. § 1367(d). The June 12 Order was modified on June 15, 2012 (A-18). The amended complaint was timely filed on Monday, July 16, 2012. (A-19)

Even assuming, *arguendo*, that Defendants' arguments are valid, their excuse still does not add up. According to Defendants, they told Judge Sand on April 7, 2011 that they had initiated steps to execute tolling agreements even *before* Appellant made a demand on February 17, 2011 – and they implied that fully executed agreements were being finalized. (*See* Tr. Br. at 45) If that were true – and assuming that effective tolling agreements were executed within a reasonable time after Defendants made their representation to Judge Sand – then at the *very least*, Appellant's claims must have been tolled until the Board finished its investigation thirteen months later on March 16, 2012. Yet, Defendants argue before *this* Court that filing the amended complaint even *one day* after the district

23

court's June 12 Order was finally entered on June 15, 2012 would be time barred. (Adv. Br. at 50 & n. 118; Tr. Br. at 46-47 at n. 24) The reason, according to Defendants, is that the Amended Complaint was filed *exactly four months* after the Board concluded its investigation and refused the demand. (Tr. Br. at 46-57, n. 24).

What happened to the remaining (purported) tolling period?[3] Defendants do not explain. Any mystery could have been easily resolved if Defendants disclosed the purported tolling agreements. The reasonable inferences from Trustees' stubborn refusal to disclose them is that they either have made misrepresentations to the courts concerning their existence, or they have knowingly made meritless statute of limitations arguments – for the improper purpose of shielding their actions from judicial review.

Defendants also argue that plaintiffs are generally not entitled to discovery at this stage of the proceedings, but that is beside the point. The relevant issue is whether Defendants' concealment raises a reasonable doubt concerning their independence, good faith and due care.

Finally, even if the parties' factual dispute were properly resolved in favor of Defendants, their *continued withholding* of the tolling agreements demonstrates an unreasonable hostility to Appellant's demand that can fairly be characterized as a

---

[3] There are four and a half months from Defendants' representation to Judge Sand on April 7, 2012 to the expiration of the statute of limitations on August 25, 2011.

lack of good faith and independence. A reasonable investor would harbor a reasonable doubt that such stonewalling by fiduciaries demonstrates that they are not truly looking after investors' best interests – much less behaving as neutral decision-makers. This too suffices to raise a "reasonable doubt."

### B. Appellant's Other Allegations Are Sufficient to Raise a "Reasonable Doubt" Concerning the Board's Lack of Independence, Good Faith and Due Care

There are two categories of additional conduct or conflicts of interest that, individually or in combination with other allegations in the Complaint, are sufficient to raise a reasonable doubt concerning the Board's independence, good faith and due care.

The first category includes the complaint's allegations concerning the Board's conduct after Appellant made his demand. There is no dispute that this category of conduct or conflicts may be properly considered by the Court.

First, Trustees are not entitled to deference under the business judgment rule because they did not give the SLC final authority. Defendants do not deny that the courts in *Spiegel v. Buntrock*, 571 A.2d 767, 770 (Del. 1990), and *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003), carefully noted that the SLC in those cases held final authority. Nor do they deny that many courts, interpreting Delaware law, agree that an SLC must be given final authority to be afforded deference. *See, e.g., In re Par Pharm, Inc. Derivative Litig.*, 750 F. Supp.

641, 646 (S.D.N.Y. 1990) (*citing* Delaware cases); *accord Janssen v. Best & Flanagan*, 662 N.W.2d 876, 884 (Minn. 2003).

Defendants' principal response is that there is a distinction between demand required and demand excused cases in examining the conduct of a litigation committee. That is a distinction without a difference. Although there appear to be different presumptions applicable in each situation, that distinction makes no difference here. Any presumption of independence may be rebutted on a motion to dismiss by *any* allegation that is sufficient to create a "reasonable doubt" concerning it. *Grimes*, 673 A.2 at 1219.

Defendants rely on *Beam v. Stewart*, 845 A.2d 1040, 1054-55 (Del. 2004), but the court refrained from deciding "whether the substantive standard of independence in an SLC case differs from that in a pre-suit demand case." *Id.* at 1055. Defendants also cite *Oracle*, 824 A.2d 917, but that case undermines Defendants' argument because there was no determination that demand was excused.

Defendants also argue that in Delaware, demand excused cases are subject to enhanced scrutiny under *Zapata Corp. v. Maldonado,* 430 A.2d 779, 788 (Del. 1981), and therefore the standards between demand excused and demand required cases are different. Although *Zapata* was a demand excused case, its first prong – analyzing a board's demand refusal for "independence, good faith and []

26

reasonable investigation," *see* 430 A.2d at 788-89 – is generally applicable to all demand refused cases (even when demand is not futile). *See Spiegel*, 571 A.2d at 778 (confirming the first prong of *Zapata* is appropriate for determining whether demand has been improperly refused generally and that *Zapata's* second prong is limited to "demand excused" cases only). None of Appellant's cases relied on *Zapata's* second prong – which requires a court to make an independent determination of the substance of an SLC's conclusion, in the relevant portions of their decisions.

Second, Trustees failed to conduct a reasonable investigation, including the lack of transparency in the process and the complete lack of involvement by the SLC in critical portions of the investigation. Contrary to Defendants' mischaracterizations, Appellant does not seek to "dictate the manner" of the Board's investigation. (Tr. Br. at 33)

*Boland v. Boland*, 31 A.3d 529, 561 (Md. 2011), extensively analyzed Delaware law concerning what specific allegations of conduct are sufficient to create a reasonable doubt concerning the board's independence, good faith and due care. *Boland's* thoughtful analysis concerning what is minimally required by boards to gain the protection of the business judgment rule under Delaware law confirms that Trustees flunked the relevant tests, as specifically alleged in Paragraphs 132-135 of the Complaint. (A-366-67)

Defendants argue that *Boland* should be disregarded because it was decided under Maryland law. However, *Boland* specifically adopted a standard "indistinguishable" in relevant part to Delaware law applicable to demand refusal cases, *Boland,* 423 Md. at 346 & n. 37. Moreover, *Boland* is the only case cited by the parties to consider demand refusal standards in light of the "national trend" by courts to require derivative plaintiffs to make demands in all but the most extraordinary cases by limiting the circumstances that will be accepted as excusing demand. That evolution in the law is based on the theory that (i) plaintiffs should be encouraged to make pre-suit demands because that allows boards the opportunity to reconsider a challenged transaction and (ii) any conflicts faced by board members can be addressed by delegating decision-making authority to a special litigation committee. *Boland*, 31 A.3d at 551 & n.25.

Defendants argue that the SLC members' complete absence from *any* interviews or investigation and *complete* delegation to outside counsel is permissible. The cases they cite, however, merely stand for the unremarkable proposition that it is appropriate to delegate *some* of the investigative responsibilities to counsel.

Defendants say that Appellant is merely complaining that the Board failed to communicate with him frequently enough. To the contrary, Appellant was

completely excluded from the investigation and completely denied access to the evidence it produced.

Defendants misleadingly suggest that they kept Appellant informed of their progress because they "wrote plaintiff on August 30, 2011 and informed him of the board's investigation." (Tr. Br. at 39) But they did that only *after* this action had been filed on August 24, 2011.

The second category of conduct and conflicts alleged in the complaint are those that existed at the time that Appellant made his demand. The district court refused to consider any of these allegations on the mistaken belief that making a demand waives a shareholder's right to challenge the board's independence. Given the trend requiring derivative plaintiffs to make a demand even on interested boards – thus allowing the board to address any issues concerning their independence by forming a truly independent SLC with final decision-making authority – there is no longer any rational justification for affording preclusive effect to the making of a demand. *See, e.g., Seidl*, 2012 WL 7986873, at *8. The most recent authority from Delaware confirms this. *La. Mun. Police Employees' Retirement Sys.*, 46 A.3 313, 333 & n.12 (Del. Ch. 2012). Defendants dismiss *La. Mun. Police* on the ground that it was reversed, but they fail to acknowledge that it was reversed on unrelated grounds. *See Pyott*, 2013 WL 1364695, at *3 (Del. Apr. 4, 2013).

Defendants do not deny that serving on the boards of entities with adverse interests does *in fact* create a conflict of interest. Instead, Defendants ask the Court to ignore this conflict by saying that service on multiple boards is a prevailing practice in the industry. The fact that it is a prevailing practice in the mutual fund industry is a reason for *heightened* vigilance because of the conflicts of interest that such practice creates. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984), confirms that the primary regulatory statute for mutual funds, the Investment Companies Act, 15 U.S.C. § 80a-35(b), reflects a strong federal policy that contemplates a primary role for shareholder investors in protecting the fund from wrongdoing by its fiduciaries and the inherent conflicts faced by mutual fund boards. The "inherent conflicts" identified by the Supreme Court is precisely the "prevailing practice" that Defendants say this Court should ignore.

Appellees attempt to dismiss *Daily Income* by arguing that the case involved a claim for excessive fees under § 36(b), and the Supreme Court in that case held that claims under § 36(b) are not corporate claims. Defendants' argument ignores the *reasoning* of *Daily Income*. The Supreme Court held that claims under § 36(b) could be brought by shareholders "on behalf of" the fund without making a pre-suit demand (and not directly by the fund itself) because Congress did not trust mutual fund fiduciaries to adequately protect investors from wrongdoing by fund fiduciaries – particularly mutual fund directors. *See* 464 U.S. at 536-537.

30

Defendants' reliance on *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006), and *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 329-31 (4th Cir. 2001), is misplaced. Those cases concerned whether demand should be excused by virtue of the fact that mutual fund directors receive *high compensation* for sitting on multiple boards. While such compensation does not necessarily make board members so conflicted that they cannot sit on the board at all or respond to a demand (for example by appointing an independent committee), that does not mean that such compensation is irrelevant when considering their fitness to actually make the ultimate decision, particularly when they choose to appoint SLC members who have this same conflict of interest.

## IV.    APPELLANT AND HIS COUNSEL ARE ADEQUATE REPRESENTATIVES

Appellant's counsel have zealously advocated the interests of mutual fund investors who have suffered massive losses at the hands of irresponsible fiduciaries. Every factual allegation in Appellant's complaint is true. Every legal argument he has made is well grounded in law. Every procedural course he has followed was one he was entitled to pursue. If Appellant is correct on the merits, then there is no reason to doubt the adequacy of his representation. If Appellant is wrong on the merits, then the question of adequacy will be moot.

## CONCLUSION

The Judgment should be reversed.

Dated:  July 31, 2013

_____
Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404
tsheridan@hanlyconroy.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). As counted by Microsoft Word, this brief contains 6,934 words exclusive of the Table of Contents and Table of Authorities.

Dated:  July 31, 2013

_____

Thomas I. Sheridan, III